**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| CTN Holdings, Inc., *et al.*,[1] | Case No. 25-10603 (TMH) |
| Debtors. | (Jointly Administered) |
| | |
| JAMI B. NIMEROFF, as chapter 7 trustee for CTN Holdings, Inc., *et al.*, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 26-50233 (TMH) |
| DONALD R. KARR; MILLER FAMILY LEGACY LLC; LOUIS R. MILLER; ALS REVOCABLE TRUST; EMERGING IMPACT FUND II, LP; PRAESUMO HOLDINGS, LLC; RAVI SARIN; PAUL SOROS 2010 FAMILY TRUST A; CHICAGO ATLANTIC FINANCE LLC; CHICAGO ATLANTIC CREDIT COMPANY, LLC; and CHICAGO ATLANTIC OPPORTUNITY FINANCE LLC, | |
| Defendants. | |

**DECLARATION OF LOUIS R. MILLER IN SUPPORT OF KARR ACTION
PLAINTIFFS' OBJECTION TO CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY
OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
PURSUANT TO SECTIONS 105(A) AND 362(A) OF THE BANKRUPTCY CODE
AND RULE 7065 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

I, Louis R. Miller, hereby declare that the following is true and correct to the best of my

knowledge, information and belief:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are CTN Holdings, Inc. (9122), CTN SPV Holdings, LLC (8689), Make Earth Green Again, LLC (4441), Aspiration QFZ, LLC (1532), Aspiration Fund Adviser, LLC (4214), Catona Climate Solutions, LLC (3375) and Zero Carbon Holdings, LLC (1679). The mailing address for the Debtors is 548 Market Street, PMB 72015, San Francisco, CA 94101-5401.

1.      I am over twenty-one (21) years of age, and I am fully competent to make this declaration.  Except as otherwise stated in this declaration, all facts set forth herein are based on my personal knowledge, and my review of the relevant documents.  If called as a witness, I could and would competently testify to the matters stated herein.  I am an attorney licensed to practice law in the State of California and several U.S. District Courts, Courts of Appeals, and the U.S. Supreme Court.  I have practiced law for over fifty years and have tried over a hundred cases as a trial attorney.

**The Karr Action**

2.      I and Miller Family Legacy, LLC ("Miller LLC") are two of the Karr Action Plaintiffs[2] in the lawsuit *Donald Karr et al. v. Joseph Sanberg et al.*, pending in the Superior Court of the State of California, County of Los Angeles, Case No. 25STCV20376 (the "Karr Action"). I also serve as counsel for the Karr Action Plaintiffs in the lawsuit.

3.      The claims asserted by myself, Miller LLC and each of the other Karr Action Plaintiffs in the lawsuit arise out of and depend upon our individual, personal reliance on specific misleading misrepresentations and omissions by Defendant Joseph Sanberg who was supported by the other Defendants in his scheme.  I personally spoke with Mr. Sanberg on a number of occasions, and I relied on what he told me when I invested in Aspiration Partners, Inc., n/k/a CTN Holdings, Inc. ("Catona").

4.      Catona was not publicly traded (though it had planned to go public via a reverse merger with a Special Purpose Acquisition Company (or "SPAC")).  This meant that when I invested, I could not rely on the public markets to determine whether I should invest and whether that price was a good one.  I had to rely on what I learned from Mr. Sanberg and the information he provided me.

5.      The pleadings in the Karr Action set forth how the other investor Karr Action Plaintiffs with whom I brought the Karr Action were similarly induced to invest by Mr. Sanberg

---

[2]     Capitalized terms not defined herein shall have the meanings attributed to them in the Objection.

and, in some cases, others working with him.   The lawsuit is about specific misleading representations and omissions made to each investor, which each investor, including me, personally relied upon.  This is set forth at paragraphs 130 to 167 of the First Amended Complaint, which includes allegations of reliance individual to each of the Karr Action Plaintiffs.

6.      To help illustrate the personal nature of these claims, I lay out my experience as an investor below.  A true and correct copy of the First Amended Complaint (the "Complaint"), which is the operative pleading in this case, is attached as **Exhibit A**.

**My Personal Experience**

7.      In or about 2020, I was introduced to Mr. Sanberg.  We spoke on multiple occasions regarding my investing in his company—Catona.  Mr. Sanberg told me that he was Catona's founder and largest shareholder and that the company was doing well and had a bright future.

8.      When Mr. Sanberg and I spoke, he made representations to me to the effect that Catona was a successful, legitimate business in the area of financial technology—a financial institution with environmentally friendly products and thus appealing to a large segment of the market.  As a direct result of these conversations, I caused Miller LLC to purchase 73,443 Series C preferred shares of Catona for $1 million.  He told me that Catona had major customers and investors who believed in, and supported, the business.

9.      I continued to speak with Mr. Sanberg, and he continued to update me on the company and how it was doing.  In or about 2023, Mr. Sanberg pitched me on the purchase of further shares of Catona through Mr. Sanberg's company, AGO Special Situations, LP ("AGO").  At this time, Mr. Sanberg made representations to me to the effect that Catona continued to be a strong, growing company, that was transitioning into the carbon credit business.  Mr. Sanberg represented to me that, among other things, Catona's carbon credit portfolio was valued in the millions of dollars and that the company had numerous blue chip clients such as Microsoft, Facebook, Deloitte, Steve Ballmer, the L.A. Clippers and many others.

10.      Mr. Sanberg also sent me financial statements for Catona that looked very strong. I now know, from what was revealed last year, that he grossly overstated Catona's financial

success and assets. A true and correct copy of the financial statements Mr. Sanberg gave me are attached hereto as **Exhibit B**.

11. Mr. Sanberg told me these financial statements had been approved by the Board of Directors (including its Chair, Defendant Nate Redmond) and Catona's auditors. I did not know at the time, but now know, that these financial statements overstated Catona's assets, revenues and profits by many millions of dollars.

12. As a direct result of these communications, I purchased 50,000 preferred shares of Catona, through AGO, for $500,000 in or about 2023. At this time and earlier, I had no idea Mr. Sanberg was lying to me. I trusted and relied on what he told me and gave me.

13. At no point during these communications with Mr. Sanberg did he ever tell me that he was generating fake customers and revenue for Catona's business. Nor did he ever tell me he was making a deal with Mr. Ballmer whereby Catona would funnel $48 million of "endorsement" money to the Clipper's star player, Kawhi Leonard. To the contrary, he told me that he had a close relationship with Mr. Ballmer and that he was a major investor and supporter of Catona and believed strongly in its business.

14. I would never have invested in Catona if I had known what Mr. Sanberg was doing with sham customers, what he was doing with Mr. Ballmer and Mr. Leonard, or about his fraudulent financial statements – all of which was done with the support of the other Defendants who knew what Mr. Sanberg was doing and concealed that he was engaged in fraud. Had I known the truth, I would not have invested at all, or would have immediately taken action to minimize Miller LLC's and my losses. This is the basis of my claims in the Karr Action.

15. I was directly and personally defrauded by the Defendants. I want my day in court in the lawsuit I filed to recoup my losses. The claims belong to me and my family trust. None of the Defendants in the lawsuit are in bankruptcy.

**Other Clients**

16. I personally interviewed our other clients who are Karr Action Plaintiffs in the lawsuit we filed. They, like me, invested based on their communications with Mr. Sanberg and

the other Defendants' conduct that contributed to the scheme.   They invested under similar circumstances, based on their personal interactions with Mr. Sanberg and other Defendants, as set forth with more specificity in the Complaint.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 28th day of April 2026, at Los Angeles, California.

*/s/ Louis R. Miller*
Louis R. Miller

**EXHIBIT A**

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
COLIN H. ROLFS (State Bar No. 280654)
crolfs@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:    (310) 552-4400
Facsimile:    (310) 552-8400

Attorneys for Plaintiffs

**FILED**
Superior Court of California
County of Los Angeles
11/03/2025
David W. Slayton, Executive Officer / Clerk of Court
By: _____ Deputy
K. Ghazarian

Electronically Received 11/03/2025 04:52 PM

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| DONALD R. KARR; MILLER FAMILY LEGACY LLC; LOUIS R. MILLER; ALS REVOCABLE TRUST; EMERGING IMPACT FUND II, LP; PRAESUMO HOLDINGS, LLC; RAVI SARIN; PAUL SOROS 2010 FAMILY TRUST A; CHICAGO ATLANTIC FINANCE LLC; CHICAGO ATLANTIC CREDIT COMPANY, LLC; and CHICAGO ATLANTIC OPPORTUNITY FINANCE LLC,<br><br>              Plaintiffs,<br><br>       v.<br><br>JOSEPH SANBERG; AGO SPECIAL SITUATIONS, LP; STEVEN BALLMER; BALLMER GIVING LLC; IBRAHIM ALHUSSEINI; NATE REDMOND; ALPHA EDISON MANAGEMENT COMPANY, LLC; DAVID ARANOFF; BAKER HOSTETLER LLP; KPMG LLP; ALVAREZ & ASSOCIATES, INC.; BDO USA, P.C.; MICHAEL ELLIS; INHERENT GROUP, LP; and DOES 1 through 30,<br><br>              Defendants. | **CASE NO. 25STCV20376**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1)  FRAUD**<br><br>**(2)  AIDING AND ABETTING FRAUD**<br><br>**(3)  VIOLATION OF PENAL CODE § 496**<br><br>**(4)  VIOLATION OF CALIFORNIA CORPORATE SECURITIES LAW**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Assigned for All Purposes to:<br>Hon. Tony L. Richardson, Dept. 39<br><br>Action Filed:    July 9, 2025<br>Trial Date:      None Set |

755829

FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................4

PARTIES .................................................................................................................................6

VENUE AND JURISDICTION ..............................................................................................8

FACTUAL ALLEGATIONS ...................................................................................................9

    A.    Catona ..................................................................................................................9

    B.    Defendants' Fraudulent Schemes .........................................................................9

        1.    Sanberg Makes A Corrupt Deal With Steve Ballmer ...............................10

        2.    Sanberg Borrows Millions From Investment Funds Using Phony Financial Statements ..............................................................................16

        3.    Sanberg Creates Sham Customers To Inflate Catona's Revenue ...............17

        4.    Catona Issues Phony Financial Statements, Supported By Its Accountants, For Its SPAC Merger ..............................................................18

        5.    Defendants Directly Provide False Financials To Plaintiffs, Aided And Abetted By BDO ........................................................................19

    C.    The Other Defendants Assisted and Concealed Sanberg's Fraud ..........................20

        1.    Defendants Hire Baker Hostetler To Conceal Sanberg's Fraud ................20

        2.    KPMG Acts As, Then Resigns As, Catona's Auditor, Citing "Indicia Of Fraud"; And Both KPMG And BDO Cover Up The Fraud ...................23

        3.    Inherent And Ellis Support Sanberg's Fraud And The Cover-Up ..............24

        4.    The Other Defendants Also Aid In The Fraud And Cover-Up ...................25

    D.    Plaintiffs Were Fraudulently Induced to Invest in Catona ...................................25

        1.    Plaintiffs Miller LLC, Miller And Karr ..................................................26

        2.    Plaintiff ALS Trust ................................................................................27

        3.    Plaintiff Emerging Impact Fund II, LP ...................................................28

        4.    Plaintiff Praesumo ................................................................................28

        5.    Plaintiff Sarin ......................................................................................29

        6.    Plaintiff PS Trust ..................................................................................30

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

FIRST AMENDED COMPLAINT

7.    Plaintiff Chicago Atlantic.................................................................30

FIRST CAUSE OF ACTION.................................................................................31

SECOND CAUSE OF ACTION.............................................................................32

THIRD CAUSE OF ACTION .................................................................................33

FOURTH CAUSE OF ACTION..............................................................................35

FIFTH CAUSE OF ACTION ...................................................................................37

PRAYER FOR RELIEF ..........................................................................................38

DEMAND FOR JURY TRIAL................................................................................39

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Following more investigation and research, for their First Amended Complaint herein, Plaintiffs Donald R. Karr,[1] Miller Family Legacy, LLC ("Miller LLC"), Louis R. Miller, the ALS Revocable Trust[2] (the "ALS Trust"), Emerging Impact Fund II, LP ("Impact Fund II"), Praesumo Holdings, LLC ("Praesumo"), Ravi Sarin, the Paul Soros 2010 Family Trust A (the "PS Trust"), Chicago Atlantic Finance LLC, Chicago Atlantic Credit Company, LLC and Chicago Atlantic Opportunity Finance LLC (collectively, "Plaintiffs"), allege against Defendants Joseph Sanberg, AGO Special Situations, LP ("AGO"), Steve Ballmer, Ballmer Giving LLC dba Ballmer Group ("Ballmer Group"), Ibrahim AlHusseini, Nate Redmond, Alpha Edison Management Company, LLC ("Alpha Edison"), David Aranoff, Baker Hostetler LLP ("Baker Hostetler"), KPMG LLP ("KPMG"), Alvarez & Associates, Inc., Certified Public Accountants ("Alvarez & Associates"), BDO USA, P.C. ("BDO"), Michael Ellis, Inherent Group LP ("Inherent Group") and DOES 1 through 30 (collectively, "Defendants"), as follows:

## **INTRODUCTION**

1.     This is an action to recover millions of dollars that Plaintiffs were defrauded into investing, directly or indirectly, in CTN Holdings, Inc. ("Catona"), previously known as Aspiration Partners, Inc. ("Aspiration").

2.     Catona is a financial technology and sustainability company founded in 2013 by Defendant Joe Sanberg and Andrei Cherny.  Sanberg was and is the largest shareholder in Catona, either directly or through entities he owns and controls, with over 30% of the company.  Plaintiffs invested in Catona based on statements by Sanberg, who was aided and abetted by the other Defendants, that Catona was a financially successful company with a solid business and strong prospects for growth, as set forth in detail below.

3.     These statements were false.  Unbeknownst to Plaintiffs at the time, Sanberg was covertly propping up Catona through fraud and corruption.  Catona was a house of cards.  Sanberg not only made false statements, but he engaged in multiple fraudulent schemes as detailed herein.

---

[1] Individuals will be referred to by their last name once introduced by this Complaint.

[2] The "ALS Revocable Trust" means the Andrew L. Sandler Revocable Trust u/t/a dated September 14, 2012, as amended and restated on July 19, 2019, by its trustee, Andrew L. Sandler.

4

4.     By 2021, Catona was running out of money and needed a deep-pocket benefactor—and along came Steve Ballmer.  Sanberg made a crooked deal with Ballmer, the billionaire owner of the NBA's Los Angeles Clippers, to provide financial support and promote Catona to investors such as Plaintiffs.

5.     The arrangement was that Ballmer would be an investor in Catona and in return, Ballmer would use Catona to secretly funnel millions of dollars to star NBA player Kawhi Leonard.  These funds would be channeled through Catona to Leonard so that Ballmer could induce Leonard to re-sign with the Clippers by covertly paying him more than allowed by the NBA's salary cap rules.

6.     Sanberg and Ballmer worked together to make Catona appear to be a successful company backed by Ballmer, who is one of the wealthiest people in the world—worth over $150 billion.  With Ballmer's knowledge, support and assistance, Sanberg and Ballmer promoted Catona to lend legitimacy to Catona's operations; and Ballmer publicly endorsed Catona.  This enticed investors like Plaintiffs to entrust in and keep their capital in Catona and helped hide the rampant fraud occurring at the company.

7.     It also served Ballmer's interest in getting extra money to Leonard so he could circumvent the salary cap, beat out the competition and re-sign his team's superstar player.  Ballmer was complicit in and aided and abetted Sanberg's fraud for his own self-serving purpose.  Ballmer publicly endorsed Catona and infused over $50 million into the company.  Absent Ballmer's support, Catona could not have sustained the frauds set forth herein.

8.     Sanberg's scheme also included borrowing millions of dollars using phony financial statements and artificially inflating the value of Catona.  Sanberg generated phony revenue for Catona, funneling his funds through others who would purport to be genuine customers of Catona and purchase sustainability products, typically carbon credits.  These were sham customers; Sanberg himself was the true source of these purchases.

9.     The foregoing was concealed from Plaintiffs for years and only came to light in 2025 when Sanberg was charged with and pled guilty to multiple federal crimes.  None of this was disclosed to Plaintiffs when Sanberg induced them to invest or afterwards.  Sanberg hid his

wrongful activities and the true state of Catona's business from Plaintiffs and concealed his scheme. Had Plaintiffs known what was going on, they never would have invested or maintained their investments in Catona.

10. Sanberg was assisted in misleading Plaintiffs by the other Defendants, who covered for Sanberg, keeping his fraudulent activities in the dark. They protected Sanberg, silenced whistleblowers, shielded Sanberg's activities from oversight and deflected anyone who sought to investigate what he was doing. As such, they aided and abetted Sanberg's wrongdoing for their own self-serving purposes.

11. Because of Defendants' coverup, Sanberg's activities only came to light this year. In or about March 2025, Sanberg was charged with federal crimes and arrested, and in October 2025, he pled guilty to the charges. In 2025, Defendant AlHusseini, a director of Catona, also pled guilty to criminal fraud. Catona declared bankruptcy and is no longer operating.

12. Attached hereto as **Exhibits A** and **B**, respectively, are copies of Sanberg's plea agreement and the Department of Justice's announcement of the plea agreement. Plaintiffs' investments in Catona have been rendered worthless. Through this lawsuit, Plaintiffs seek to recover their losses.

## PARTIES

13. Plaintiff Karr is an individual residing in Los Angeles, California.

14. Plaintiff Miller LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

15. Plaintiff Miller is an individual residing in Los Angeles, California.

16. Plaintiff ALS Trust is the Andrew L. Sandler Revocable Trust u/t/a dated September 14, 2012, as amended and restated.

17. Plaintiff Impact Fund II is a Delaware limited partnership based in San Francisco, California.

18. Plaintiff Praesumo is a Delaware limited liability company based in Miami Beach, Florida.

19. Plaintiff Sarin is an individual residing in Los Angeles, California.

FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

20. Plaintiff PS Trust is the Paul Soros 2010 Family Trust A.

21. Plaintiffs Chicago Atlantic Finance LLC, Chicago Atlantic Credit Company, LLC and Chicago Atlantic Opportunity Finance LLC (collectively, "Chicago Atlantic") are Delaware limited liability companies based in Chicago, Illinois.

22. Defendant Sanberg is an individual residing in Los Angeles, California. Sanberg was a co-founder and member of the Board of Directors of Catona.

23. Defendant AGO is a Delaware limited partnership based in Los Angeles, California. AGO was an entity created and controlled by Sanberg and used by him to sell indirect interests in Catona, including to certain Plaintiffs.

24. Defendant AlHusseini is an individual residing in Los Angeles, California. AlHusseini served as a member of the Board of Directors of Catona.

25. Defendant Redmond is an individual residing in Los Angeles, California. At all relevant times, Redmond was acting as an agent of his investment company, Defendant Alpha Edison, a Delaware limited liability company based in Los Angeles, California, that had or managed, directly or indirectly, substantial investments in Catona. Redmond's conduct alleged herein was taken within the scope of his authority as an agent of Alpha Edison. Redmond also served as a member of the Board of Directors of Catona and was the Chairman of the Board.

26. Defendant Aranoff is an individual residing in Los Angeles, California and a partner at the law firm of Defendant Baker Hostetler, a limited liability partnership. Aranoff's conduct alleged herein was taken within the scope of his authority as an agent of Baker Hostetler.

27. Defendant KPMG is a Delaware limited liability partnership based in New York, New York and doing business in Los Angeles, California.

28. Defendant Alvarez & Associates is a California corporation based in Northridge, California.

29. Defendant BDO is a Virginia professional corporation based in Chicago, Illinois.

30. Defendant Ballmer is an individual residing in Los Angeles, California. Ballmer is the founder of Defendant Ballmer Group and the majority owner of the Los Angeles Clippers, an American professional basketball team based in Los Angeles. Defendant Ballmer Group is a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

foreign limited liability company doing business in Los Angeles, California. At all relevant times, Ballmer was acting as an agent of Ballmer Group. Ballmer's conduct alleged herein was taken within the scope of his authority as an agent of Ballmer Group.

31. Defendant Ellis is an individual residing in New York, New York. At all relevant times, Ellis was acting as an agent of Defendant Inherent Group, a Delaware limited partnership based in New York, New York. Defendant Ellis' conduct alleged herein was taken within the scope of his authority as an agent of Inherent Group.

32. Plaintiffs are ignorant of the true names, capacities, relationships and extent of participation in the conduct alleged herein of the Defendants sued as DOES 1 through 30, inclusive, but on information and belief allege that said Defendants are legally responsible for it. Plaintiffs will amend this Complaint to allege the true names and capacities of DOES 1 through 30 when ascertained.

33. Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each Defendant, including the DOE Defendants, was and is the agent, servant, representative, alter ego, employee and/or employer of each of the remaining Defendants and in doing the things hereinafter alleged, was acting within the course and scope of his authority. Plaintiffs are further informed and believe and thereon allege, that Defendants and each of them, knowingly and willfully conspired, cooperated and agreed among themselves to perpetrate the acts alleged herein for an improper purpose and that each of the Defendants did the acts and things alleged herein pursuant to and in furtherance of that conspiracy.

**VENUE AND JURISDICTION**

34. This Court has jurisdiction in this matter pursuant to California Code of Civil Procedure section 410.10 and the California Constitution, Article VI, § 10. Section 410.10 of the Code of Civil Procedure provides that California state courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of California or of the United States."

35. The exercise of jurisdiction by California is constitutionally permissible because Defendants reside, conduct business, have bank accounts and own property in California; and each engaged in the wrongdoing alleged herein in California. Thus, each Defendant has sufficient

FIRST AMENDED COMPLAINT

minimal contacts with the State of California, or has intentionally availed itself of the State of California, so as to render the exercise of jurisdiction by California courts proper.

36.    Venue is proper under California Code of Civil Procedure sections 395(a) and 395.5 because Defendants reside, have their principal place of business, or took action causing harm to Plaintiffs in Los Angeles County.

## FACTUAL ALLEGATIONS

### A.    Catona

37.    Catona opened for business in 2015.  It was originally pitched as a financial technology firm, promising to serve families confronted with economic insecurity and make life better for hardworking Americans.  The company began by offering consumer financial products focused on sustainability, such as its "Redwood Fund," a mutual fund that Catona claimed did not invest in the oil and gas industry.

38.    Over time, Catona shifted the focus of its business towards selling sustainability products, such as carbon credits.  A carbon credit represents a reduction in carbon emissions.  Carbon credits are generated by projects that reduce greenhouse gas emissions or directly remove greenhouse gases from the atmosphere—*e.g.*, planting trees that absorb carbon dioxide.  Carbon credits can be purchased by companies or individuals to offset their carbon emissions.

39.    In 2021, Catona announced that it would merge with a special-purpose acquisition vehicle ("SPAC") in order to allow the company to be publicly traded on the New York Stock Exchange.  Defendants saw this as a way to riches by cashing in their Catona stock in the public markets, so they were motivated to and did protect Sanberg, who was orchestrating the merger.

### B.    Defendants' Fraudulent Schemes

40.    Unbeknownst to Plaintiffs, Catona was a house of cards built on and sustained by corruption and fraud.  Sanberg launched fraudulent schemes to artificially inflate the value of Catona.  Sanberg was assisted by the other Defendants, who stood to gain from the schemes and helped him carry out and conceal them.  These schemes were concealed from and not disclosed to Plaintiffs when they invested and were not discovered until Sanberg was charged criminally in 2025.

FIRST AMENDED COMPLAINT

**1.      Sanberg Makes A Corrupt Deal With Steve Ballmer**

41.      As part of his scheme to inflate the value of Catona, Sanberg turned to the billionaire owner of the Los Angeles Clippers, Defendant Ballmer.  Previously the Chief Executive Officer of Microsoft, Ballmer is one of the ten wealthiest people in the world and a well-recognized figure.  While some NBA owners are not household names, Ballmer maintains a public profile and promotes himself as an environmental activist.

42.      Ballmer became the face of the Los Angeles Clippers in 2014 when he purchased the team for $2 billion and spent billions more building the Clippers' new arena, which Ballmer promised would be carbon neutral and maintain a LEED Platinum certification for sustainability.  Ballmer entered the NBA with promises of bringing the Clippers their first-ever NBA Championship.

43.      Nearly seven years after becoming the owner, Ballmer had fallen short of his goal of making the Clippers into NBA Champions.  The team had multiple early playoff exits and never made it to the championship round.  Even worse, in 2021, the team's contract with NBA superstar Kawhi Leonard was ending.  As a two-time NBA Champion before joining the Clippers, Leonard was the most coveted free agent in the NBA, and multiple teams in championship contention were bidding to draw him away from the Clippers.

44.      Ballmer viewed Leonard as critical to the team.  Here is what he said: "[Leonard is] not only [our] best player but one of the preeminent handful of players in the world."

45.      The NBA's fair competition rules prohibited Ballmer from leveraging his billions in personal wealth to keep Leonard with the Clippers.  As a member of the NBA, the Clippers are subject to a collective bargaining agreement, which includes a cap on the amount of money teams can spend on player salaries.  Multiple teams, including the Clippers, had already offered Leonard the maximum compensation allowable under NBA rules.

46.      At the time, Leonard's history of demanding impermissible compensation—dating back to Leonard's time with the Toronto Raptors and negotiations with the Los Angeles Lakers— was well-known.  Those requests—made through his uncle and business manager, Dennis

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

Roberston—included part ownership of the team, access to a private plane and house and, most significantly, guaranteed off-court endorsement money.

47.    Knowing of Leonard's demands for impermissible compensation, including endorsement money, Ballmer and Sanberg launched a scheme to circumvent the NBA's salary cap and secretly funnel compensation to Leonard via a sham endorsement deal that Leonard did not have to and did not ever perform and which made absolutely no business sense for Catona.

48.    Around this time, Catona's financial condition was bad and getting worse. Catona's venture in fintech was a failure and Sanberg had purportedly shifted Catona's operations towards sustainability initiatives, namely carbon credits.  In reality, this new carbon credit business was a fraud and failure as well.

49.    Ballmer was the perfect deep-pocket partner to fund Catona's flagging operations and lend legitimacy to Catona's carbon credit business.  Since Ballmer had publicly promoted himself as an advocate for sustainability, Catona was an ideal vehicle for Ballmer to secretly circumvent the NBA salary cap while purporting to support the company as a legitimate environmentalist investor.

50.    In or about 2021, Ballmer and Sanberg agreed to use Catona to circumvent the NBA salary cap and, in return, Sanberg would use Ballmer's funds and reputation to float Catona's failing operations and fraudulently induce individuals, including Plaintiffs, to invest in and keep their capital in Catona.  Ballmer used his team, the Clippers, to support Catona by causing the team to do business with Catona.

51.    The scheme was as follows:  Leonard, through his company KL2 Aspire LLC, entered into a guaranteed endorsement deal with Catona that included (i) $28,000,000 cash (paid over four years in quarterly installments of $1,750,000) and (ii) $20,000,000 in Catona stock, for a total compensation package of $48,000,000 (the "Leonard Deal").

52.    Leonard was signed by the Clippers in or about August 2021, just before Ballmer funded Catona.  In other words, the deal was structured so that Leonard would be with the Clippers when Ballmer's money came in.  Shortly after Leonard signed, in or about September

11

2021, Ballmer invested nearly the same amount as the Leonard Deal, $50,000,000—funding that was critical to keeping Catona afloat.

53.     The Leonard Deal cannot be plausibly explained as anything other than a means for Ballmer and the Clippers to evade the NBA salary cap.  It otherwise makes no sense.  Leonard did not provide any services to Catona.

54.     Catona executives and staffers recognized the agreement was illusory and of no substantive benefit to Catona and objected.  But Sanberg overrode their objections, forcing the agreement through as part of his deal with Ballmer.

55.     Leonard was not, in any sense, a sensible brand ambassador for a fintech-turned-carbon-offset company.  An endorsement deal with an NBA star might make sense for an athletic brand.  But the same could not be said of Catona, which promoted itself as a broker of carbon credits for pollution-intensive industries.  Leonard had little to no social media presence, was notoriously reclusive and was not known as a climate activist.

56.     Catona was in no financial position to afford a $48,000,000 endorsement deal.  The value of the Leonard Deal was abnormal for any company, let alone one with no history sponsoring NBA athletes, whose core market was outside the athletic space.  The typical athlete endorsement deal with a company outside the athletic industry ranges from $500,000 to $1,000,000.  The Leonard Deal was over fifty times that value.

57.     The only explanation for the Leonard Deal is that it was part of a scheme between Ballmer and Sanberg to circumvent the NBA salary cap and keep Catona afloat financially.  Catona needed the money.  Ballmer needed to sign Leonard.  They came together.  It was a match made in heaven—until they got caught.

58.     The only way for Catona to afford the Leonard Deal was if Ballmer paid for it, which of course is exactly what occurred.  In September 2021, Ballmer, through his company Defendant Ballmer Group, transferred $50,000,000 to Catona, almost exactly the value of the Leonard Deal.

59. For the entire duration of the Leonard Deal, Leonard never once endorsed Catona's business, appeared at its events, recorded marketing material, collaborated on a project, or referred to Catona in public. The Leonard Deal was a sham.

60. Ballmer further funded the Leonard Deal in 2022, when Catona was low on funds to pay Leonard. In every sense, Ballmer was Sanberg's enabler and ally. In November 2022, Leonard's agent sent messages to Catona's General Counsel that Catona had failed to pay Leonard his quarterly payment under the Leonard Deal.

61. So in December 2022, Ballmer had Dennis Wong, Ballmer's partner, college-roommate and co-owner of the Clippers, pay Catona $1,999,999 as a purported investment. Days later, in December 2022, Catona paid Leonard's past due $1,750,000. This was not a coincidence. Wong was acting at Ballmer's behest.

62. Ballmer again funded Catona when the company was low on funds, giving Catona $10 million. This money was part and parcel of the Leonard Deal, whereby Sanberg would help Ballmer circumvent the salary cap and Ballmer would help Sanberg keep Catona afloat.

63. By 2024, the government's investigation of Catona's operations was underway. In order to conceal the circumvention of the salary cap, Defendant Ballmer Group donated $1,875,000 to Golden State Opportunity—a company founded by Sanberg. This was almost the exact amount of the quarterly $1,750,000 payment owed to Leonard under the Leonard Deal.

64. In return for using Catona to evade the NBA's salary cap restrictions, Ballmer knowingly purported to be an investor and supporter of Catona to create an air of legitimacy for Catona to solicit and retain investments, such as those by Plaintiffs. There is substantial evidence of this, including as set forth below.

13

FIRST AMENDED COMPLAINT

65.    Here is a photo of Sanberg and Ballmer's press conference announcing the Clippers' support of Catona (then called Aspiration).  Ballmer is on the left with the mask; Sanberg is on the right.



66.    The collaboration between Catona and the Clippers was billed by Ballmer as part of the fight for environmental sustainability.  Ballmer publicly touted his connection to Catona (then Aspiration).  Ballmer supported and endorsed Catona.

67.    Here are some of Ballmer's public statements about Catona (Aspiration):

"As fighting climate change continues to become front and center for more people and businesses, *[Catona]'s technology, brand and community of members make it one of the most significant new companies in the public markets*."

*"[W]e had a chance to really sit down and meet the folks from [Catona]*, Joe Sanberg who runs [Catona] is here, he'll talk to you a little more about their company, *we can talk about our partnership, but to have your first Founding Partner be a company that focuses on providing services to consumers and businesses to reduce or even go negative on their own carbon footprints was a great thing*, particularly not only as we thought about our own building but how do we help our fans do what they want to do."

"*[I]t was great that Joe [Sanberg] and the group at [Catona] was interested in working with us.*  I'm pretty keen on all the projects and *we're keen to have these guys as a marketing partner*."

14

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

"*[Catona] becoming the first Founding Partner [for the Clippers' arena]* supports the stake we are planting in the ground to make the Intuit Dome the most sustainable arena in the world."

68.    Plaintiffs allege that Ballmer transferred other funds to Catona to keep the company afloat and buy Sanberg's support, cooperation and silence about the secret deal with Leonard.  The full extent of Ballmer's transfers of funds to Catona and Sanberg will be ascertained in discovery.

69.    Sanberg and Ballmer publicly represented that Ballmer was a legitimate investor and supporter of Catona.  They did so with Ballmer's knowledge and active participation, in order to increase Catona's profile.

70.    Ballmer's reputation as a successful entrepreneur and climate activist was known to Plaintiffs.  Plaintiffs believed that Ballmer's purported investment in Catona would have a material, positive impact on Catona's success.  Ballmer was the CEO of Microsoft from 2000 to 2014.  Microsoft is one of the most highly respected and valuable companies in the world, with a market value of $3.9 trillion.

71.    Ballmer's purported status as a legitimate investor in Catona was material to Plaintiffs' decision to invest in and/or keep their investments with Catona.  Ballmer is extremely successful and high-profile, worth $150 billion, with the Clippers valued at $5.5 billion.  Plaintiffs would not have invested and/or kept their investment in Catona if Ballmer and Sanberg had disclosed the true nature of Ballmer's investment.  Ballmer thus supported and participated in Sanberg's fraud.

72.    Sanberg and Ballmer never disclosed the truth about Ballmer's investment and support of Catona.  Sanberg and Ballmer never disclosed to Plaintiffs that the millions of dollars Ballmer injected into Catona were meant to allow Ballmer to funnel compensation to Leonard in violation of NBA rules and keep Catona's failing business afloat financially.  Sanberg and Ballmer's scheme to pay Leonard through Catona to evade the NBA's salary cap was only later revealed in 2025, by journalist Pablo Torre.

15

FIRST AMENDED COMPLAINT

**2.      Sanberg Borrows Millions From Investment Funds Using Phony Financial Statements**

73.      Also as part of his scheme, Sanberg borrowed large amounts from investment funds using phony financial statements and false representations.  These activities came to light in March 2025, when the U.S. Department of Justice announced that Sanberg had been arrested and charged with financial fraud.  The U.S. Department of Justice also announced that Defendant AlHusseini had pleaded guilty to wire fraud.

74.      In early 2020, Sanberg began negotiating a loan from an investment fund in the amount of $55 million.  To obtain the loan, Sanberg was required by the investment fund to pledge approximately 10.3 million shares of his Catona stock as collateral and find a buyer for those shares.

75.      Sanberg recruited another member of the Board of Directors of Catona, Defendant AlHusseini, to serve as the buyer by entering into a put option agreement with the investment fund that required AlHusseini to purchase, at the fund's option, the 10.3 million shares pledged as collateral.

76.      Sanberg and AlHusseini created phony bank statements showing that AlHusseini had sufficient funds available to cover the put option, when in truth he did not have anywhere close to sufficient funds.  Using these fraudulent bank statements, Sanberg and AlHusseini induced the investment fund to enter into the option agreement with AlHusseini, and the investment fund thus made the loan to Sanberg.

77.      In November 2021, Sanberg refinanced the $55 million loan with a new loan of $145 million from another investment fund.  To obtain the loan, Sanberg was again required to pledge approximately 10.3 million shares of his Catona stock as collateral and find a buyer for those shares.  Sanberg again recruited AlHusseini to act as the "buyer" to enter into a put option agreement with the investment fund and together they again provided doctored, fraudulent bank statements to the fund.

FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

78.    Using these fraudulent bank statements, Sanberg and AlHusseini induced the second investment fund to enter into the option agreement with AlHusseini, and the investment fund thus made the $145 million loan to Sanberg.

**3.    Sanberg Creates Sham Customers To Inflate Catona's Revenue**

79.    Another part of Sanberg's scheme involved using the funds he had obtained by fraud to artificially pump the value of Catona by making the company's business appear far more successful than it truly was.  Sanberg did so by creating sham customers of Catona.  Sanberg has admitted to this scheme in his plea agreement (Exhibit A).  The Securities and Exchange Commission ("SEC") has also filed a civil enforcement action against Sanberg over this scheme.  A true and correct copy of the SEC's Complaint is attached hereto as **Exhibit C**.

80.    Sanberg carried out this scheme by recruiting third parties to act as purported customers of Catona's enterprise sustainability products.  These purported customers signed "letters of intent" or similar agreements ("LOIs") promising to make recurring payments to Catona in return for sustainability products.

81.    The LOIs were a sham.  These were not genuine customers of Catona who intended to use their own funds to pay for Catona services.  Sanberg himself was effectively the purchaser of these products.  In some cases, Sanberg directly paid Catona for the products using shell companies.  In other cases, Sanberg compensated the purported customers for purchasing the products from Catona.  The "purchasers" were not genuine.

82.    The vast majority of Catona's LOIs were phony, and this was known within Catona.  Catona staffers and executives tried to blow the whistle on these fake customers.  But, as explained below, they were stymied by Defendants, who covered up the fraud for Sanberg's and their own benefit.

83.    Sanberg used these sham customers to make it appear that Catona was experiencing explosive growth and allow Sanberg to falsely tout Catona's performance to investors.  For example, Catona's revenue from fiscal year 2021 was artificially inflated by at least $44 million as a result of these phony customers.

84.    Sanberg eventually stopped making payments for these phony customers, resulting in ballooning and uncollectible receivables at Catona.  Catona was ultimately forced to write these receivables off as uncollectible, but even then Defendants refused to acknowledge that these were never genuine customers to begin with, intentionally concealing this fact from Plaintiffs, the public and other investors.

**4.    Catona Issues Phony Financial Statements, Supported By Its Accountants, For Its SPAC Merger**

85.    In or about 2021, Catona announced it would go public via a SPAC merger with InterPrivate Financial Partners III ("InterPrivate").

86.    Catona issued a press release attached to a Form 8-K publicly filed with the SEC to announce the SPAC merger.  Catona also included an investor presentation with the Form 8-K. The presentation claimed that Catona's sustainability business had experienced "explosive growth":



87.    The claims in the slide were false.  Most or all of these "corporate clients" were phony customers and the revenue purportedly generated by them came from Sanberg.

88.    On February 15, 2022, Catona, through InterPrivate, filed a Form S-4 Registration Statement.  The filing claimed that Catona's enterprise sustainability revenue had risen from nothing in 2020 to "$33.7 million for the nine months ended September 30, 2021."  The filing also

18

FIRST AMENDED COMPLAINT

claimed that Catona's revenue had risen to $62 million during this period, as compared to $9.2 million during the same period the year prior. This was false. Catona's purported revenue growth in enterprise sustainability was generated by Sanberg's phony customers.

89. Defendant Sanberg and Defendant-directors AlHusseini and Redmond caused these false public filings to be made with the SEC in order to pump the value of Catona's stock and conceal Sanberg's fraud. The purported growth of Catona's enterprise business—the backbone of its plan to go public via the SPAC merger—rested on Sanberg's sham customers and phony revenue. And Catona's accountants, KPMG, BDO and Alvarez & Associates, knew and lent support.

**5.      Defendants Directly Provide False Financials To Plaintiffs, Aided And Abetted By BDO**

90. Defendants Sanberg, AlHusseini and Redmond provided materially false financial information to certain Plaintiffs herein.

91. Attached hereto as **Exhibit D** is the "Catona Climate: Confidential 2023 Year End Board Report" that was provided to Plaintiffs Chicago Atlantic and Praesumo. The report is signed by AlHusseini and Redmond.

92. This report grossly misrepresented Catona's financial condition. For example, the report states: "Catona entered 2024 with a strong advanced negotiation stage pipeline representing $3.4 billion of potential contract value. Given historic close rates for this section of the pipeline and that it represents deals in final documentation, a near 100% close rate is expected. Current clientele represents $4.5 billion of contract value at 60% gross margin to be realized over the next 4 years."

93. This was wildly false. Catona's clientele represented nowhere close to $4.5 billion in contract value. Nor was Catona in advanced negotiations with clients representing anywhere close to $3.4 billion of potential contract value.

94. These financial statements also grossly overstated Catona's revenue and assets. For example, the financial statements asserted that Catona had total assets of $561,869,655, when in truth it had a fraction of that amount and was nearly or already insolvent.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

95. In or about 2024, Defendants Redmond and Sanberg personally participated in a call with Chicago Atlantic and Praesumo for the purpose of inducing Chicago Atlantic and Praesumo to make, respectively, the loan and investment set forth below. Redmond and Sanberg went through the false financial report set forth above page by page during this call, and Redmond and Sanberg endorsed the financial report and the financial statements contained therein.

96. The report provided to these Plaintiffs also stated, "The financial results presented herein are the results that have been presented to Catona's auditors at BDO, which is engaged in preparing audited financials for the past 3 years." Sanberg and Redmond also represented on their call with Chicago Atlantic and Praesumo that BDO had already affirmed the correctness of Catona's accounting for its enterprise sustainability business.

97. Defendant BDO assisted and helped conceal Sanberg's wrongdoing and fraud. Acting as Catona's outside auditor, BDO kept silent and suppressed proof of Sanberg's activities and allowed and approved phony financials to be presented to investors. Plaintiffs allege that BDO, based on its review of and access to Catona's financial information and the resignation of Catona's prior auditor, KPMG, because of "indicia fraud" as set forth below, knew of, or was willfully blind to, Sanberg's fraudulent scheme and assisted in covering it up.

98. The result of Sanberg's many fraudulent activities was to render Catona a house of cards, built on and sustained by fraud. Sanberg launched his scheme with the aim of pumping the value of Catona so that Sanberg and other Defendants could offload their shares of Catona at inflated values.

**C.    The Other Defendants Assisted and Concealed Sanberg's Fraud**

99. Plaintiffs allege that the other Defendants all either knew of, or were willfully blind to, Sanberg's scheme. They assisted Sanberg in defrauding Plaintiffs by covering up Sanberg's wrongdoing. They shielded Sanberg from oversight and scrutiny, deflected anyone who attempted to investigate his activities and lent Sanberg legitimacy by supporting and vouching for him.

**1.    Defendants Hire Baker Hostetler To Conceal Sanberg's Fraud**

100. In or about March 2022, an internal Catona accountant reported to the Chief Financial Officer of Catona that carbon credits purchased by purported Catona customers were, in

FIRST AMENDED COMPLAINT

fact, being paid for by Sanberg. The accountant also raised the lack of supporting documentation for Sanberg's phony customers and the increasing balance of uncollected revenue from them.

101. The accountant's findings were reported to senior Catona executives and members of Catona's Board of Directors (including Defendants AlHusseini and Redmond).

102. The Board of Directors, including Defendants AlHusseini and Redmond, initially attempted to ignore these reports. But the complaints of impropriety persisted.

103. In response, Defendants launched a cover-up to assure that the findings were squashed and Sanberg's fraud would not be revealed to Catona investors.

104. Defendants accomplished this cover-up by setting up a Special Committee of the Board of Directors, whose purpose was to investigate Sanberg. The Special Committee consisted of Defendants AlHusseini and Redmond and Hellen Melluish. Defendants AlHusseini and Redmond were purportedly independent directors but were, in truth, allied with Sanberg. Rather than investigate Sanberg's misconduct, they buried it.

105. Defendants AlHusseini and Redmond retained Defendant Aranoff and his law firm, Defendant Baker Hostetler, to conduct a purported "investigation" of Sanberg's conduct. But the investigation, by design, was a whitewash that guaranteed Sanberg's scheme would not be revealed.

106. Aranoff and Baker Hostetler, in coordination with Defendants AlHusseini and Redmond, conducted this "investigation" in order to ensure Sanberg would be cleared of any wrongdoing, allowing Sanberg to continue in his scheme without interference. This was the opposite of why Aranoff and Baker Hostetler were brought in and what they were supposed to do.

107. Aranoff and Baker Hostetler claim they are adept and thorough in conducting internal investigations. Baker Hostetler advertises that its "team includes some of the country's most experienced and seasoned lawyers who are dedicated to protecting businesses and individuals by preventing violations before they occur" and works to "quickly identify, contain and correct potential misconduct." Aranoff claims to have been the "[l]lead investigator in over 20 internal investigations for public and private companies."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

21

FIRST AMENDED COMPLAINT

108. Notwithstanding their claimed expertise, Baker Hostetler's investigation was anything but thorough. Aranoff and Baker Hostetler discounted evidence collected by Catona accountants showing that carbon credits purchased by purported Catona customers were, in fact, being paid for by Sanberg. Aranoff and Baker Hostetler also knowingly did not collect available evidence—including bank records—that would have confirmed that Sanberg was the true source of the revenue from Sanberg's sham customers.

109. The only explanation for these failures, given Baker Hostetler's and Aranoff's claimed deep expertise in internal investigations, is that Aranoff and Baker Hostetler knew the result that Defendants Sanberg, AlHusseini and Redmond wanted, so they made sure they conducted their investigation so that Sanberg's fraud could remain hidden.

110. To that end, Aranoff and Baker Hostetler reported that they had found no evidence of wrongdoing by Sanberg, when all they had to do was track down and examine financial records and the identities of the sham customers. And to obscure their investigation, they purposely did not prepare a written report.

111. Aranoff and Baker Hostetler's findings were reported orally to the Special Committee and Board of Directors of Catona. Aranoff and Baker Hostetler, in coordination with Defendants AlHusseini and Redmond, did not create any written report of their investigation in order to obfuscate their pre-determined outcome.

112. After Aranoff and Baker Hostetler reported the findings of their rigged investigation, Aranoff was confronted about the adequacy of the investigation by a Catona executive, who asked why Aranoff and Baker Hostetler had failed to follow up on leads about potential sham customers. Aranoff and Baker Hostetler deflected and refused to conduct any further investigation, acting to protect Sanberg and conceal his wrongdoing.

113. Catona used Aranoff and Baker Hostetler to shield Catona from public scrutiny of Sanberg's activities. For example, when whistleblowers tipped off a reporter about Sanberg's schemes, the reporter contacted Catona. Catona disclosed the Baker Hostetler "investigation" to the reporter, claiming it was a "forensic accounting review" that had found "no evidence of wrongdoing." Catona, aided by Aranoff and Baker Hostetler, thereby deflected suspicion of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Catona's business practices and prevented Sanberg's fraud from being revealed to the public, including Plaintiffs.

**2.     KPMG Acts As, Then Resigns As, Catona's Auditor, Citing "Indicia Of Fraud"; And Both KPMG And BDO Cover Up The Fraud**

114.    Catona retained KPMG as its auditor in or about 2021.  KPMG, based on its review of and access to Catona's financial information, knew of, or was willfully blind to, Sanberg's fraudulent scheme and assisted in covering up the scheme.

115.    As Catona's auditor, KPMG was required to disclose in its audit opinion Catona's material overstatement of revenue resulting from the fake revenue from Sanberg's phony customers.

116.    As Catona's auditor, KPMG was also required to investigate and report, internally and then externally, the fraud occurring at Catona.  This is what the law requires:

a.     KPMG was required, if it became aware of potential fraud, to investigate and determine if it were likely that such fraud had occurred.

b.     If KPMG determined that fraud likely had occurred, KPMG was required to report its findings to Catona's management and the audit committee.

c.     If management and the audit committee failed to take appropriate action, KPMG was required to report its findings to the Board of Directors.

d.     If the Board of Directors similarly failed to take appropriate action, KPMG was then required to report the fraud to appropriate authorities outside of Catona.

117.    KPMG, however, disregarded these standard audit practices.  KPMG never issued an audit opinion identifying the material overstatement of revenue and the fraud being perpetrated by Sanberg.  Nor did KPMG ever make an appropriate report of the fraud occurring at Catona to management, the audit committee, the Board of Directors and then appropriate authorities.

118.    Instead of reporting the fraud at Catona, KPMG resigned as Catona's auditor. KPMG cited "revenue transactions that had characteristics of fraud" as the basis for its resignation and was thus aware of the fraud.  Before resigning, KPMG neither issued an audit opinion

disclosing the fraud nor made an appropriate report of the fraud internally and then to appropriate authorities outside Catona.

119. KPMG kept silent about Sanberg's scheme, suppressing proof of Sanberg's activities and preventing the fraud from becoming public. KPMG thereby supported, endorsed and assisted Catona in presenting false financial results and in its recognition of fake revenue from Sanberg's phony customers, in violation of law.

120. BDO similarly supported, endorsed and assisted Catona in presenting false financial results. After allowing false financial statements to be presented to investors, as set forth above, BDO ended its engagement with Catona without issuing an audit opinion disclosing the overstatement of revenue and fraud at Catona.

121. Nor did BDO make an appropriate report of the fraud occurring at Catona to management, the audit committee, the Board of Directors and then appropriate authorities. BDO kept silent about Sanberg's scheme, suppressing proof of Sanberg's activities and preventing the fraud from becoming public.

**3.      Inherent And Ellis Support Sanberg's Fraud And The Cover-Up**

122. Defendants Ellis and Inherent supported Sanberg's fraud as well. Ellis is the Chief Operating Officer of Inherent Group, an investment firm that provided capital to Catona starting in or about 2021.

123. Ellis and Sanberg were briefed as to Baker Hostetler's investigation and KPMG's resignation based on "characteristics of fraud" and had regular meetings with Catona insiders regarding Catona's increasing uncollectible accounts receivable due to Sanberg's phony customers. Ellis and Inherent Group thus knew of, or were willfully blind to, Sanberg's fraudulent scheme.

124. Inherent assisted Sanberg's fraud by providing capital for his "expansion" of Catona's sustainability business. Inherent was Catona's primary source of debt financing for its operations. Inherent financially propped up Catona's fraudulent operations, allowing Sanberg to continue his scheme.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

FIRST AMENDED COMPLAINT

125.    Ellis and Inherent Group also aided and abetted Sanberg's fraud by assisting in covering it up.  As Catona's major lender, Inherent and Ellis had power, influence and authority over Catona, and Defendants Sanberg, AlHusseini and Redmond thus required Inherent's blessing for their cover-up.  Inherent and Ellis endorsed and supported the cover-up by siding with Defendants Sanberg, AlHusseini and Redmond over whistleblowers and supporting their sidelining and silencing of whistleblowers within Catona.

### 4.    The Other Defendants Also Aid In The Fraud And Cover-Up

126.    Defendant AGO also assisted Sanberg's wrongdoing.  Controlled by Sanberg, Defendant AGO served as a vehicle for Sanberg's fraudulent sale of interests in Catona.

127.    Defendant Alvarez & Associates, as Catona's outside auditor, also assisted and helped conceal Sanberg's wrongdoing.  On or about February 22, 2022, Alvarez & Associates issued an opinion, filed with the Securities and Exchange Commission, stating that Catona's financial statements presented fairly, in all material respects, the financial position of Catona, despite the failure of those statements to contain any disclosure of Sanberg's activities as set forth herein.

128.    Plaintiffs allege that Alvarez & Associates, based on its review of and access to Catona's financial information and the resignation of KPMG because of "indicia of fraud," knew of, or was willfully blind to, Sanberg's fraudulent scheme, yet still agreed to issue this audit opinion, thereby covering up Sanberg's fraud and lending Sanberg's activities legitimacy.

129.    Defendants' cover-up was successful.  Defendants concealed Sanberg's misconduct, preventing his fraud from becoming known until at least March 2025, when it was announced that Sanberg had been arrested and that Defendant AlHusseini had pleaded guilty to fraud.  Catona unraveled in the wake of these criminal charges, filing for bankruptcy in March 2025.

### D.    Plaintiffs Were Fraudulently Induced to Invest in Catona

130.    Plaintiffs are victims of Defendants' fraud.  Plaintiffs were induced to invest in Catona by Sanberg and Redmond, who touted Catona's success and concealed from Plaintiffs the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

scheme to inflate the value of Catona.  None of the Plaintiffs would have invested in Catona had they known what was really going on.  They were purposefully kept in the dark by Defendants.

### 1.    Plaintiffs Miller LLC, Miller And Karr

131.    In or about 2020, Plaintiffs Miller LLC, Miller and Karr were solicited by Sanberg to purchase shares in Catona.  Sanberg spoke to Plaintiff Miller multiple times, pitching him on investing in Catona, which Sanberg represented was a successful, legitimate business.

132.    In or about 2023, Sanberg pitched Plaintiff Miller on the purchase of further shares of Catona through AGO, representing that Catona continued to be a strong, growing company based on its carbon credit business.  In or about January 2023, Sanberg represented to Plaintiff Miller that Catona's carbon credit portfolio was valued in the millions of dollars and that the business represented "a key evolution as [Catona] increasingly focuses on originating high value credits."

133.    At no point during these communications did Sanberg disclose the truth—that Sanberg, with the other Defendants' active assistance, was engaged in a fraudulent scheme, as set forth above.  Had Plaintiffs been informed of Defendants' fraudulent and illegal activities, they would not have invested in Catona.

134.    As a result of Sanberg's misrepresentations and omissions, Plaintiff Miller LLC purchased 73,443 Series C preferred shares of Catona for $1 million in or about 2020, Plaintiff Karr purchased 7,334 Series C preferred shares of Catona for $100,000 in or about 2020 and Plaintiff Miller purchased 50,000 preferred shares of Catona, through AGO, for $500,000 in or about 2023.

135.    Sanberg sought to cover his tracks and conceal Defendants' fraud from Plaintiffs Miller LLC, Miller and Karr by providing them with fraudulent financial statements for Catona. The financial statements were fabricated and grossly mispresented the financial health of Catona's business.  The financial statements showed Catona had approximately $450 million in assets and millions in profits, when in truth it had nowhere near those amounts and was not profitable at all.

136. This fraud was ongoing and continued from 2020 through 2025. Sanberg continued to communicate with Plaintiff Miller though 2024, but at no point did he disclose his fraudulent and illegal activities.

137. The other Defendants also aided and abetted Sanberg's fraud by concealing and hiding it from 2020 through 2025, as set forth above. Had Miller LLC, Miller and Karr learned the truth, they would not have invested and/or would have taken action to minimize their losses. Sanberg and the other Defendants prevented Plaintiffs Miller LLC, Miller and Karr from doing so by concealing Sanberg's fraud until 2025.

**2.    Plaintiff ALS Trust**

138. In or about August 2021, Plaintiff ALS Trust was solicited by Defendant Sanberg to purchase shares in Catona. Defendant Sanberg had multiple conversations with the trustee of the ALS Trust, Andrew L. Sandler, regarding the potential sale to the ALS Trust of Defendant Sanberg's founder's stock in Catona, which Defendant Sanberg represented was a successful, legitimate business.

139. Defendant Sanberg falsely informed Mr. Sandler that Defendant Sanberg was selling a small portion of his founder's stock in Catona for the purpose of providing funding for his (Sandberg's) foundation.

140. At no point during these communications did Defendant Sanberg disclose the truth—that Defendant Sanberg was engaged in a fraudulent scheme, as set forth above. Had the ALS Trust been informed of Defendant Sanberg's fraudulent and illegal activities, it would never have invested in Catona.

141. As a result of Defendant Sanberg's misrepresentations and omissions, the ALS Trust purchased from AGO 55,555 Series C preferred shares of Catona for $1 million.

142. The other Defendants also aided and abetted Sanberg's fraud by concealing and hiding it from 2020 through 2025, as set forth above. Had the ALS Trust learned the truth, it would not have invested and/or would have taken action to minimize its losses. Sanberg and the other Defendants prevented the ALS Trust from doing so by concealing Sanberg's fraud until 2025.

### 3.     Plaintiff Emerging Impact Fund II, LP

143.    In or about March 2020, Impact Fund II made a loan of $2 million to a Catona executive and shareholder, secured by shares of Catona.  As part of due diligence, in or about early 2020, a representative of Impact Fund II, Dan Skaff, spoke to Defendant Sanberg regarding Catona, which Defendant Sanberg represented was a successful, legitimate business.

144.    At no point during these communications did Defendant Sanberg disclose the truth—that Defendant Sanberg was engaged in a fraudulent scheme, as set forth above.  Had Impact Fund II been informed of Defendant Sanberg's fraudulent and illegal activities, it would never have made the loan of $2 million.

145.    After the loan went into default, Impact Fund II received the collateral for the loan in the form of 587,548 common shares of Catona.  Impact Fund II continued to hold these shares because Defendant Redmond covered up Sanberg's fraud by falsely assuring Impact Fund II that Catona was a valuable, legitimate company.

146.    The other Defendants also aided and abetted Sanberg's fraud by concealing and hiding it from 2020 through 2025, as set forth above.  Had Impact Fund II learned the truth, it would not have invested and/or would have taken action to minimize its losses.  Sanberg and the other Defendants prevented Impact Fund II from doing so by concealing Sanberg's fraud until 2025.

### 4.     Plaintiff Praesumo

147.    In or about 2024, Praesumo was solicited by Defendant Sanberg to purchase shares in Catona.  Defendant Sanberg spoke with a representative of Praesumo on multiple occasions and convinced Praesumo to invest by representing that Catona was a successful, legitimate business.

148.    In order to induce Praesumo to make the investment, Sanberg, AlHusseini and Redmond provided to Praesumo the false financial report attached hereto as **Exhibit D**.

149.    In or about the spring of 2024, Redmond and Sanberg participated in a call with Praesumo, for the purpose of inducing Praesumo to purchase shares of Catona.  Redmond and Sanberg went through the false financial report set forth above page by page during this call and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Redmond and Sanberg endorsed the financial report and the financial statements contained therein.

150.    At no point during these communications did Sanberg, AlHusseini or Redmond disclose the truth——that Defendant Sanberg, with the other Defendants' active assistance, was engaged in a fraudulent scheme, as set forth above.  Had Praesumo been informed of Defendant Sanberg's fraudulent and illegal activities, it would never have invested.

151.    As a result of Defendant Sanberg's misrepresentations and omissions, Praesumo purchased from AGO 1,175,000 common shares of Catona for $1 million.

152.    The other Defendants also aided and abetted Sanberg's fraud by concealing and hiding it from 2020 through 2025, as set forth above.  Had Praesumo learned the truth, it would not have invested and/or would have taken action to minimize its losses.  Sanberg and the other Defendants prevented Praesumo from doing so by concealing Sanberg's fraud until 2025.

**5.    Plaintiff Sarin**

153.    In or about 2020, Sarin was solicited to purchase shares in Catona.  Defendant Sanberg represented that Catona was a successful, legitimate business.  Defendant Sanberg knew and intended that these representations would induce Sarin to invest in Catona.

154.    At no point during these communications did Defendant Sanberg disclose the truth—that Defendant Sanberg was engaged in a fraudulent scheme, as set forth above.  Had Sarin been informed of Defendant Sanberg's fraudulent and illegal activities, he would never have invested in Catona.

155.    As a result of Defendant Sanberg's misrepresentations and omissions, Sarin purchased Series C shares of Catona for $250,000 in or about early 2021.

156.    The other Defendants also aided and abetted Sanberg's fraud by concealing and hiding it from 2020 through 2025, as set forth above.  Had Sarin learned the truth, he would not have invested and/or would have taken action to minimize his losses.  Sanberg and the other Defendants prevented Sarin from doing so by concealing Sanberg's fraud until 2025.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

FIRST AMENDED COMPLAINT

**6.      Plaintiff PS Trust**

157.    In or about 2020, the PS Trust was solicited to purchase shares in Catona. Defendant Sanberg was held out in investment materials and conversations as a key driver of the company's growth, with extensive experience and Catona was held out as a successful, legitimate business. Defendant Sanberg made these representations knowing and intending that they would induce the PS Trust to invest.

158.    At no point during these communications did Defendant Sanberg disclose the truth—that Defendant Sanberg was engaged in a fraudulent scheme, as set forth above. Had the PS Trust been informed of Defendant Sanberg's fraudulent and illegal activities, it would never have invested in Catona.

159.    As a result of Defendant Sanberg's misrepresentations and omissions, the PS Trust purchased Series C shares of Catona for $500,000.

160.    The other Defendants also aided and abetted Sanberg's fraud by concealing and hiding it from 2020 through 2025, as set forth above. Had the PS Trust learned the truth, it would not have invested and/or would have taken action to minimize its losses. Sanberg and the other Defendants prevented the PS Trust from doing so by concealing Sanberg's fraud until 2025.

**7.      Plaintiff Chicago Atlantic**

161.    In or about 2024, Sanberg, AlHusseini and Redmond solicited Chicago Atlantic to make a $16 million loan to Sanberg, through a company owned by Sanberg, secured by shares in Catona, among other things. Sanberg, AlHusseini and Redmond held out Catona as a successful, legitimate business in order to induce Chicago Atlantic to make the loan.

162.    In order to induce Chicago Atlantic to make the loan, Sanberg, AlHusseini and Redmond provided the false financial report attached hereto as Exhibit D to Chicago Atlantic.

163.    In or about the spring of 2024, Redmond and Sanberg participated in a call with Chicago Atlantic, for the purpose of inducing Chicago Atlantic to make the loan. Redmond and Sanberg went through the false financial report set forth above page by page during this call and Redmond and Sanberg endorsed the financial report and the financial statements contained therein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

164.    At no point during these communications did Sanberg, AlHusseini or Redmond disclose the truth—that Defendant Sanberg, with the other Defendants' active assistance, was engaged in a fraudulent scheme, as set forth above.  Had Chicago Atlantic been informed of the aforesaid fraudulent and illegal activities, it would never have made any loan to Sanberg.

165.    Redmond, in particular, vouched for and signed off on grossly inflated, false Catona financial statements (Exhibit D).

166.    As a result of these misrepresentations and omissions, Chicago Atlantic made a loan of $16 million to Sanberg in or about January 2025.

167.    The other Defendants also aided and abetted Sanberg's fraud by concealing and hiding it from 2020 through 2025, as set forth above.  Had Chicago Atlantic learned the truth, it would not have made any loan to Sanberg and/or would have taken action to minimize its losses.

## FIRST CAUSE OF ACTION

### (Fraud)

**By All Plaintiffs Against Joseph Sanberg and DOES 1 through 30**

168.    Plaintiffs repeat and re-allege the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

169.    Sanberg represented to Plaintiffs that Catona was a successful, legitimate business, supported by well-recognized figures such as Ballmer, with growing revenue from its enterprise sustainability business.  Sanberg concealed from Plaintiffs that he was engaged in a fraudulent scheme on behalf of Catona.

170.    This included concealing from Plaintiffs that: (1) Ballmer was not a true, legitimate investor in Catona but rather Sanberg and Ballmer were using Catona as a means to funnel funds to the Clippers' star player Kawhi Leonard so the Clippers could evade the NBA's salary cap; (2) Sanberg was stealing money from investment funds using doctored financial statements to prop up Catona; (3) Sanberg was generating phony customers and revenue for Catona's enterprise sustainability business; and (4) Sanberg was using false and inflated financials for Catona.

171.    Because of his exclusive knowledge, Sanberg owed Plaintiffs a duty of disclosure, which he breached by concealing these facts from Plaintiffs.  Sanberg also had a fiduciary duty of

FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

disclosure as a member of the Board of Directors of Catona, which he breached by concealing these facts from Plaintiffs.

172.    Sanberg knew the foregoing representations and omissions were false or misleading and acted with utter disregard and recklessness as to their truth.  Sanberg intended and understood that Plaintiffs would rely on these representations and omissions.  His very purpose in making these representations was to induce Plaintiffs to invest in Catona, directly or indirectly, and/or continue to hold their shares in Catona rather than taking action to minimize their losses from their investments therein.

173.    In reliance on these misrepresentations and omissions, Plaintiffs purchased and/or continued to hold shares, directly or indirectly, in Catona, rather than taking action to minimize their losses from their investments therein, which Plaintiffs never would have done had they known the truth.  As a result, Plaintiffs have suffered damages and losses in excess of $50 million or an amount to be proven at trial.

174.    In doing the acts alleged herein, Sanberg acted with oppression, fraud and malice. Plaintiffs are thus entitled to punitive damages.

**SECOND CAUSE OF ACTION**

**(Fraud)**

**By Plaintiffs Chicago Atlantic and Praesumo Against Joseph Sanberg, Nate Redmond, Ibrahim Alhusseini and DOES 1 through 30**

175.    Plaintiffs repeat and re-allege the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

176.    In or about the spring of 2024, Sanberg, Redmond and Alhusseini provided and presented to Chicago Atlantic and Praesumo a false financial report, attached as Exhibit D and other financial information regarding Catona.  This financial information grossly overstated the success and financial condition of Catona.

177.    In or about the spring of 2024, Redmond and Sanberg participated in a call with Chicago Atlantic and Praesumo.  Redmond and Sanberg went through the false financial report

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

32

FIRST AMENDED COMPLAINT

(Exhibit D) set forth above page by page during this call and Redmond and Sanberg endorsed the financial report and the false financial statements contained therein.

178. At no point during these communications did Sanberg, AlHusseini or Redmond disclose the truth—that Defendant Sanberg was engaged in a fraudulent scheme, as set forth above.

179. Sanberg, Redmond and Alhusseini knew the foregoing representations and omissions were false or misleading and acted with utter disregard and recklessness as to their truth. Sanberg, Redmond and Alhusseini intended and understood that Chicago Atlantic and Praesumo would rely on these representations and omissions. Their purpose in making these representations was to induce Praesumo to invest in Catona and induce Chicago Atlantic to make a loan to Sanberg.

180. In reliance on these misrepresentations, Praesumo purchased shares in Catona, and Chicago Atlantic made the loan to Sanberg. As a result, Praesumo and Chicago Atlantic have suffered damages and losses in excess of $20 million or an amount to be proven at trial.

181. In doing the acts alleged herein, Sanberg, Redmond and Alhusseini acted with oppression, fraud and malice. Plaintiffs are thus entitled to punitive damages.

## THIRD CAUSE OF ACTION

### (Aiding and Abetting Fraud)

**By All Plaintiffs Against Steve Ballmer, Ballmer Group, AGO Special Situations, LP, Ibrahim AlHusseini, Nate Redmond, Alpha Edison Management Company, LLC, David Aranoff, Baker Hostetler LLP, KPMG, Alvarez & Associates, BDO, Michael Ellis, Inherent Group and DOES 1 through 30**

182. Plaintiffs repeat and re-allege the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

183. Plaintiffs allege that Defendants Ballmer, Ballmer Group, AGO, AlHusseini, Redmond, Alpha Edison, Aranoff, Baker Hostetler, KPMG, Alvarez & Associates, BDO, Ellis and Inherent Group knew that Sanberg was making false or misleading statements to Plaintiffs about Catona and was concealing that he was engaged in a fraudulent scheme on behalf of Catona.

184.  Defendants Ballmer, Ballmer Group, AGO, AlHusseini, Redmond, Alpha Edison, Aranoff, Baker Hostetler, KPMG, Alvarez & Associates, BDO, Ellis and Inherent Group substantially assisted Sanberg.  They gave substantial assistance to Sanberg by, among other things, helping him conceal his fraudulent activities, including as follows:

a.  Defendants Ballmer and Ballmer Group made a corrupt deal with Sanberg to allow Sanberg to use Ballmer's status as a purported investor in Catona to make Catona appear to be a successful company backed by one of the wealthiest people on the planet.  With Ballmer's knowledge and assistance, Sanberg promoted Ballmer's fraudulent investment in Catona to lend legitimacy to Catona's operations.  This encouraged good-faith investors to entrust and keep their capital with the company and helped hide the rampant fraud occurring at Catona.

b.  Defendants AlHusseini, Redmond, Aranoff and Baker Hostetler covered up and endorsed Sanberg's activities by forming a Special Committee of the Board of Directors and conducting an intentionally shoddy investigation to "clear" Sanberg of wrongdoing.

c.  Defendants AlHusseini and Redmond caused Catona to issue false financial statements, which misrepresented Catona's sales and revenue, allowing Sanberg to continue to perpetuate and conceal his fraud.

d.  Defendant AGO served as a vehicle for Sanberg's fraudulent sale of interests in Catona.

e.  Defendant KPMG, acting as Catona's outside auditor, supported and assisted the company in presenting its false financial results and fraudulent recognition of fake revenue from Sanberg's phony customers in 2021 and into 2022 by keeping silent about Sanberg's frauds, suppressing proof of Sanberg's activities and lending legitimacy to Catona's fraudulent operations by serving as its auditor.

f.  Defendant Alvarez & Associates issued an opinion stating that Catona's financial statements presented fairly, in all material respects, the financial position of Catona, despite the failure of those statements to contain any disclosure of Sanberg's activities on behalf of Catona, covering up Sanberg's fraud and casting Sanberg's activities as legitimate, despite them being as phony as a three-dollar bill.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

34

g.    Defendant BDO, acting as Catona's outside auditor, kept silent and suppressed proof of Sanberg's fraudulent activities, endorsed Catona's fraudulent accounting practices, allowed Sanberg, Redmond and AlHusseini to represent that BDO had endorsed its accounting practices and lent legitimacy to Catona's fraudulent operations by serving as its auditor.

h.    Defendant Ellis and Inherent Group provided capital for Sanberg's purported "expansion" of Catona's fraudulent sustainability business, lent legitimacy to that business as its lender and sided with and supported Defendants Sanberg, AlHusseini and Redmond in sidelining and silencing whistleblowers within Catona, in service of and to assist the cover-up of Sanberg's fraud, all to protect and enhance their investment in Catona.

185.    Defendants Ballmer, Ballmer Group, AGO, AlHusseini, Redmond, Alpha Edison, Aranoff, Baker Hostetler, KPMG, Alvarez & Associates, BDO, Ellis and Inherent Group's assistance was a substantial factor in causing millions of dollars in damages and losses to Plaintiffs, in excess of $50 million or in an amount to be proven at trial.

186.    In doing the acts alleged herein, Defendants Ballmer, Ballmer Group, AGO, AlHusseini, Redmond, Alpha Edison, Aranoff, Baker Hostetler, KPMG, Alvarez & Associates, BDO, Ellis and Inherent Group acted with oppression, fraud and malice.  Plaintiffs are thus entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### (Violation of Penal Code § 496)

**By All Plaintiffs Against Joseph Sanberg, Steve Ballmer, Ballmer Group,**

**AGO Special Situations, LP, Ibrahim AlHusseini, Nate Redmond,**

**Alpha Edison Management Company, LLC, David Aranoff, Baker Hostetler LLP, KPMG,**

**Alvarez & Associates, BDO, Michael Ellis, Inherent Group and DOES 1 through 30**

187.    Plaintiffs repeat and re-allege the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

35

188.     Defendants knowingly obtained by fraud and deceit funds belonging to Plaintiffs and concealed and aided in concealing or withholding funds belonging to Plaintiffs, knowing those funds had been obtained by fraud and deceit.  In particular:

a.     Defendants obtained and/or aided in concealing or withholding $1 million from Plaintiff Miller LLC, $500,000 from Plaintiff Miller and $100,000 from Plaintiff Karr. These funds were obtained in a manner constituting theft by fraud and deceit and Defendants concealed their theft by further fraudulent concealment.

b.     Defendants obtained and/or aided in concealing or withholding $1 million from the ALS Trust.  These funds were obtained in a manner constituting theft by fraud and deceit and Defendants concealed their theft by further fraudulent concealment.

c.     Defendants obtained and/or aided in concealing or withholding $2 million from Impact Fund II.  These funds were obtained in a manner constituting theft by fraud and deceit and Defendants concealed their theft by further fraudulent concealment.

d.     Defendants obtained and/or aided in concealing or withholding $1 million from Praesumo.  These funds were obtained in a manner constituting theft by fraud and deceit and Defendants concealed their theft by further fraudulent concealment.

e.     Defendants obtained and/or aided in concealing or withholding $250,000 from Sarin.  These funds were obtained in a manner constituting theft by fraud and deceit and Defendants concealed their theft by further fraudulent concealment.

f.     Defendants obtained and/or aided in concealing or withholding $500,000 from the PS Trust.  These funds were obtained in a manner constituting theft by fraud and deceit and Defendants concealed their theft by further fraudulent concealment.

g.     Defendants obtained and/or aided in concealing or withholding $16,000,000 from Chicago Atlantic.  These funds were obtained in a manner constituting theft by fraud and deceit and Defendants concealed their theft by further fraudulent concealment.

189.     As a result, Plaintiffs have suffered damages and losses in excess of $50 million or in an amount to be proven at trial.  Pursuant to Penal Code section 496(c), Plaintiffs are entitled to an award of treble damages, costs of suit and reasonable attorneys' fees.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

FIRST AMENDED COMPLAINT

**FIFTH CAUSE OF ACTION**

**(Violation of California Corporate Securities Law)**

**By All Plaintiffs Against Joseph Sanberg, Steve Ballmer, Ballmer Group,**

**AGO Special Situations, LP, Ibrahim AlHusseini, Nate Redmond,**

**Alpha Edison Management Company, LLC, David Aranoff, Baker Hostetler LLP, KPMG,**

**BDO, Alvarez & Associates, Michael Ellis, Inherent Group and DOES 1 through 30**

190.    Plaintiffs repeat and re-allege the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

191.    Defendants offered for sale and sold and/or materially assisted or aided in the sale of shares of Catona and AGO to Plaintiffs by misleading statements and omissions of material fact in violation of Corporations Code sections 25401, 25501, 25403, 25504 and 25504.1.  The specifics of these misleading statements and omissions of material fact to each Plaintiff are set forth above.

192.    As a result of the misleading statements or omissions by Sanberg, who was materially assisted or aided by the other Defendants, Plaintiff Miller LLC purchased 73,443 Series C preferred shares of Catona for $1 million in or about 2020, Plaintiff Karr purchased 7,334 Series C preferred shares of Catona for $100,000 in or about 2020 and Plaintiff Miller purchased 50,000 preferred shares of Catona, indirectly through AGO, for $500,000 in or about 2023.  These shares were securities.

193.    As a result of the misleading statements or omissions by Sanberg, who was materially assisted or aided by the other Defendants, the ALS Trust purchased from AGO 55,555 Series C preferred shares of Catona for $1 million in 2021.  These shares were securities.

194.    As a result of the misleading statements or omissions by Sanberg, who was materially assisted or aided by the other Defendants, Impact Fund II received a security interest in and then acquired 587,548 shares of Catona.  These shares were securities.

195.    As a result of the misleading statements or omissions by Sanberg, who was materially assisted or aided by the other Defendants, Praesumo purchased from AGO 1,175,000 common shares of Catona for $1 million.  These shares were securities.

FIRST AMENDED COMPLAINT

196.     As a result of these misleading statements or omissions by Sanberg, who was materially assisted or aided by the other Defendants, Sarin purchased shares of Catona for $250,000.  These shares were securities.

197.     As a result of these misleading statements or omissions by Sanberg, who was materially assisted or aided by the other Defendants, the PS Trust purchased shares of Catona for $500,000.  These shares were securities.

198.     As a result of the misleading statements or omissions by Sanberg, who was materially assisted or aided by the other Defendants, Chicago Atlantic received a security interest in shares of Catona.  These shares were securities.

199.     As a result, Plaintiffs are entitled to rescission of the sale of these securities and have suffered damages and losses in excess of $50 million or in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(1)     For damages in excess of $50 million or in an amount to be proven at trial;

(2)     For treble damages;

(3)     For interest;

(4)     For attorneys' fees and costs;

(5)     For costs of suit incurred herein; and

(6)     For such other relief that the Court deems just and proper.

DATED:  November 3, 2025          Respectfully submitted,

MILLER BARONDESS, LLP

By: _____
        LOUIS R. MILLER
        Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a jury trial on any and all claims so triable.

DATED:  November 3, 2025

Respectfully Submitted,

MILLER BARONDESS, LLP

By: _____

LOUIS R. MILLER
Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT

## INDEX OF EXHIBITS

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| A. | Sanberg Plea Agreement | 41-73 |
| B. | Department of Justice Announcement re Sanberg Plea Agreement | 74-77 |
| C. | SEC Complaint | 78-101 |
| D. | Catona Climate: Confidential 2023 Year End Board Report | 102-133 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

FIRST AMENDED COMPLAINT

# EXHIBIT A

Case 26-50233-TMH    Doc 17-1    Filed 04/28/26    Page 48 of 144

BILAL A. ESSAYLI
Acting United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
Major Frauds Section
JENNA G. WILLIAMS (Cal. Bar No. 307975)
Transnational Organized Crime Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2429
     Facsimile: (213) 894-0241
     E-mail:    Nisha.Chandran@usdoj.gov

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
THEODORE M. KNELLER (D.C. Bar No. 978680)
ADAM L.D. STEMPEL (D.C. Bar No. 1615015)
Trial Attorneys, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue, NW
     Washington, DC 20530
     Telephone: (202) 514-5799
     Facsimile: (202) 514-3708
     Email: Theodore.Kneller@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**FILED**
CLERK, U.S. DISTRICT COURT

**8/20/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:25-cr-00200(A)-SVW |
| Plaintiff, | |
| v. | PLEA AGREEMENT FOR DEFENDANT JOSEPH NEAL SANBERG |
| JOSEPH NEAL SANBERG, | |
| Defendant. | |

1.   This constitutes the plea agreement between JOSEPH NEAL

SANBERG ("defendant") and the United States Attorney's Office for the

Central District of California (the "USAO") and the Fraud Section of

the Department of Justice's Criminal Division (the "DOJ") in the

**Page 42**

above-captioned case.  This agreement is limited to the USAO and DOJ (collectively referred to herein as the "United States") and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>DEFENDANT'S OBLIGATIONS</u>

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the United States and provided by the Court, appear and plead guilty to counts one and two of the first superseding information in <u>United States v. Joseph Neal Sanberg</u>, CR No. 2:25-cr-00200(A)-SVW, in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with a wire fraud, in violation of 18 U.S.C. § 1343.

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

2

h.   Agree that any and all criminal debt ordered by the Court will be due in full and immediately.  The United States is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

i.   Complete the Financial Disclosure Statement on a form provided by the United States and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the United States by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 312 North Spring Street, 11th Floor, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j.   Authorize the United States to obtain a credit report upon returning a signed copy of this plea agreement.

k.   Consent to the United States inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

3.   Defendant further agrees:

a.   To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, or involved in the illegal activity to which defendant is pleading guilty, specifically including, but not limited to, the following:

3

i.   $138.50 seized from Bank of America account 3251-5678-8058 (Consolidated Asset Tracking System ID ("CATS ID") 25-FBI-003506);

ii.   $605.91 seized from Bank of America account 3830-2602-6099 (CATS ID 25-FBI-003502);

iii. $2,187.68 seized from Bank of America account 3940-0164-7725 (CATS ID 25-FBI-003504);

iv.   $9,190.53 seized from Bank of America account 0094-5480-1102 (CATS ID 25-FBI-003505); and

v.   All funds, securities, or negotiable instruments, seized from Bank of America Account 41-01-100-0166771 (CATS ID 25-FBI-003501, collectively, the "Forfeitable Property").

b.   To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Property and to the forfeiture of the property.

c.   That the Preliminary Order of Forfeiture shall become final as to the defendant upon entry.

d.   To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

e.   Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees

4

to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property. Defendant further waives any and all notice requirements of 18 U.S.C. § 983(a)(1)(A).

f.   Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

g.   Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

h.   To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

i.   To fill out and deliver to the United States a completed financial statement listing defendant's assets on a form provided by the USAO.

j.   That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

k.   To the entry as part of defendant's guilty plea of a personal money judgment of forfeiture against defendant in the amount of $6,650,000.00, which sum defendant admits was derived from proceeds traceable to the violations described in the factual basis of the plea agreement.  Defendant understands that the money judgment of forfeiture is part of defendant's sentence and is separate from any fines or restitution that may be imposed by the Court.

l.   That with respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture at sentencing, and incorporation of

5

the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property and the money judgment of forfeiture in any proceeding on any grounds including, without limitation, that the forfeiture of the Forfeitable Property or the money judgment of forfeiture constitute an excessive fine or punishment.  Defendant acknowledges that the forfeiture of the Forfeitable Property and the money judgment of forfeiture are part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty pleas.

THE UNITED STATES' OBLIGATIONS

4.    The United States agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    At the time of sentencing, move to dismiss the underlying indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.  Defendant further agrees that he may be treated as if he had been convicted of the dismissed charges for purposes of U.S.S.G. § 1B1.2(c), regardless of whether the factual basis below would be sufficient to satisfy all elements of each

6

charge.  Defendant waives the right to challenge the sufficiency of the factual basis as to any element of any dismissed charge.

d.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, and the conditions set forth in paragraph 2 through 3 are met and defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e.   Not seek a sentence of imprisonment above the high end of the applicable Sentencing Guidelines range corresponding to an offense level of 36 and the criminal history category calculated by the Court.  For purposes of this agreement, the high end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A.  The parties also agree that the government may respond to a request by defendant for a sentence below the government's recommendation.

NATURE OF THE OFFENSES

5.   Defendant understands that for defendant to be guilty of the crime charged in counts one and two in the first superseding information, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, the following must be true for each count: (1) defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts;

7

(2) the statements made, or facts omitted, as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

<u>PENALTIES AND RESTITUTION</u>

6.   Defendant understands that the statutory maximum sentence that the Court can impose for each violation of Title 18, United States Code, Section 1343, is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

7.   Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 40 years imprisonment; a 3-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $200.

8.   Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offenses to which defendant is pleading guilty.  Defendant agrees that, in return for the United States' compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty.  In particular, defendant agrees that

8

the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offenses to which defendant is pleading guilty.  The parties currently believe that the applicable amount of restitution is approximately $248,703,886.00, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

9.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

10.    Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated

9

collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

11.  Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case make it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

FACTUAL BASIS

Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the United States agree to the statement of facts provided in the factual basis included as Attachment A to this plea agreement and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 13 below, but is not meant to be a complete recitation of all facts relevant to

10

the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS

12.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other Section 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

13.   Defendant and the United States agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base offense level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss greater than $150 million: | +26 | U.S.S.G. § 2B1.1(b)(1)(N) |
| 10 or more victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| Offense involved sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense: | +2 | U.S.S.G. § 2B1.1(b)(17)(A) |

The United States will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an

11

additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 2 through 3 are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  The parties agree that defendant did not use violence or credible threats of violence in connection with the offense.  Subject to paragraph 28 below, defendant and the United States agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed, except that either party may seek or oppose, and argue for or against the applicability of a zero-point offender adjustment under U.S.S.G. § 4C1.1.  If, however, the U.S. Probation Office finds in preparing the Presentence Report that the zero-point offender adjustment does not apply for any reason including because (i) the defendant personally caused substantial financial hardship, or (ii) defendant should receive an adjustment for aggravating role under U.S.S.G. § 3B1.1, the United States may concur with Probation's findings if asked by the Court.  Defendant agrees, however, that if, after signing this agreement, but prior to sentencing, defendant were to commit an act, or the United States were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the United States, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the United States would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.

12

14.    Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

15.    Subject to paragraph 4(e) above, defendant and the United States reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

WAIVER OF CONSTITUTIONAL RIGHTS

16.    Defendant understands that by pleading guilty, defendant gives up the following rights:

a.    The right to persist in a plea of not guilty.

b.    The right to a speedy and public trial by jury.

c.    The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.    The right to be presumed innocent and to have the burden of proof placed on the United States to prove defendant guilty beyond a reasonable doubt.

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

13

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

WAIVER OF APPEAL OF CONVICTION

17.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

WAIVER OF APPEAL AND COLLATERAL ATTACK

18.  Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, including, to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (e) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

14

**Page 55**

19. Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

20. This agreement does not affect in any way the right of the United States to appeal the sentence imposed by the Court.

WAIVER OF RIGHTS CONCERNING PLEA COLLOQUY AND FACTUAL BASIS

21. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing; (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

22. Defendant further agrees that this paragraph of the agreement is severable. Thus, defendant's waivers are binding and effective even if, subsequent to defendant's signing this agreement,

15

defendant declines to plead guilty, the Court declines to accept his guilty plea, or, if this agreement is of the type described in Federal Rule of Criminal Procedure 11(c)(1)(A) or (c)(1)(C), the Court rejects this agreement.  Defendant also agrees that his waivers are binding and effective even if some other portion of this agreement is found to be invalid by this Court or the Ninth Circuit.

RESULT OF WITHDRAWAL OF GUILTY PLEAS

23.  Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then the United States will be relieved of all of its obligations under this agreement and should the United States choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

EFFECTIVE DATE OF AGREEMENT

24.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an attorney for the United States.

16

BREACH OF AGREEMENT

25.  Defendant agrees that if defendant, at any time after the effective date of the agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the United States may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the United States to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the United States in writing.  If the United States declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas.

b.   The United States will be relieved of all its obligations under this agreement; in particular, the United States: will no longer be bound by any agreements (i) concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crimes to which defendant has pleaded guilty; and (ii) regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the United States would otherwise have been obligated to dismiss pursuant to this agreement.

c.   The United States will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

26.  Following the Court's finding of a knowing breach of this agreement by defendant, should the United States choose to pursue any

17

charge that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of the defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

OFFICE NOT PARTIES

27. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the United States' sentencing recommendations or the parties' agreements to facts or sentencing factors.

28. Defendant understands that both defendant and the United States are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 13 are consistent with the facts of this case. While this paragraph permits both the United States and defendant to submit full and complete

18

factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the United States' obligations not to contest the facts agreed to in this agreement.

29. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

30. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the United States and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

//

//

19

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

31. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

BILAL A. ESSAYLI
Acting United States Attorney

DEPARTMENT OF JUSTICE
CRIMINAL DIVISION

LORINDA I. LARYEA
Acting Chief, Fraud Section

_____          August 20, 2025
NISHA CHANDRAN                            Date
JENNA G. WILLIAMS
Assistant United States Attorneys

THEODORE M. KNELLER
ADAM L.D. STEMPEL
Trial Attorneys, Fraud Section
Department Of Justice
Criminal Division


Signed by:

_____          August 15, 2025
JOSEPH NEAL SANBERG                       Date
Defendant

_____          August 18, 2025
BRIAN R. MICHAEL                          Date
MARC L. MUKASEY
Attorneys for Defendant JOSEPH NEAL
SANBERG

20

<u>CERTIFICATION OF DEFENDANT</u>

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

Signed by:

_____          August 15, 2025
JOSEPH NEAL SANBERG                                Date
Defendant

21

**Page 62**

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am JOSEPH NEAL SANBERG's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____        ___August 18, 2025_____
BRIAN R. MICHAEL                        Date
MARC L. MUKASEY
Attorneys for Defendant JOSEPH NEAL
SANBERG

22

**Page 63**

**ATTACHMENT A – FACTUAL BASIS**

Defendant acknowledges that if this case proceeded to trial, the United States would prove the following facts, among others, which defendant acknowledges to be true, beyond a reasonable doubt.

At times relevant to this factual basis:

**I.   Background**

Relevant Entities and Individuals

1.   JOSEPH NEAL SANBERG ("defendant") was the co-founder of Company A, and, at various times, was Company A's largest shareholder and served on Company A's board of directors.

2.   Company A maintained its principal office in Los Angeles County, California.

3.   Investor Fund A was a private credit fund that made a loan to defendant.

4.   Investor Fund B was a private credit fund that made a loan to defendant.

5.   Co-Schemer Ibrahim Ameen AlHusseini was a resident of Los Angeles, California and served on the board of directors of Company A.

6.   Investment Adviser 1 was an investment adviser to Investor Fund A and Investor Fund B.

7.   Individual 1 solicited potential investors and lenders on behalf of defendant.

8.   Investment Manager 1 managed one or more investment funds that made a loan to defendant.

9.   Sanberg Entity 1 was a closely held legal entity, which had one or more bank accounts controlled by defendant.

10.   Sanberg Entity 2 was a closely held legal entity, which had one or more bank accounts controlled by defendant.

11.   LOI Customer 1 was an entity that defendant presented to Company A as a bona fide customer.

12.   Employee 1 was an officer of Company A.

<u>Overview of Scheme to Defraud</u>

13.   Beginning no later than in or around January 2020, and continuing through in or about February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant and others knowingly and with intent to defraud, devised, intended to devise, and participated in a scheme to defraud lenders and investors and to obtain money and property from those lenders and investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

**II.   <u>False and Fraudulent Representations to Lenders</u>**

14.   Beginning no later than in or around January 2020, defendant negotiated terms for a loan from Investor Fund A of approximately $55 million (the "Investor Fund A Loan") for the benefit of defendant and others.  Under the terms of the Investor Fund A Loan, defendant pledged approximately 10.3 million shares of Company A stock as collateral.

15.   To secure the Investor Fund A Loan, defendant and co-schemer Ibrahim Ameen AlHusseini arranged a separate financial transaction (a put option agreement) between co-schemer AlHusseini and Investor Fund A.  The put option agreement purported to act as a type of financial guarantee by obligating co-schemer AlHusseini to purchase the Company A stock posted as collateral from Investor

2

Fund A for tens of millions of dollars if defendant defaulted on the loan.

16. Defendant and co-schemer AlHusseini knowingly and intentionally made, and caused to be made, materially false and fraudulent representations to Investor Fund A and Investment Adviser 1 that co-schemer AlHusseini had sufficient liquid assets to pay tens of millions of dollars for the shares of Company A stock in the event of defendant's default. In truth and in fact, co-schemer AlHusseini did not have sufficient liquid assets to cover the obligations in the put option agreement if defendant defaulted on the loan. Defendant knew that the put option agreement was a material term of the Investor Fund A Loan.

17. But at relevant times, defendant knew that co-schemer AlHusseini did not have sufficient assets to pay tens of millions of dollars to Investor Fund A in co-schemer AlHusseini's bank and brokerage accounts that were identified to Investor Fund A and Investment Adviser 1.

18. Defendant and co-schemer AlHusseini prepared, or caused to be prepared, materially false and fraudulent bank and brokerage account statements that overstated the liquid assets in co-schemer AlHusseini's bank and brokerage accounts by tens of millions of dollars.

19. Defendant and co-schemer AlHusseini sent, or caused to be sent, the false and fraudulent bank and brokerage account statements showing co-schemer AlHusseini's purported assets, by means of wire communications in interstate commerce, to Investment Adviser 1 and Investor Fund A to obtain the $55 million loan for defendant.

3

20.  In or around November 2021, defendant negotiated with Investment Advisor 1 to refinance the terms of the Investor Fund A Loan by taking out a new loan from Investor Fund B for $145 million.

21.  In or around November 2021, defendant and co-schemer AlHusseini sent, or caused to be sent, falsified bank and brokerage account statements, by means of interstate wires, containing materially false and fraudulent statements regarding co-schemer AlHusseini's purported assets to Investment Adviser 1 and Investor Fund B to obtain the $145 million loan for defendant.

22.  From in or around February 2020 and continuing until at least in or around October 2024, defendant concealed the scheme to defraud from Investment Adviser 1, Investor Fund A, and Investor Fund B.

23.  Additionally, beginning in or around October 2024, defendant negotiated the terms of a loan with Investment Manager 1, to be collateralized by defendant's shares in Company A.  In furtherance of the scheme and artifice to defraud lenders, defendant made and caused to be made materially false and fraudulent representations to Investment Manager 1 regarding the financial condition of Company A, including by providing and causing to be provided a copy of a letter purportedly signed by Company A's Audit Committee that falsely overstated Company A's available cash by hundreds of millions of dollars.

24.  Specifically, in furtherance of the scheme to defraud and to carry out an essential part of the scheme, on or about June 5, 2024, defendant sent an email via interstate wire from within the Central District of California to Individual 1 in Florida, attaching a letter purporting to be written and signed by members of

4

Company A's Audit Committee (the "Audit Committee Letter").  The Audit Committee Letter contained materially false representations that defendant knew to be false.  Among other things, the Audit Committee Letter stated that Company A had "a balance of cash and equivalents of at least $250,000,000."  In truth and in fact, Company A had a cash balance of less than $1,000,000 in June 2024.

25.  Defendant knowingly and intentionally sent the Audit Committee Letter to Individual 1 for the purpose of obtaining money or property by means of materially false or fraudulent pretenses and misrepresentations and with the intent to deceive and cheat. Defendant knew that the letter contained materially false representations and intended that the materially false representations would fraudulently influence others to part with money or property.

26.  The materially false and fraudulent statements in the Audit Committee Letter were capable of influencing, intended to influence, and did in fact influence Investment Manager 1's decision to loan defendant approximately $16,000,000 in or around January 2025.

III.   **False and Fraudulent Representations to Investors**

27.  Defendant also sent and caused to be sent false and fraudulent representations to investors seeking to invest in various assets related to Company A, including purchasing shares of Company A stock and making pooled investments to acquire debt securities issued by Company A through defendant.  In furtherance of the scheme, defendant caused Company A's revenue to be falsely inflated and misrepresented Company A's revenue and assets to induce those investments.

5

A. Revenue Fraud

28. Beginning no later than January 2021, Company A established a business line, known as "enterprise sustainability services," in which Company A sold tree planting services to individuals and companies interested in reducing their environmental impact.

29. Beginning no later than January 2021, defendant solicited small businesses and individuals, directly and through intermediaries, to sign "Letters of Intent" with Company A. The Letters of Intent stated that each small business or individual (collectively, the "LOI Customers") would pay for tens of thousands of trees to be planted on a recurring monthly or quarterly basis at a price of $1 per tree.

30. Certain LOI Customers paid Company A for the tree planting services described in the Letters of Intent with funds received from defendant. Defendant concealed from Company A investors that defendant was the source of funds for the payments under the Letters of Intent. These certain LOI Customers were not bona fide purchasers of the tree planting services from Company A.

31. Between in or about March 2021 and November 2022, defendant paid millions of dollars to LOI Customers, who then paid Company A. At times, defendant paid the LOI Customers using money he received from Company A. For example, in or around January 2022, as a result of defendant's actions, Company A entered into a 12-month, $8 million advisory contract for business development services with one of defendant's closely held entities, Sanberg Entity 1.

32. On or about January 31, 2022, Company A paid Sanberg Entity 1 $8 million. The $8 million payment to Sanberg Entity 1 was made using funds of investors in Company A.

6

33.   On or about March 14, 2022, defendant:

a.   Made two transfers of approximately $350,000 each from the prepaid $8 million from the bank account of Sanberg Entity 1 to defendant's personal checking account;

b.   Made two subsequent transfers of approximately $350,000 each from defendant's personal checking account to an account for another one of defendant's closely held entities, Sanberg Entity 2; and

c.   Made two more subsequent transfers to Company A for $350,000 each from the Sanberg Entity 2 bank account and listed the name of LOI Customer 1 and an invoice number in each wire instruction.

34.   Defendant also made or caused to be made additional payments to Company A directly from bank accounts held in the names of Sanberg Entity 2 and other closely held entities that defendant controlled.  To conceal from Company A's investors that defendant was in fact was the source of these funds, defendant made these payments to Company A purportedly on behalf of LOI Customers through the Sanberg Entity 2 bank account, and through other accounts in the names of other entities that defendant controlled.  Defendant concealed from Company A investors that he controlled Sanberg Entity 2 and the other closely held entities that defendant used to make payments to Company A on behalf of LOI Customers.

35.   On or about March 21, 2022, defendant knowingly sent encrypted messages via interstate wires using a smartphone application called "Signal" from within the Central District of California to Employee 1 of Company A in Arizona to carry out an essential part of the scheme.  Defendant informed Employee 1 via the

7

messages that the March 14, 2022 payments of $350,000 to Company A from Sanberg Entity 2 should be credited to LOI Customer 1.

36. To conceal the scheme to defraud from Company A's investors, defendant's March 21, 2022 text messages to Employee 1 contained deceitful statements of half-truths, and statements that omitted material facts. Defendant made such statements to Employee 1 with the intent to deceive and cheat Company A investors.

37. At relevant times and to further conceal the scheme to defraud, defendant also instructed Company A not to contact the LOI Customers to conceal from Company A's investors and creditors that certain payments for tree planting services pursuant to Letters of Intent were made by or indirectly funded by entities controlled by defendant and not from the LOI Customers.

38. From in or around March 2021 through in or around November 2022, Company A recognized as revenue the anticipated monthly and quarterly payments from each of the LOI Customers in the amounts specified in the Letters of Intent. Company A recognized that revenue from the LOI Customers as being from arms-length third parties and not as related-party revenue from Company A's co-founder, defendant.

39. The revenue booked from the LOI Customers materially misstated the recognized revenue of Company A such that Company A's financial statements were materially inaccurate.

40. At relevant times, defendant knew Company A's financial statements materially misstated revenue from LOI Customers. Knowing that Company A's financial statements materially misstated Company A's revenue, defendant knowingly and intentionally, through the use of interstate wires, solicited investors to purchase

8

securities to invest in Company A by means of materially false and fraudulent representations, and statements that omitted material facts.

B. Inflated Assets Fraud

41.   In furtherance of the scheme to defraud, defendant also made, and caused to be made, materially false and fraudulent representations that materially overstated Company A's value and assets, including Company A's available cash, to multiple investors for the purpose of influencing their decision to purchase Company A stock or to make pooled investments to acquire debt securities issued by Company A.

42.   From at least in or around June 2024 to in or around January 2025, defendant knowingly and intentionally made, and caused to be made, materially false and fraudulent representations that overstated Company A's available cash by hundreds of millions of dollars to investors for the purpose of influencing their decisions to invest in securities related to Company A.

IV.   Conclusion

43.   From in or around August 2024 to at least in or around February 2025, defendant accepted and received, directly or indirectly, criminal proceeds of the wire fraud scheme.  Defendant transferred at least approximately $6,650,000 to an account held in defendant's name at a financial institution, account number 41-01-100-0166771, knowing that the deposits were the proceeds of some form of unlawful activity, namely proceeds of the victim-lenders' and victim-investors' funds that defendant obtained from the wire fraud scheme.

9

44.   In accepting and receiving those victim-lenders' and victim-investors' funds, defendant deposited millions of dollars in unlawful proceeds from the scheme to defraud in an account with a financial institution.  The financial institution later loaned defendant more than $1 million because defendant posted the millions of dollars deposited to the account as collateral for the loan. Accordingly, defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense.

45.   Defendant's scheme to defraud lenders and investors involved sophisticated means as described above, including the use of sophisticated loan and investment structures, and multiple corporate entities, and defendant intentionally engaged in or caused the conduct constituting sophisticated means.

46.   In total, defendant's scheme to defraud lenders and investors involved 10 or more victims who sustained actual pecuniary harm, and victim losses are at least approximately $248,703,886.

10

# EXHIBIT B



**United States
Attorney's Office**
Central District of California

**Page 75**



PRESS RELEASE

# Orange County Man and Aspiration Partners Co-Founder Agrees to Plead Guilty to $248 Million Scheme to Defraud Investors and Lenders

Thursday, August 21, 2025

**For Immediate Release**

U.S. Attorney's Office, Central District of California

*LOS ANGELES* – An Orange County man who co-founded and served as board member of the financial technology and sustainability services company formerly known as Aspiration Partners Inc., was charged today by criminal information and agreed to plead guilty to defrauding multiple investors and lenders.

Joseph Neal Sanberg, 46, of Orange, is charged with two counts of wire fraud, felonies that each carry a statutory maximum sentence of 20 years in federal prison. He has agreed to plead guilty to both counts.

Sanberg is expected to formally enter a guilty plea in the coming weeks.

"This so-called 'anti-poverty' activist has admitted to being nothing more than a self-serving fraudster, by seeking to enrich himself by defrauding lenders and investors out of hundreds of millions of dollars," said Acting United States Attorney Bill Essayli. "I commend our law enforcement partners for their efforts in this case, and I urge the investing public to use caution and beware of wolves in sheep's clothing."

**Page 75**

"For years, Joseph Sanberg used his position at Aspiration to deceive investors and lenders for his own benefit, causing his victims over $248 million in losses," said Acting Assistant Attorney General Matthew R. Galeotti of the Justice Department's Criminal Division. "The Criminal Division is committed to pursuing, charging, and convicting fraudsters like Sanberg, who cause significant harm to their victims and undermine our financial institutions."

"The defendant didn't just bend the truth, he built a business on a lie to boost the company's value and line his own pockets," said Inspector in Charge Eric Shen of the United States Postal Inspection Service (USPIS), Criminal Investigations Group. "The Postal Inspection Service will go after this kind of calculated deception. No matter who you are, you will be brought to justice."

"This is a case about greed and abuse of trust," said Assistant Director Jose A. Perez of the FBI Criminal Investigative Division. "Today's guilty plea is a direct result of the commitment by the FBI and our law enforcement partners to hold those accountable who set out to defraud victims and undermine our financial system. The FBI will continue to work with our partners to ensure this kind of malicious behavior is investigated and stopped."

According to court documents, beginning in 2020 and continuing into 2025, Sanberg devised a scheme to use his role as a co-founder and board member of Aspiration as well as his shares of company stock to defraud various lenders and investors.

Between 2020 and 2021, Sanberg and Ibrahim AlHusseini, both members of Aspiration's board of directors, fraudulently obtained $145 million in loans from two lenders by pledging shares of Sanberg's Aspiration stock. Sanberg and AlHusseini also falsified AlHusseini's bank and brokerage statements to fraudulently inflate AlHusseini's assets by tens of millions of dollars to secure the loans. Beginning in 2021, Sanberg also defrauded Aspiration's investors by concealing that he was the source of certain revenue recognized by the company.

Court documents also state that Sanberg personally recruited companies and individuals to sign letters of intent with Aspiration in which they committed to pay tens of thousands of dollars per month for tree planting services. Sanberg used legal entities under his control to conceal that these payments came from Sanberg rather than from the customers. Sanberg instructed Aspiration employees not to contact the customers that he had recruited to conceal his scheme.

Aspiration booked revenue from these customers between March 2021 and November 2022, but Sanberg did not disclose that he was the source of the payments. As a result, Aspiration's financial statements were inaccurate and reflected much higher revenue than the company in fact received. Sanberg continued to solicit investors to invest in Aspiration securities into 2025.

According to the documents, Sanberg also defrauded other lenders and investors with fraudulent materials describing Aspiration's financial condition, including a fabricated letter from Aspiration's audit committee that falsely stated that Aspiration had $250 million in available cash and equivalents at a time that Aspiration had less than $1 million in available

cash. Sanberg used these fraudulent financial materials to obtain millions of dollars in additional loans and investments in Aspiration securities. Sanberg's victims sustained more than $248 million in losses.

USPIS and the FBI are investigating this matter.

Assistant United States Attorneys Nisha Chandran of the Major Frauds Section and Jenna Williams of the Transnational Organized Crime Section and Justice Department Trial Attorneys Theodore Kneller and Adam L.D. Stempel of the Criminal Division's Fraud Section are prosecuting this case.

If you believe you are a victim in this case, please contact the Fraud Section's Victim Witness Unit toll-free at (888) 549-3945 or by email at victimassistance.fraud@usdoj.gov. To learn more about victims' rights, please visit www.justice.gov/criminal/criminal-vns/victim-rights-derechos-de-las-v-ctimas.

**Contact**

Ciaran McEvoy

Public Information Officer

ciaran.mcevoy@usdoj.gov

(213) 894-4465

*Updated August 21, 2025*

**Topic**

FINANCIAL FRAUD

**Component**

USAO - California, Central

Press Release Number: 25-223

**Page 77**

# EXHIBIT C

DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov
MATTHEW T. MONTGOMERY (Cal. Bar No. 260149)
Email: montgomerym@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission
Brent W. Wilner, Associate Director
Douglas M. Miller, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH NEAL SANBERG, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendant Joseph Sanberg ("Defendant" or "Sanberg") has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant resides in this district.

## SUMMARY

4.      Between in or about January 2021 and December 2022, Sanberg, the co-founder, board member, and shareholder of an environmental sustainability services company, Aspiration Partners, Inc. ("Aspiration"), engaged in a scheme to artificially inflate the company's revenue in order to attract investors and increase the value of its stock.  To carry out the scheme, Sanberg made materially false and misleading statements to investors and engaged in other deceptive acts.

5.      To make it appear as though Aspiration's business was rapidly growing, Sanberg recruited friends, associates, small businesses, and religious organizations and presented them to Aspiration as bona fide customers who were fully committed to paying large sums of money for Aspiration's services.  These purported customers signed "letters of intent" or other one-to-two-page agreements ("LOIs") promising to pay $25,000 to $750,000 on a recurring basis in return for the company's reforestation services.

6.      In reality, however, these LOIs were a sham because the purported customers (the "LOI Customers") had no intention of paying for the sustainability services they received from Aspiration.  In fact, Sanberg made it clear to the LOI Customers that they did not actually have to pay for the services Aspiration provided.

2

7.      Sanberg just needed the LOI Customers to sign the sham LOIs so that Aspiration could recognize the amounts in them as revenue, creating the false appearance that Aspiration was experiencing "explosive growth" and allowing Sanberg to tout Aspiration's performance to investors looking to buy its stock.

8.      To add apparent legitimacy to these sham LOIs and ensure that Aspiration would continue recognizing the amounts on the LOIs as revenue, Sanberg paid the initial payment obligations of the LOI Customers by either sending funds to LOI Customers directly or sending funds to an entity that would then transfer those funds to Aspiration.  Sanberg made these payments in a way to avoid detection by Aspiration.

9.      Even as Sanberg stopped paying LOI Customer obligations, and Aspiration was left with a ballooning uncollected and aging receivable LOI balance, the company continued to recognize the amounts on the LOIs as revenue.

10.      Sanberg took several steps in furtherance of this fraudulent scheme. Using his influence as a co-founder, large shareholder, and board member of the company, he limited the access that Aspiration employees had to the LOI Customers to avoid detection and continue his secret payments on their behalf.  Sanberg also vouched for the LOI Customers and pushed for the amounts in the LOIs to be recognized as revenue, even though the LOI Customers had no intention of making payments and large portions of the purported revenue went uncollected.  In addition, Sanberg made false and misleading statements about Aspiration's revenue to investors, saying things like the LOI Customers were "recurring, sticky and value-add" when, in fact, the LOI Customers had no intention of paying for the sustainability services they received from Aspiration.  Sanberg also led certain investors to believe—falsely—that Aspiration's revenue projections for fiscal year 2022 were over $100 million higher than what the company had stated publicly.

11.      The purported LOI Customer revenue artificially increased Aspiration's revenue by approximately $44 million for fiscal year 2021, even though

3

approximately $33,875,000 of that amount remained uncollected by December 31, 2021, and the rest had been paid by Sanberg.

12.     In total, Sanberg's scheme resulted in his recruiting approximately 27 LOI Customers between 2021 and 2022, all of whom were ostensibly required to pay between $25,000 and $750,000 to Aspiration on a recurring basis.

13.     Through his fraud, Sanberg raised more than $300 million from investors who falsely believed Aspiration had a thriving environmental sustainability services business.

14.     By engaging in this conduct, Sanberg violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(3), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder.

15.     Accordingly, the SEC seeks an order against Defendant: permanently enjoining him from future violations of these provisions and from participating in the issuance, purchase, offer, or sale of any security other than for his own personal accounts; requiring him to pay disgorgement of ill-gotten gains and prejudgment interest; requiring him to pay civil monetary penalties; and imposing an officer-and-director bar against him.

## THE DEFENDANT

16.     **Joseph Neal Sanberg**, age 46, resides in Anaheim, California.  He is a co-founder and, until March 2025, was a member of the board of directors of Aspiration.  Sanberg also controls several other entities.  Sanberg and his entities held 29.82% of Aspiration's shares as of September 2021.

## RELATED ENTITIES

17.     **Aspiration Partners, Inc.** (n/k/a CTN Holdings, Inc.), a Delaware corporation based in Marina del Rey, California, was formed in 2013 to provide consumer banking services to consumers focused on environmental sustainability.  In early 2024, Aspiration sold its financial services business and rebranded its carbon business as Catona Climate Solutions LLC ("Catona").  In or about March 2025,

4

**Page 82**

CTN Holdings, the parent company of Catona, filed for bankruptcy.  Neither Aspiration nor its securities have been registered with the Commission in any capacity.

18.    **InterPrivate Financial Partners III** ("InterPrivate"), a Delaware corporation based in New York, New York, was formed as a blank check company, or Special Purpose Acquisition Company ("SPAC"), to pursue a business combination.  InterPrivate's securities are registered under Section 12(b) of the Exchange Act and its common stock is quoted on the New York Stock Exchange (ticker symbol: IPVF).  Starting in around August 2021, InterPrivate sought to acquire Aspiration through a merger agreement that was ultimately terminated.

**THE ALLEGATIONS**

**A.    The Fraudulent Scheme**

**1.    Sanberg's Influence and Control Over Aspiration**

19.    In 2013, Sanberg co-founded Aspiration, a privately held financial services company focused on environmental sustainability.

20.    Sanberg was a large shareholder in and board member of Aspiration, and exercised decision-making authority over its business operations and fund-raising activities.

21.    Sanberg was also personally and financially tied to the success of Aspiration.

22.    From March 2020 through at least November 2021, Sanberg obtained more than $100 million in loans by pledging over ten million Aspiration shares as collateral.

23.    Sanberg made clear to others that maintaining and increasing the value of Aspiration's shares was important to him personally, and would also benefit Aspiration.

24.    For example, on November 29, 2020, Sanberg texted Aspiration's co-founder and Chief Executive Officer ("CEO"): "Figure out how to get me the money

5

tomorrow or I'll be in default.  It's your turn to do what needs to be done. . . .  But if you don't get me the money tomorrow we are all f…ed.  Get me the money.  Your turn to figure it out like I have for so long.  Wire it to the [Sanberg-entity] account.  If you don't then [the lender] will foreclose.  This will give you a good taste of what I have to experience every day.  I hate you and I hate this company and I don't want to work anymore with you [ ].  You are so oblivious to what you've forced me to have to do."

### 2.    Sanberg Takes Advantage of a New Line of Business

25.    In late 2020, Aspiration began offering environmental sustainability services directly to individual and corporate customers under a wholly owned subsidiary called Aspiration Sustainable Impact Services, LLC ("ASIS").

26.    This new line of business offered carbon offsets and reforestation services, i.e., tree-planting, where customers would pay Aspiration, which in turn would pay a third party to plant trees.

27.    Starting in or around December 2020, Sanberg began to recruit the LOI Customers, including those friends and associates he directly communicated with and those who heard about the opportunity from those friends and associates.

28.    Sanberg made it clear to the LOI Customers he communicated with directly that they could receive reforestation and carbon footprint reduction services from Aspiration at no charge, through subsidies or "sponsorships."

29.    Specifically, Sanberg told them that he or his entities would pay Aspiration, or provide the LOI Customers funds to pay Aspiration, for these services.

30.    As a result of Sanberg's representations, the LOI Customers believed that they did not have to pay for Aspiration's reforestation services, and had no intention of paying for them.

### 3.    Sanberg Has His Customers Sign Bogus "Letters of Intent"

31.    Despite his verbal assurances to the LOI Customers that they need not pay for the services they received from Aspiration, starting in or around January

6

2021, Sanberg prepared, or caused others to prepare, LOIs that made it appear like those customers were financially obligated to purchase a certain number of "trees per month" in return for a monthly/quarterly fee to Aspiration.

32.    These LOIs were illusory because they did not indicate that customers were not actually obligated or expected to pay the monthly/quarterly fees.

33.    The LOI Customers signed the LOIs, and Aspiration's CEO counter-signed them on behalf of Aspiration.

34.    In 2021, Aspiration entered into approximately 27 LOIs and each of the LOI Customers purportedly agreed to pay amounts ranging from $25,000 to $750,000 to Aspiration on a monthly/quarterly basis.

35.    The chart below contains the initials of the LOI Customers, the effective dates of the LOIs, and the purported monthly or quarterly payment obligations:

| INITIALS | DATES | AMOUNT |
| --- | --- | --- |
| A.P.M. | 1/1/2021 | $500,000 |
| D. | 1/1/2021 | $250,000 |
| G.P.M.S. | 1/1/2021 | $50,000 |
| G.B. (assigned to S.B.) | 1/1/2021 | $350,000 |
| 3.E. | 2/1/2021 | $250,000 |
| C.M. | 2/1/2021 | $50,000 |
| C.E. | 2/1/2021 | $100,000 |
| E.L.F. | 2/1/2021 | $50,000 |
| F.A.V.R. | 2/1/2021 | $50,000 |
| F.A. | 2/1/2021 | $50,000 |
| J.M. | 2/1/2021 | $50,000 |
| Y.I.N.B.H. | 2/1/2021 | $25,000 |
| E.P. | 3/1/2021 (amended from 2/1/2021 LOI) | $425,000 |
| M.E. | 3/1/2021 (amended from 2/1/2021 LOI) | $100,000 |
| 5.N.A.V. | 3/1/2021 | $50,000 |
| D.D.C. | 3/1/2021 | $150,000 |
| G.R. | 3/1/2021 | $50,000 |
| N.C. | 3/1/2021 | $25,000 |
| O.C. | 3/1/2021 | $50,000 |

| O. | 3/1/2021 | $50,000 |
|---|---|---|
| S.S.E. | 3/1/2021 | $75,000 |
| V. | 3/1/2021 | $50,000 |
| W. | 3/1/2021 | $50,000 |
| W.P. | 3/1/2021 | $50,000 |
| A.C.D. | 6/1/2021 | $750,000 |
| H.L.I. | 6/1/2021 | $300,000 |
| S.I. | 6/1/2021 | $50,000 |

### 4.   Sanberg Limits Access to the LOI Customers

36.   Sanberg tightly controlled Aspiration's communications with the LOI Customers, preventing Aspiration from conducting onboarding procedures designed to, *inter alia*, ensure that Aspiration's customers could meet their financial obligations.

37.   Sanberg even had to approve the process by which invoices were sent to LOI Customers.

38.   For example, on February 17, 2021, when Aspiration's CEO emailed Sanberg asking for an LOI Customer's address to send an invoice, Sanberg replied: "You should send it to me.  And for all my relationships with [the LOI Customers] please email me the invoices to pass on."

39.   Similarly, on March 26, 2021, when Aspiration's CEO asked Sanberg for his permission to send February and March 2021 invoices to an LOI Customer, Sanberg permitted the executive to send only one of the two invoices.

### 5.   Sanberg Secretly Makes Payments for the LOI Customers

40.   Despite the purportedly binding payment obligations imposed on LOI Customers, Sanberg made any and all payments on their behalf.

41.    Sanberg did this by sending funds from bank accounts he controlled to either the LOI Customer or Aspiration.

42.   As one example, Sanberg paid the LOI Customer obligations by sending funds to the LOI Customer, as follows:

    a.    On June 4, 2021, Aspiration emailed the March invoice to E.P. for $425,000;

    b.    On June 14, 2021, Aspiration emailed the April invoice to E.P. for $425,000;

    c.    On June 14, 2021, Sanberg wired $450,000 from a bank account he controlled to E.P.;

    d.    On June 15, 2021, E.P. wired $425,000 to Aspiration;

    e.    On June 15, 2021, Sanberg wired $450,000 from a bank account he controlled to E.P.; and

    f.    On June 15, 2021, E.P. wired $425,000 to Aspiration.

43.    As another example, Sanberg paid the LOI Customer obligations by sending funds first to a separate entity, which would then send those funds to Aspiration, as follows:

    a.     On March 19, 2022, Aspiration emailed a September 2021 invoice to S.B.;

    b.    On March 22, 2022, Sanberg wired $350,000 from a bank account he controlled to a separate entity affiliated with Sanberg;

    c.    On March 22, 2022, that entity transferred the $350,000 to Aspiration, with a description indicating that the funds were for S.B.'s invoice.

44.    In these ways, Sanberg provided and sent the funds for every payment that was made by an LOI Customer to Aspiration from 2021 to 2022.  These payments totaled approximately $33,575,000.

    **6.**    **Aspiration's Artificially Inflated Revenues Are Recognized and Disseminated to the Public**

45.    In or around March 2021, Aspiration sought to become a public company through a SPAC merger.  In pursuit of this goal, Aspiration hired KPMG to conduct an audit of Aspiration's finances.

9

46. KPMG considered Aspiration's expected revenue stream from LOI Customers an important factor in its audit.

47. With Sanberg's support, Aspiration recognized the revenue purportedly generated by the LOI Customers as actual revenue, despite the fact that Sanberg had agreed to cover their payments and despite concerns among Aspiration's finance department regarding the collectability of such payments.

48. The revenue recognized from LOI Customers represented a significant portion of Aspiration's overall revenue for fiscal year 2021.

49. Specifically, for fiscal year 2021, LOI Customer revenue accounted for approximately $44 million of Aspiration's $100.6 million in recognized revenue. Aspiration recognized this approximate $44 million in LOI Customer revenue, even though approximately $33,875,000 million remained uncollected as of December 31, 2021.

50. On August 18, 2021, Aspiration announced the proposed SPAC merger with InterPrivate in a joint press release that was attached to a publicly filed Form 8-K.

51. In an August 2021 investor presentation, which was attached to Aspiration's Form 8-K filed on August 18, 2021, Aspiration titled a slide "Explosive growth from a standing start" and noted its "Corporate ESG [or Environmental, Social, and Governance] Business has Scaled Rapidly . . ."

52. The slide showed significant growth in Aspiration's annual recurring revenue in the first two quarters of 2021, referring to the number of "corporate clients" (i.e., primarily the LOI Customers) and revenue from the same.

53. In a Form S-4 filed on February 15, 2022, InterPrivate included Aspiration's results of operations for the nine months ended September 30, 2021, which compared to the nine months ended September 30, 2020, showing that "[e]nterprise sustainability services revenue" went from $0 in 2020 to $33.7 million in 2021.

10

**Page 88**

54.     The same Form S-4 showed that Aspiration's total revenue went from $9.2 million for the nine months ended September 30, 2020 to $62 million for the nine months ended September 30, 2021.

55.     In a press release a few days later, Aspiration's CEO stated: "Our results for the fourth quarter and full year 2021 demonstrate Aspiration's key role at the forefront of driving the sustainability revolution" and "Aspiration's strong, ongoing growth in revenues and gross profits reinforces the power of our differentiated business model . . . ."

56.     In the same press release, Aspiration announced that its total revenue in 2021 was $100.6 million, "up 584%" from 2020 due in part to "Enterprise Sustainability Services."

**7.     Sanberg Solicits Investors by Touting the Artificially Inflated Revenues**

57.     Between September and December 2021, Investor 1 purchased over $50 million in Aspiration stock.

58.     Before Investor 1 made this investment, Sanberg touted Aspiration's successes and profitability in the corporate ESG sector to Investor 1's Chief Investment Officer ("CIO") in person and over the phone, making materially false and misleading statements to Investor 1 in the process.

59.     As an example, Sanberg touted how Aspiration's ESG business "represented a large area of profitability" for the company.

60.     Further, on February 17, 2022, shortly after the investment and as a lulling tactic, Sanberg emailed Investor 1's CIO with a subject line "analysis of Aspiration 4Q results," noting that "Aspiration produced $100mm of revenue" in 2021, and touting how Aspiration was "growing as fast/faster" and "a lot more efficiently and profitably than projected."

61.     Investor 1's CIO considered these representations about Aspiration's successes in the corporate ESG sector and rapid growth to be "extremely important"

11

in Investor 1's decision to purchase Aspiration stock, as it made the company look "incredibly well" financially.

62.    On December 15, 2021, Investor 2 purchased $250 million in Aspiration stock through a special purpose entity.

63.    Prior to this investment, on September 2, 2021, Aspiration shared detailed financials with Investor 2, including the purported revenue from LOI Customers for the first half of 2021.

64.    On September 8, 2021, after reviewing the financials, Investor 2's managing director asked, among other things, about the average term of the agreements that LOI Customers were signed up to and whether they were "one-off consulting agreements."

65.    On the same day, Sanberg emailed a reply to Investor 2's question, saying that the agreements with LOI Customers were "definitely not one-off consulting agreements" and "we are engaging our corporate clients in long term relationship[s]."

66.    In that same email, Sanberg said he "wanted to call out this point because I think it's such a big deal" and noted that Aspiration's relationship with the LOI Customers was "recurring, sticky and value-add" in nature.

67.    In an October 12, 2021 email, Sanberg told Investor 2 about a specific LOI Customer, E.P., saying that it was "carbon neutral through Aspiration" and that he expected "more opportunities for deals like this."

68.    Investor 2 considered these representations regarding the purported success, long-term relationship, and revenue generated from the LOI Customers to be important in its decision to invest.

**8.    Sanberg Further Inflates the Already Inflated Revenues**

69.    At the start of 2022, Aspiration hoped to take advantage of its purportedly strong 2021 financial performance, based in large part on "revenue" generated by the LOI Customers, and use it to attract even more investors.

12

70. InterPrivate included in its February 15, 2022 Form S-4 that Aspiration expected an estimated $254 million in total revenue for fiscal year 2022. The Form S-4 also contained a "Letter from the Co-Founders" of Aspiration—identified as the CEO and Sanberg—to "Prospective Shareholders," stating that the enterprise sustainability services revenue for the nine months ended September 30, 2021 "represents a significant avenue for future growth."

71. Despite these estimates in the Form S-4, Sanberg wanted to separately present much higher projections (i.e., $385-to-$386 million) to select, potential investors who had signed confidentiality agreements.

72. Aspiration's Chief Financial Officer ("CFO") disagreed with Sanberg on this approach, due to issues with recognizing and collecting LOI Customer revenue, and expressed a preference for sharing the publicly disclosed, lower projection.

73. Specifically, on March 14, 2022, the CFO informed Sanberg: "We do have some revenue recognition risk that I wanted to outline for you. . . . As such, we may not be able to recognize all the revenues outlined [in Sanberg's higher projections]."

74. In that same email, the CFO told Sanberg: "There is also risk with the existing Enterprise business.[] Our collection has been poor and KPMG may push us to reverse or write off some revenue. But our main challenge today is revenue recognition. . . . Considering the revenue recognition risk, my recommendation is to go out with one set of projections ($255M)."

75. On March 31, 2022, the Aspiration board, which included Sanberg, received the company's 2022 budget, which forecasted the lower $255 million in revenue for fiscal year 2022, largely driven by a forecast of $150 million in "[e]nterprise sustainability revenue."

76. However, Sanberg still insisted on showing select investors the higher projections.

77.    After the March 31, 2022 email to Aspiration's board with the lower forecast, Sanberg went forward with circulating the higher projections to prospective investors who had signed confidentiality agreements.

78.    On April 6, 2022, Sanberg emailed a prospective investor this confidential "Investor Addendum," which projected that Aspiration would achieve "$386 million in total revenues in 2022" and discussed "strong demand generated by our Enterprise business."

79.    In the same April 6, 2022 email, Sanberg told the potential investor that the Investor Addendum contained "internal projections" that were "substantially ahead of the public projections that Aspiration disclosed to the marketplace."

80.    Sanberg was also copied on an April 25, 2022 email from an Aspiration executive to another prospective investor containing the higher 2022 revenue projections—i.e., more than $385 million in revenue for fiscal year 2022 based on expected revenue of over $280 million in "Enterprise Sustainability Services"—and purported actual revenue from LOI Customers in 2021.  In this email, the executive similarly told this prospective investor that the higher projections were "based on our internal targets rather than the more conservative numbers we've shared publicly."

81.    The prospective investors who received these inflated projections considered them important in deciding whether to invest in Aspiration.

**9.    Sanberg Obtained Money and Shares from Aspiration as a Result of the Artificially Inflated Revenue**

82.    Sanberg received significant compensation from Aspiration between 2021 and 2022 for his work recruiting LOI Customers.

83.    For example, on April 12, 2021, an Aspiration board resolution granted Sanberg an option to purchase 3,338,809 shares of Aspiration stock.

84.    Aspiration's CEO later memorialized this grant by signing an Aspiration services contract dated September 13, 2021, which stated that "in exchange for Joseph Sanberg's advisory services related to Aspiration Sustainable Impact Services

14

LLC . . . the Company has offered 3,338,809 common stock options of the Company to Joseph Sanberg [] in consideration for these services."

85.   In September 2021, Aspiration internally valued 3,338,809 in its common stock at tens of millions of dollars.

86.   Aspiration's CEO signed another services contract dated July 29, 2021, which obligated Aspiration to pay one of Sanberg's entities $475,000 "in exchange for Joseph Sanberg's services related to Aspiration's Sustainable Impact Services LLC."

87.   Aspiration's CEO signed another services contract dated August 30, 2021, which obligated Aspiration to pay one of Sanberg's entities $550,000 and specified that the payment was "related to Aspiration Sustainable Impact Services LLC."

88.   Aspiration's CEO signed another Aspiration services contract dated September 30, 2021, which obligated Aspiration to pay one of Sanberg's entities $525,316 "in exchange for Joseph Sanberg's services related to [Aspiration's] sustainability impact business."  An identical contract dated October 22, 2021, for $512,476, was also signed by the CEO.

89.   In all, in 2021, Aspiration paid Sanberg and his entities over $3.6 million in cash.

90.   In addition, during its January 2022 meeting, the Aspiration board granted Sanberg a one-time cash bonus of $8,000,000, deeming such a grant "advisable and in the in best interests of the Company."

91.   In the same January 2022 meeting, the Aspiration board approved the grant of "9,000,000 shares of fully vested Restricted Stock to Joseph Sanberg . . . to reward Mr. Sanberg for his service to the Company and in order to incent Mr. Sanberg to continue his service to the Company."

92.   In all, in 2022, Aspiration paid Sanberg and his entities approximately $8 million in cash.

15

**Page 93**

93. As of December 31, 2022, Sanberg and his entities owned more than 33 million shares of Aspiration stock, representing 24.8% of all outstanding shares of the company.

94. Aspiration made these lucrative payouts to Sanberg despite having low cash reserves and employees expressing concerns over Aspiration's ballooning accounts receivable and accounts payable balances.

95. Moreover, Sanberg used a portion of millions of dollars he obtained from Aspiration to pay the monthly/quarterly fees owed by the LOI Customers.

96. For example, Sanberg used nearly $2.3 million of his aforementioned $8 million cash bonus from January 2022 to pay invoices for approximately five LOI Customers in early February 2022.

**10. Sanberg's Inflated Revenue Scheme Falls Apart**

97. In 2022, revenue from the LOI Customers accounted for over $40 million of Aspiration's $216,764,449 in recognized revenue.

98. However, Aspiration's accounts receivable balance had increased to approximately $104 million by June 2022, higher than the entirety of the company's 2021 revenue.

99. On March 18, 2022, an Aspiration accountant lodged an internal complaint to express concerns about "related party transactions" pertaining to Aspiration's reforestation services business, lack of supporting documentation for LOI Customer revenue, Aspiration's uncollected balances, and invoicing issues.

100. As a result, the Aspiration board agreed to form a Special Committee to investigate these concerns. By April 5, 2022, all board members, including Sanberg, signed the "Action by Written Consent of the Board" establishing the Special Committee.

101. On or about July 5, 2022, after the creation of the Special Committee, KPMG resigned as Aspiration's outside auditor, citing, among other factors, "revenue transactions that had characteristics of fraud."

16

102. In late 2022, Aspiration's new management launched a revenue remediation project that resulted in Aspiration restating its financial statements for fiscal years 2021 and 2022.

103. In August 2023, InterPrivate announced that it was abandoning its SPAC merger with Aspiration.

**B.      Sanberg's False and Misleading Statements**

104. In furtherance of and in connection with the fraudulent scheme to artificially inflate Aspiration's revenue, Sanberg made various false and misleading representations to investors.

105. Sanberg was the maker of these false and misleading statements because he had ultimate authority over their content and/or approved their dissemination.

106. Sanberg's false and misleading statements were material in that they would have been viewed by a reasonable investor as important in making an investment decision and as having significantly altered the total mix of information made available to the investor.

107. First, Sanberg represented to investors that Aspiration's LOI Customer business—which was referred to as Aspiration's corporate ESG business, Enterprise Sustainability business, or ASIS business—was highly successful and profitable.

108. Second, he represented to investors that LOI Customers were long-term customers.

109. Third, he specifically identified a few specific LOI Customers for investors, to prove that they existed.

110. Fourth, he circulated to investors inflated 2022 projections that were premised on revenue from the LOI Customers.

111. All of these representations were materially false and misleading because Sanberg omitted the fact that he assured the LOI Customers they would not have to pay for Aspiration's services, that the LOI Customer revenue was predicated on Sanberg paying the monthly/quarterly fees on behalf of the LOI Customers, that

17

Sanberg was partially relying on money he obtained from Aspiration to cover those monthly/quarterly payments, and that a significant portion of the LOI Customer revenue remained uncollected.

112.   In addition, with respect to the 2022 projections, Sanberg omitted that Aspiration's CFO expressed concerns about the collectability of the projected revenue and its ability to be recognized as revenue.

**C.     Sanberg Acted with Scienter and Negligently**

113.   Sanberg acted with scienter in carrying out the scheme to defraud and in making the false and misleading statements to investors.  Sanberg also acted negligently in carrying out his scheme and in making the false and misleading statements, that is, Sanberg failed to exercise the level of care that a reasonable person would have exercised under the same circumstances.

114.   Sanberg's scienter and failure to act reasonably under the circumstances is demonstrated, in part, by the following:

(a)     Sanberg knew, or was reckless and negligent for not knowing, that the LOIs were artificially inflating Aspiration's revenue, both internally and to the public, because he assured LOI Customers they did not actually have to make the payments set forth in the LOIs.

(b)     Sanberg paid the invoices sent to the LOI Customers by either paying Aspiration or by wiring money to the LOI Customers for the customers to pay Aspiration.

(c)     Sanberg limited Aspiration's communication with the LOI Customers, controlling who could send invoices to them, and how many invoices could be sent at one time.

(d)     Sanberg ensured that little to no due diligence was done on the LOIs themselves, including on the identity and paying ability of the LOI Customers.

(e)     Despite knowing that he told LOI Customers they would not have to pay for Aspiration's services, and that most of the LOI Customer

18

monthly/quarterly payments were not actually being made, Sanberg touted the LOI Customers to Aspiration investors, calling them "a big deal" and claiming they were "recurring, sticky and value-add."

(f)     Despite knowing that his inflated 2022 projections were based on LOI Customer revenue that he financed and was largely uncollected, Sanberg created, advocated for, and disseminated to investors those inflated projections.

(g)     Sanberg knew, or was reckless and negligent for not knowing, that the inflated 2022 projections were riddled with revenue recognition issues, as specifically outlined for him by Aspiration's CFO, before he sent them out to investors.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

115.   The SEC realleges and incorporates by reference paragraphs 1 through 114 above.

116.   In connection with the purchase or sale of securities, Sanberg engaged in a scheme to defraud and made material misstatements, false statements, and omissions to investors.  Specifically, Sanberg (1) recruited LOI Customers to buy Aspiration's tree-planting services and maintained exclusive relationships with them; (2) had LOI Customers sign LOIs that purportedly obligated them to pay Aspiration over a long period of time but assured them that they would not actually have to do so; (3) made those payments himself through accounts he controlled and, in some cases, with money Aspiration paid him; (4) ensured that Aspiration recognized such payments and uncollected LOI Customer payments as revenue even though LOI Customers did not pay the amounts due and the LOIs themselves were not properly vetted; (5) made false statements to investors that such "revenue" was a sign of Aspiration's long-term success; and (6) lulled investors with financials showing such purported revenue.

117.   By engaging in the conduct described above, Sanberg, with scienter, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

118.   By engaging in the conduct described above, Sanberg violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

119.   The SEC realleges and incorporates by reference paragraphs 1 through 114 above.

120.   In the offer or sale of securities, Sanberg engaged in a scheme to defraud and made material misstatements, false statements, and omissions to investors. Specifically, Sanberg (1) recruited LOI Customers to buy Aspiration's tree-planting services and maintained exclusive relationships with them; (2) had LOI Customers sign LOIs that purportedly obligated them to pay Aspiration over a long period of time but assured them that they would not actually have to do so; (3) made those payments himself through accounts he controlled and, in some cases, with money Aspiration paid him; (4) ensured that Aspiration recognized such payments and uncollected LOI Customer payments as revenue even though LOI Customers did not pay the amounts due and the LOIs themselves were not properly vetted; (5) made false statements to investors that such "revenue" was a sign of Aspiration's long-term

20

**Page 98**

success; (6) lulled investors with financials showing the purported revenue; and (7) disseminated false, unsupported, and inflated projections to prospective investors.

121.   By engaging in the conduct described above, Sanberg, with scienter, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

122.   By engaging in the conduct described above, Sanberg violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant from directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

**IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and/or Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], prohibiting Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**V.**

Order Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3); 78u(d)(5) and 78u(d)(7)].

**VI.**

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for their violations of the federal securities laws.

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

22

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 21, 2025

*/s/ Daniel S. Lim*

Daniel S. Lim
Attorney for Plaintiff
Securities and Exchange Commission

### Jury Demand

The SEC demands trial by jury on liability.

Dated:  August 21, 2025

*/s/ Daniel S. Lim*

Daniel S. Lim
Attorney for Plaintiff
Securities and Exchange Commission

# EXHIBIT D



**Catona Climate: Confidential 2023 Year End Board Report       March 5, 2024**

## Section 1: Pipeline and Current Clientele

Catona entered 2024 with a strong advanced negotiation stage pipeline representing $3.4 billion of potential contract value.  Given historic close rates for this section of the pipeline and that it represents deals in final documentation, a near 100% close rate is expected.  Current clientele represents $4.5 billion of contract value at 60% gross margin to be realized over the next 4 years.

## Section 2: 2023 Operating Results

In 2023, Catona successfully rationalized expenses in its consumer business in preparation for selling that business in 2024.  Furthermore, Catona continued to scale adoption of its enterprise carbon credits to include new clients like Microsoft, Meta, Deloitte, Bank of America and Societe Generale among others.

## Section 3: 2024 and 2025 Projections

On the foundation of its pipeline and revenue under contract, Catona is well positioned to meet its 2024 and 2025 projections.

## Section 4: Historic Operating Results

Catona has successfully executed on an evolution from an unprofitable consumer fintech business (formerly known as Aspiration) to a prosperous producer and enterprise provider of high quality carbon removal credits.

## Appendix

Catona has differentiated its origination and production of high quality carbon removal credits through a technology strategy that has widened its moat and engendered loyalty and preference among the highest quality enterprise clients for carbon removal credits.

## Audit Committee Authorization

The financial results presented herein are the results that have been presented to Catona's auditors at BDO, which is engaged in preparing audited financials for the past 3 years.

_____
Nate Redmond

Audit Committee Chair

_____
Ibrahim AlHusseini

Audit Committee Member

**Catona Climate Year End Review:**

**Section 1 – Pipeline and Current Clientele**

Catona entered 2024 with a strong advanced negotiation stage pipeline representing $3.4 billion of potential contract value. Given historic close rates for this section of the pipeline and that it represents deals in final documentation, a near 100% close rate is expected. Current clientele represents $4.5 billion of contract value at 60% gross margin to be realized over the next 4 years.

Pipeline of Potential Clients – Confidential Advanced Negotiation – Page 1

Active – Page 2

Clients Under Contract – Confidential Client Schedule – Page 4

Revenue by Quarter – Page 5

**Catona Climate**
**Client Prospect Pipeline**                                    *CONFIDENTIAL*
**As of 2023 Dec 15**
**Advanced Negotiations and Active**
*(USD in Millions)*

| Client Prospect | Sector | Contract Size | Term (years) | Potential 2024 Revenue |
|---|---|---|---|---|
| **Status:  Advanced Negotiations** | | | | |
| American Express | Financial Institution | 400 | 5 | 80 |
| Royal Bank of Canada (RBC) | Financial Institution | 350 | 5 | 70 |
| Societe Generale (second contract) | Financial Institution | 350 | 5 | 70 |
| TD Bank Group | Financial Institution | 280 | 5 | 56 |
| Citigroup | Financial Institution | 250 | 5 | 50 |
| Salesforce (third contract) | Software | 250 | 4 | 63 |
| Shopify | E-commerce | 200 | 5 | 40 |
| Provisão Business & Carbon | Conglomerate | 180 | 5 | 36 |
| McKinsey | Consulting | 175 | 5 | 35 |
| Credit Suisse | Financial Institution | 175 | 6 | 29 |
| Morgan Stanley | Financial Institution | 150 | 3 | 50 |
| Shell | Energy | 150 | 3 | 50 |
| Edison Energy | Energy | 150 | 3 | 50 |
| ICE/Intercontinental Exchange Inc | Financial Institution | 120 | 5 | 24 |
| Pavilion Energy | Energy | 100 | 4 | 25 |
| Kataman | Energy | 50 | 3 | 17 |
| Advent Health | Health Care | 50 | 4 | 13 |
| Alterra Mountain Company | Hospitality | 20 | 4 | 5 |
| **Total Adv Neg** | | **$    3,400** | | **$    762** |

*Memo: "Advanced Negotiations" means verbal commitment obtained from client; 95% conversion/close rate within 12 months and 75% conversion/close rate within 6 months*

| 2024 Revenue Plan | | |
|---|---|---|
| Projection ** | $ | 1,086 |
| Under Contract | | 1,044 |
| New contract revenue needed | $ | 42 |
| % of Advance Negotiations $ required | | 6% |

*** Projections are built around aggregate probability weighting of holistic potential Customer's in pipeline.*

**Catona Climate**
**Client Prospect Pipeline**                                              *CONFIDENTIAL*
**As of 2023 Dec 15**
**Advanced Negotiations and Active**
*(USD in Millions)*

| Client Prospect | Sector | Contract Size | Term (years) | Potential 2024 Revenue |
|---|---|---|---|---|
| **Status: Active** | | | | |
| Qatar Energy | Energy | $ 1,000 | | |
| Mastercard | Financial Institution | 400 | | |
| American Express | Financial Institution | 400 | | |
| JPMorgan Chase | Financial Institution | 400 | | |
| Macquarie Energy Group | Energy | 400 | | |
| Mitsui & Co. Energy Trading Singapore | Conglomerate | 400 | | |
| TotalEnergies | Energy | 350 | | |
| Constellation Energy | Energy | 300 | | |
| Uplight | Energy | 250 | | |
| Wells Fargo | Financial Institution | 250 | | |
| Bloomberg | Financial Institution | 200 | | |
| Airbnb | Travel and Hospitality | 200 | | |
| Port/City of LA | Logistics | 200 | | |
| Pivot Energy | Energy | 200 | | |
| OMV Exploration and Production | Energy | 200 | | |
| Brookfield Renewables (Luminace) | Energy | 200 | | |
| HSBC | Financial Institution | 150 | | |
| Snap | Social Media | 150 | | |
| Netflix | Media | 150 | | |
| Goldman Sachs | Financial Institution | 140 | | |
| ACT Commodities Group | Energy | 100 | | |
| Targray | Energy | 100 | | |
| Orsted | Energy | 100 | | |
| Nexamp | Energy | 100 | | |
| Persefoni | Energy | 90 | | |
| AFS Energy | Energy | 70 | | |
| Cargill | Concessions | 50 | | |
| Measurabl | Software | 40 | | |
| DRW | Energy | 35 | | |
| Allbirds | E-commerce | 30 | | |
| Chooose | E-commerce | 30 | | |
| Greenly | E-commerce | 30 | | |
| OTC Flow | Financial Institution | 25 | | |
| Alterra Mountain Company | Hospitality | 20 | | |
| Monumental Sports | Hospitality | 20 | | |
| Cogo | Energy | 20 | | |
| WSP | Energy | 20 | | |
| Earthchain | Energy | 15 | | |
| Guidehouse | Energy | 10 | | |
| Anthesis | Strategy Consulting | 10 | | |
| Stok | Software | 10 | | |
| **Total Active** | | **$ 6,865** | | |

*Memo: "Active" means analysis of carbon footprint complete and serious interest*

**Page 107**

**Catona Climate**
**Client Prospect Pipeline**                                                                                      *CONFIDENTIAL*
**As of 2023 Dec 15**
**Advanced Negotiations and Active**
*(USD in Millions)*

| Client Prospect | Sector | Contract Size | Term (years) | Potential 2024 Revenue |
|---|---|---|---|---|

*Profitable Growth and Partnership Strategies:  2023-2026*

1. *Develop new customers in existing targeted sectors*
2. *Develop new products and services in existing sectors*
        *- Project-related carbon credit offtake*
        *- Carbon credit spot sales through online marketplaces*
        *- Self-service carbon credit salkes for mid-tier and smaller enterprises*
        *- Real estate "net zero" strategies*
        *- Consumer carbon credit sales*
3. *Expand into new sectors*
        *- E-commerce-linked reforestation and carbon removal*
        *- Retail integration of climate solutions*
        *- Advisory and Consulting integration*
4. *Expand Customer relationships outside traditional US market focus*

**Page 108**

**Catona Climate**
**Clients Under Contract**
**As of 2023 Dec 15**
*(USD in Millions)*

*CONFIDENTIAL*

| Client | Sector | Contract Size | Term (years) | Contracted Annual Revenue | In Current 2024 Projections (Y=Yes) |
|---|---|---|---|---|---|
| **Status:  Under Contract** | | | | | |
| Microsoft | Software | $        500 | 5 | $        100 | Y |
| Bank of America | Financial Institution | 300 | 5 | 60 | Y |
| NEC Global | Tech Hardware | 300 | 5 | 60 | Y |
| Meta | Social Media | 240 | 5 | 48 | Y |
| Intel | Tech Hardware | 220 | 4 | 55 | Y |
| ING | Financial Institution | 200 | 5 | 40 | Y |
| ENGIE | Energy | 200 | 4 | 50 | N |
| Qatar Free Zones Authority | Conglomerate | 200 | 8 | 25 | Y |
| Deloitte | Strategy Consulting | 150 | 3 | 50 | Y |
| Deloitte 2 | JV | 150 | 4 | 38 | N |
| Salesforce 2 | Software | 125 | 5 | 25 | Y |
| Societe Generale | Financial Institution | 100 | 5 | 20 | Y |
| 7 Glaciers | Energy | 100 | 3 | 33 | Y |
| BP | Energy | 90 | 3 | 30 | Y |
| Lyft | Transportation | 80 | 3 | 27 | Y |
| Boston Consulting Group | Services | 75 | 5 | 15 | Y |
| LA Clippers | Sports | 75 | 20 | 4 | Y |
| Forum | Entertainment | 75 | 5 | 15 | Y |
| Intuit | Software | 75 | 4 | 19 | Y |
| NEU Community Homes | Real Estate | 75 | 3 | 25 | Y |
| Schneider Electric | Industrials | 50 | 5 | 10 | Y |
| Fifth Third | Financial Institution | 50 | 5 | 10 | Y |
| CohnReznick | Strategy Consulting | 50 | 3 | 17 | Y |
| Sustainability Brands | Consumer Brands | 50 | 5 | 10 | Y |
| Fareportal | Travel | 50 | 3 | 17 | Y |
| Arctic Climate Defenders | Energy | 50 | 5 | 10 | Y |
| Clarity AI | Software | 50 | 3 | 17 | Y |
| Takeda | Miscellaneous | 40 | 3 | 13 | N |
| Etsy | Retail | 40 | 4 | 10 | N |
| Salesforce 1 | Software | 30 | 4 | 8 | Y |
| Boston Red Sox | Sports | 25 | 5 | 5 | Y |
| Autodesk | Software | 20 | 3 | 7 | Y |
| FC Barcelona | Sports | 20 | 4 | 5 | Y |
| Other 40 Clients | Miscellaneous | 676 | 4 | 169 | Y |
| | **Total Under Contract** | $      4,531 | | $      1,044 | |

---

*Memo:  "Under Contract" Characteristics and Implications*

*Contracts values are paid to Aspiration on a quarterly, pro-rata basis, relative to total contract value, to reflect delivery of carbon credits and associated services credited against those contracts.*

*When a contract begins mid quarter, a pro-rata amount is earned by Aspiration for the pro-rata carbon delivered for that portion of the quarter.*

*Contract pricing is fixed for contract duration and matched against fixed pricing for Aspiration so that margin percentage for duration of each contract is also fixed.*

**Catona Climate**
**Enterprise Sustainability Services**                                                                                 *CONFIDENTIAL*
**Revenue by Quarter**
**2020Q4 - 2022Q4 Actual; 2023B - 2024B**
*(USD in Millions)*

| Client | Sector | 2020A Q4 | 2021A Q1 | Q2 | Q3 | Q4 | 2022A Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|
| Microsoft | Software | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Bank of America | Financial Institution | - | - | - | - | - | - | - | - | - |
| NEC Global | Tech Hardware | - | - | - | - | - | - | - | - | - |
| Meta | Social Media | - | - | - | - | - | - | - | 12.0 | 12.0 |
| Intel | Tech Hardware | - | - | - | - | - | - | - | - | 7.0 |
| Qatar Free Zones Authority | Conglomerate | - | - | - | - | 1.5 | 6.0 | 6.0 | 6.0 | 6.0 |
| Deloitte | Strategy Consulting | - | - | - | - | - | 3.0 | 3.0 | 13.0 | 13.0 |
| 7 Glaciers | Energy | - | - | - | - | 2.7 | 2.7 | 8.0 | 8.0 | 8.0 |
| BP | Energy | - | - | - | - | - | - | - | - | 0.1 |
| Lyft | Transportation | - | - | - | - | - | - | - | 7.0 | 7.0 |
| LA Clippers | Sports | - | - | - | - | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Forum | Entertainment | - | - | - | - | - | - | 4.0 | 4.0 | 4.0 |
| Intuit | Software | - | - | - | - | 1.7 | 5.0 | 5.0 | 5.0 | 5.0 |
| NEU Community Homes | Real Estate | - | - | - | - | - | 2.0 | 6.0 | 6.0 | 6.0 |
| CohnReznick | Strategy Consulting | - | - | 1.3 | 1.3 | 1.3 | 1.3 | 4.0 | 4.0 | 4.0 |
| Sustainability Brands | Consumer Brands | - | - | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Fareportal | Travel | - | - | - | - | - | - | - | 4.0 | 4.0 |
| Arctic Climate Defenders | Energy | - | - | 1.0 | 1.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Clarity AI | Software | - | - | - | - | - | - | - | - | - |
| Salesforce | Software | - | - | - | - | - | - | - | - | - |
| Boston Red Sox | Sports | - | - | - | - | - | - | 1.0 | 1.0 | 1.0 |
| Autodesk | Software | - | - | - | - | - | - | - | - | - |
| FC Barcelona | Sports | - | - | - | - | - | - | - | - | - |
| Other 40 Clients | Miscellaneous | 0.6 | 6.2 | 7.8 | 9.0 | 8.8 | 11.8 | 18.8 | 38.4 | 42.2 |
| **Total** | | $ 0.6 | $ 6.2 | $ 13.2 | $ 14.3 | $ 23.0 | $ 38.8 | $ 62.8 | $ 115.4 | $ 126.3 |
| **Year Total** | | | | | | $ 56.6 | | | | $ 343.4 |

*Memo: 20Q4 was first quarter of enterprise revenue booking*

| Client | Sector | | 2023B Q1 | Q2 | Q3 | Q4 | 2024B Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|
| Microsoft | Software | | $ - | $ - | 5.0 | 10.0 | $ 25.0 | $ 25.0 | $ 25.0 | $ 25.0 |
| Bank of America | Financial Institution | $ - | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| NEC Global | Tech Hardware | | - | - | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| Meta | Social Media | | 12.0 | 12.0 | 12.0 | 12.0 | 12.0 | 12.0 | 12.0 | 12.0 |
| Intel | Tech Hardware | | 7.0 | 7.0 | 7.0 | 7.0 | 13.8 | 13.8 | 13.8 | 13.8 |
| ING | Financial Institution | | | | | | 10.0 | 10.0 | 10.0 | 10.0 |
| ENGIE | Energy | | | | | | 12.5 | 12.5 | 12.5 | 12.5 |
| Qatar Free Zones Authority | Conglomerate | | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 |
| Deloitte | Strategy Consulting | | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 |
| Deloitte 2 | Strategy Consulting | | | | | | 9.4 | 9.4 | 9.4 | 9.4 |
| Salesforce 2 | Software | | | | | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 |
| Societe Generale | Financial Institution | | | | | | 5.0 | 5.0 | 5.0 | 5.0 |
| 7 Glaciers | Energy | | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| BP | Energy | | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 |
| Lyft | Transportation | | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 |
| Boston Consulting Group | Services | | | | | | 3.8 | 3.8 | 3.8 | 3.8 |
| LA Clippers | Sports | | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Forum | Entertainment | | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Intuit | Software | | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| NEU Community Homes | Real Estate | | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 | 6.0 |
| Schneider Electric | Industrials | | | | | | 2.5 | 2.5 | 2.5 | 2.5 |
| Fifth Third | Financial Institution | | | | | | 1.3 | 2.5 | 2.5 | 2.5 |
| CohnReznick | Strategy Consulting | | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Sustainability Brands | Consumer Brands | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Fareportal | Travel | | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Arctic Climate Defenders | Energy | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Clarity AI | Software | | - | - | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Takeda | Miscellaneous | | | | | | | 3.3 | 3.3 | 3.3 |
| Etsy | Retail | | | | | | 2.5 | 2.5 | 2.5 | 2.5 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Salesforce 1 | Software | - | - | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 |
| Boston Red Sox | Sports | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Autodesk | Software | - | - | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| FC Barcelona | Sports | - | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |
| Other 40 Clients | Miscellaneous | 42.2 | 42.2 | 42.2 | 42.2 | 42.2 | 42.2 | 42.2 | 42.2 |
| | **Total** | **$148.7** | **$150** | **$177.7** | **$189.0** | **$257.6** | **$262.2** | **$262.2** | **$262.2** |
| | **Year Total** | | | | **$665.4** | | | | **$1,044.1** |

> **IMPORTANT NOTE:**  *The above illustrates solely the impact of revenues generated from ACTUAL active contracts that are in full force and effect as of the date of preparation of this model.  This model does NOT attempt to project for new contracts that may be entered by the Company with additional customers, whether such customers are currently reflected in the Company's pipeline or not.  Therefore, the Company's projections for 2023 and 2024 are expected to be higher than those outcomes portrayed above since the Company reasonably expects additional contracts to close during the 2023 and 2024 annual periods.*

/ Qtr Rev Actual

2 / 2

**Page 111**



**Catona Climate Year End Review:**

**Section 2: 2023 Operating Results**

In 2023, Catona successfully rationalized expenses in its consumer business in preparation for selling that business in 2024. Furthermore, Catona continued to scale adoption of its enterprise carbon credits to include new clients like Microsoft, Meta, Deloitte, Bank of America and Societe Generale among others.

Catona Climate
Operating Results
YTD 12/31/23

| | 2023-03-31 | 2023-06-30 | 2023-09-30 | 2023-12-31 | YTD |
|---|---|---|---|---|---|
| Enterprise Sustainability Services | $ 148,843,183 | $ 153,892,321 | $ 178,056,839 | $ 204,286,875 | $ 685,079,218 |
| Interchange - Depository | 2,064,508 | 2,105,292 | 2,136,871 | 2,139,008 | 8,445,680 |
| Interest Income | 2,593,987 | 2,538,002 | 2,714,142 | 2,716,856 | 10,562,987 |
| Consumer Subscription | 1,624,774 | 1,622,031 | 1,646,361 | 1,648,008 | 6,541,174 |
| Consumer Sustainability | 940,002 | 950,582 | 964,841 | 965,806 | 3,821,230 |
| Product Partnerships | 109,002 | 117,930 | 119,699 | 119,819 | 466,450 |
| Credit Card | 260,203 | 103,511 | 105,064 | 105,169 | 573,946 |
| Other Revenue | - | - | - | - | - |
| **Revenue** | $ 156,435,659 | $ 161,329,669 | $ 185,743,817 | $ 211,981,540 | 715,490,685 |
| Enterprise Carbon Credits | $ 24,976,431 | $ 26,487,000 | $ 30,623,309 | $ 36,134,512 | $ 118,221,253 |
| Enterprise Tree-Planting and Other Expense | 21,575,873 | 23,283,000 | 29,583,845 | 33,941,922 | 108,384,640 |
| Enterprise Sustainability Services | $ 46,552,304 | $ 49,770,000 | $ 60,207,155 | $ 70,076,434 | $ 226,605,893 |
| Service Fees | 2,993,536 | 3,041,128 | 3,071,843 | 3,074,915 | 12,181,423 |
| Interchange expense | (97,255) | (98,004) | (98,994) | (99,093) | (393,346) |
| Customer sustainability services expense | 354,341 | 339,369 | 342,797 | 343,139 | 1,379,646 |
| ATM Network | 128,813 | 115,073 | 116,235 | 116,351 | 476,473 |
| Interest Expense | 419,163 | 418,144 | 422,367 | 422,790 | 1,682,464 |
| Subscription expense | 165,617 | 168,895 | 170,601 | 170,771 | 675,884 |
| Product Partnership Expense | 7,298 | 7,564 | 7,640 | 7,648 | 30,150 |
| Credit Card Expenses | 48,309 | 25,000 | 25,253 | 25,278 | 123,839 |
| Other Expenses | - | - | - | - | - |
| | - | - | - | - | - |
| **Cost of Revenue** | 50,572,126 | 53,787,169 | 64,264,897 | 74,138,234 | 242,762,427 |
| **Gross Profit** | $ 105,863,533 | $ 107,542,500 | $ 121,478,920 | $ 137,843,306 | 472,728,259 |
| *% Margin* | 67.7% | 66.7% | 65.4% | 65.0% | 66.1% |
| Employee Stock-Based Compensation | $ 324,565 | $ 426,000 | $ 489,900 | $ 538,890 | $ 1,779,355 |
| Compensation & Benefits | 12,822,374 | 11,735,968 | 12,054,804 | 18,976,726 | 55,589,872 |
| Professional Services | 7,586,003 | 6,483,192 | 12,187,956 | 12,997,354 | 39,254,504 |
| Software | 3,515,248 | 3,754,083 | 6,612,856 | 6,745,113 | 20,627,300 |
| Hosting | 239,426 | 246,132 | 3,904,246 | 3,982,331 | 8,372,136 |
| Nottingham Fund | 107,184 | 106,710 | 248,593 | 253,565 | 716,053 |
| Bad Debt/Chargebacks/Fraud/Disputes | 6,205,792 | 5,145,502 | 108,844 | 111,021 | 11,571,159 |
| Legal | 2,740,420 | 3,147,494 | 3,836,772 | 3,913,507 | 13,638,193 |
| Rent & Utilities | 46,663 | 46,000 | 46,000 | 46,920 | 185,583 |
| Other G&A | 4,271,251 | 4,271,000 | 2,407,672 | 2,455,825 | 13,405,748 |
| | - | - | | | |
| **Total G&A** | $ 37,858,926 | $ 35,362,081 | $ 41,897,644 | $ 50,021,253 | $ 165,139,903 |

**Page 114**

| | | | | | |
|---|---|---|---|---|---|
| Acquisition | | 3,040,762 | 2,813,919 | 2,413,919 | 2,462,197 | 10,730,797 |
| Promotions | | 199,315 | 109,381 | 107,302 | 109,448 | 525,446 |
| | | | | | | |
| Brand Marketing | | 8,193,437 | 8,271,000 | 8,391,043 | 8,558,864 | 33,414,344 |
| Sponsorship | | 9,582,299 | 11,583,114 | 11,082,815 | 11,304,471 | 43,552,699 |
| Brand & Sponsorship | | 17,775,736 | 19,854,114 | 19,473,858 | 19,863,335 | 76,967,043 |
| | | | | | | |
| **Total Marketing** | | 21,015,813 | 22,777,414 | 21,995,079 | 22,434,981 | 88,223,287 |
| | | | | | | |
| **EBITDA (unadjusted)** | | $ 46,988,794 | $ 49,403,005 | $ 57,586,197 | $ 65,387,072 | $ 219,365,069 |

CTN Holdings, Inc (d/b/a Catona Climate)
Balance Sheet
4Q23

|  | | 2023-12-31 |
|---|---|---:|
| **Assets** | | |
| | | |
| Cash & Equivalents | $ | 228,394,904 |
| Receivables | | 56,356,374 |
| Inventory | | 72,572,771 |
| Prepaid Assets | | 124,798,307 |
| Other Current Assets | | 10,863,179 |
| **Total Current Assets** | | **492,985,535** |
| Fixed Assets, Net | | 65,872,247 |
| Other Assets | | 3,011,873 |
| **Total Assets** | | **561,869,655** |
| | | |
| **Liabilities & Equity** | | |
| | | |
| Accounts Payable | | 48,277,152 |
| Accrued Expenses | | 20,283,407 |
| Lease Liability | | 1,823,262 |
| Term Loan | | 62,138,322 |
| Loan Derivative | | 42,476,000 |
| Convertible Notes | | - |
| **Total Liabilities** | | **174,998,143** |
| | | |
| **Total Shareholders Equity** | | **386,871,513** |
| | | |
| **Total Liabilities & Equity** | $ | **561,869,655** |

CTN Holdings, Inc (d/b/a Catona Climate)
Cash Flow Statement
Year of 2023

| | Year ending 2023-12-31 |
|---|---|
| **Cash & Equivalents, Beginning of period** | $ **117,398,435** |
| **Operating Activities** | |
| Net Income | $ 196,961,304 |
| Add: Depreciation/Amortization | 14,848,515 |
| Add: Amortization of debt costs | |
| Add: Amortization of preferred OID | |
| Add: Stock Based Compensation | 1,779,355 |
| Accounts Receivables | (3,152,288) |
| Inventory (Carbon Credits) | (21,210,858) |
| Prepaid Assets | (56,700,864) |
| Other Current Assets | (1,033,354) |
| Lease Liability | (366,969) |
| Accounts Payable | 4,432,174 |
| Accrued Expenses | 341,477 |
| **Net cash provided by (used in) operating activities** | $ **135,898,491** |
| **Investing Activities** | |
| Fixed Assets, Gross | (15,902,022) |
| Other Assets | |
| Sale of Investment in Securities | |
| **Net cash provided by (used in) investing activities** | $ **(15,902,022)** |
| **Financing Activities** | |
| Receipts from Convertible Note C | |
| Receipts from Equity Series A,B, C and X | |
| InterPrivate Trust and PIPE, Net of Fees | |
| Term Loan Given | (9,000,000) |
| Principal payment of long-term debt | |
| Loan Derivative | |
| Other | |
| Long-term debt issued | |
| **Net cash provided by (used in) financing activities** | **(9,000,000)** |
| **Net increase (decrease) in cash** | **110,996,469** |
| **Cash & Equivalents, End of Period** | $ **228,394,904** |



**Catona Climate Year End Review:**

**Section 3: 2024 and 2025 Projections**

On the foundation of its pipeline and revenue under contract, Catona is well positioned to meet its 2024 and 2025 projections.

Catona Climate - Confidential Projections

| | 2H23 | 2H23 | 1H24 | 1H24 | 2H24 | 2H24 | 1H25 | 1H25 | 2H25 | 2H25 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2023 | 2023 | 2024 | 2024 | 2024 | 2024 | 2025 | 2025 | 2025 | 2025 |
| | 2023-09-30 | 2023-12-31 | 2024-03-31 | 2024-06-30 | 2024-09-30 | 2024-12-31 | 2025-03-31 | 2025-06-30 | 2025-09-30 | 2025-12-31 |
| | Q3'23 | Q4'23 | Q1'24 | Q2'24 | Q3'24 | Q4'24 | Q1'25 | Q2'25 | Q3'25 | Q4'25 |
| **Income Statement** | | | | | | | | | | |
| | | | | | | | | | | |
| Interchange - Depository | $ 3,843,547 | $ 4,678,380 | $ 5,454,741 | $ 6,202,977 | $ 6,972,856 | $ 7,729,558 | $ 7,806,854 | $ 7,884,922 | $ 7,963,771 | 8,043,409 |
| Interest Income | 3,523,122 | 4,378,835 | 5,082,267 | 5,693,657 | 6,305,344 | 6,913,667 | 6,982,803 | 7,052,631 | 7,123,158 | 7,194,389 |
| | | | | | | | | | | |
| Depository PWIF Fee | 2,005,329 | 2,440,894 | 2,845,951 | 3,236,335 | 3,638,012 | 4,032,812 | 4,073,141 | 4,113,872 | 4,155,011 | 4,196,561 |
| Investment PWIF Fee | 607,226 | 686,102 | 773,126 | 866,133 | 959,184 | 1,051,723 | 1,062,240 | 1,072,863 | 1,083,592 | 1,094,427 |
| Premium Subscription Fee | 900,454 | 1,050,039 | 1,215,389 | 1,392,955 | 1,572,530 | 1,753,150 | 1,770,681 | 1,788,388 | 1,806,272 | 1,824,335 |
| Subtotal - Subscription | 3,513,009 | 4,177,035 | 4,834,466 | 5,495,423 | 6,169,726 | 6,837,685 | 6,906,062 | 6,975,123 | 7,044,874 | 7,115,323 |
| | | | | | | | | | | |
| Plant Your Change Fee | 1,073,988 | 1,127,687 | 1,184,071 | 1,243,275 | 1,305,439 | 1,370,711 | 1,384,418 | 1,398,262 | 1,412,245 | 1,426,367 |
| Plant Your Change for All Revenue | 34,512 | 35,547 | 36,613 | 37,712 | 38,843 | 40,008 | 40,409 | 40,813 | 41,221 | 41,633 |
| | | | | | | | | | | |
| Consumer Sustainability Services | | | | | | | | | | |
| | | | | | | | | | | |
| Plant Your Change - Credit Card | 681,162 | 848,113 | 1,075,723 | 1,341,147 | 1,611,493 | 1,886,725 | 1,905,592 | 1,924,648 | 1,943,894 | 1,963,333 |
| Subtotal - Consumer Sustainability | 1,789,662 | 2,011,347 | 2,296,408 | 2,622,134 | 2,955,775 | 3,297,444 | 3,330,418 | 3,363,722 | 3,397,360 | 3,431,333 |
| | | | | | | | | | | |
| Enterprise Sustainability Services | 163,679,034 | 189,191,797 | 217,570,566 | 250,206,151 | 287,737,074 | 330,897,635 | 363,987,399 | 400,386,138 | 440,424,752 | 484,467,227 |
| | | | | | | | | | | |
| Product Partnerships | 705,769 | 723,202 | 873,992 | 903,559 | 924,769 | 941,665 | 951,081 | 960,592 | 970,198 | 979,900 |
| International Fee Income | 47,812 | 49,246 | 50,723 | 52,245 | 53,812 | 55,427 | 55,981 | 56,541 | 57,106 | 57,677 |
| Subtotal - Product Partnerships | 753,581 | 772,447 | 924,716 | 955,804 | 978,581 | 997,091 | 1,007,062 | 1,017,133 | 1,027,304 | 1,037,577 |
| | | | | | | | | | | |
| Interchange - Credit Card | 2,459,870 | 3,062,774 | 3,884,742 | 4,843,263 | 5,819,558 | 6,813,496 | 6,881,631 | 6,950,448 | 7,019,952 | 7,090,152 |
| Annual Fee | 711,685 | 877,343 | 1,105,975 | 1,366,568 | 1,627,381 | 1,888,308 | 1,907,191 | 1,926,263 | 1,945,526 | 1,964,981 |
| Partner/Bounty | 533,294 | 539,938 | 552,064 | 656,869 | 868,331 | 869,160 | 877,852 | 886,630 | 895,496 | 904,451 |
| Subtotal - Credit Card Revenue | 3,704,849 | 4,480,055 | 5,542,781 | 6,866,700 | 8,315,270 | 9,570,965 | 9,666,674 | 9,763,341 | 9,860,974 | 9,959,584 |
| | | | | | | | | | | |
| Other revenue | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| *By Reportable Segment:* | | | | | | | | | | |
| Consumer Financial Services | 15,338,108 | 18,486,752 | 21,838,971 | 25,214,560 | 28,741,777 | 32,048,966 | 32,369,456 | 32,693,150 | 33,020,082 | 33,350,282 |
| Consumer Sustainability Services | 1,789,662 | 2,011,347 | 2,296,408 | 2,622,134 | 2,955,775 | 3,297,444 | 3,330,418 | 3,363,722 | 3,397,360 | 3,431,333 |
| Enterprise Sustainability Services | 163,679,034 | 189,191,797 | 217,570,566 | 250,206,151 | 287,737,074 | 330,897,635 | 363,987,399 | 400,386,138 | 440,424,752 | 484,467,227 |
| Revenue | $ 180,806,804 | $ 209,689,895 | $ 241,705,945 | $ 278,042,846 | $ 319,434,626 | $ 366,244,045 | $ 399,687,272 | $ 436,443,011 | $ 476,842,193 | $ 521,248,843 |
| | | | | | | | | | | |
| Sub-Adviser Costs | 287,216 | 324,524 | 365,686 | 409,677 | 453,690 | 497,461 | 502,435 | 507,460 | 512,534 | 517,660 |
| | | | | | | | | | | |
| Galileo Processing Fee | 2,396,549 | 2,917,088 | 3,401,168 | 3,867,712 | 4,347,751 | 4,819,574 | 4,867,770 | 4,916,448 | 4,965,612 | 5,015,268 |
| Coastal Services | 924,562 | 927,474 | 937,485 | 983,053 | 1,028,644 | 1,123,985 | 1,135,225 | 1,146,577 | 1,158,043 | 1,169,623 |
| Promontory Network | 294,890 | 366,515 | 425,393 | 476,567 | 527,767 | 578,684 | 584,471 | 590,316 | 596,219 | 602,181 |
| Mastercard Fees | 1,964,805 | 2,217,366 | 2,496,018 | 2,793,824 | 3,091,774 | 3,388,085 | 3,421,966 | 3,456,186 | 3,490,748 | 3,525,655 |
| Subtotal - Service Fees | 5,868,022 | 6,752,967 | 7,625,749 | 8,530,834 | 9,449,626 | 10,407,789 | 10,511,867 | 10,616,986 | 10,723,155 | 10,830,387 |
| | | | | | | | | | | |
| Interchange/Network Costs | 143,246 | 161,853 | 182,382 | 204,323 | 226,274 | 248,104 | 250,585 | 253,091 | 255,622 | 258,178 |
| Interchange Rewards | (49,625) | (56,071) | (63,183) | (70,784) | (78,388) | (85,951) | (86,810) | (87,678) | (88,555) | (89,441) |
| Subtotal - Interchange expense | 93,621 | 105,782 | 119,200 | 133,539 | 147,886 | 162,153 | 163,775 | 165,413 | 167,067 | 168,737 |
| | | | | | | | | | | |
| Plant Your Change Costs (Debit) | 377,201 | 396,061 | 415,864 | 436,657 | 458,490 | 481,414 | 486,228 | 491,091 | 496,002 | 500,962 |
| Plant Your Change For All Expense | 1,139 | 976 | 882 | 777 | 667 | 572 | 577 | 583 | 589 | 595 |
| Consumer Sustainability Services Expense | | | | | | | | | | |
| | | | | | | | | | | |
| Credit Card PYC | 361,238 | 449,776 | 570,484 | 711,245 | 854,616 | 1,000,579 | 1,010,584 | 1,020,690 | 1,030,897 | 1,041,206 |
| Subtotal - Customer sustainability services expense | 739,577 | 846,813 | 987,230 | 1,148,679 | 1,313,773 | 1,482,564 | 1,497,390 | 1,512,364 | 1,527,487 | 1,542,762 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Enterprise Sustainability Services Expense | 62,169,627 | 71,902,825 | 82,688,249 | 95,091,486 | 109,355,209 | 125,758,491 | 138,334,340 | 152,167,774 | 167,384,551 | 184,123,006 |
| ATM Network | 392,425 | 439,892 | 492,263 | 548,233 | 604,231 | 659,921 | 666,520 | 673,185 | 679,917 | 686,716 |
| Interest Expense | 752,781 | 935,620 | 1,085,921 | 1,216,556 | 1,347,255 | 1,477,234 | 1,492,006 | 1,506,927 | 1,521,996 | 1,537,216 |
| Charity Match | 383,860 | 441,436 | 506,293 | 567,199 | 628,135 | 688,736 | 695,624 | 702,580 | 709,606 | 716,702 |
| Premium Subscription Costs | 156,722 | 188,887 | 225,844 | 267,235 | 311,328 | 358,064 | 361,645 | 365,261 | 368,914 | 372,603 |
| Subtotal - Subscription expense | 540,582 | 630,322 | 732,137 | 834,434 | 939,464 | 1,046,800 | 1,057,268 | 1,067,841 | 1,078,519 | 1,089,305 |
| Product Partnership Expense | - | - | - | - | - | - | - | - | - | - |
| Credit Card Interchange Rewards (Cashback) | 916,562 | 1,141,208 | 1,447,478 | 1,804,629 | 2,168,402 | 2,538,750 | 2,564,137 | 2,589,779 | 2,615,676 | 2,641,833 |
| Credit Card - Interchange Fees | - | - | - | - | - | - | - | - | - | - |
| Credit Card - Infrastructure Fees | 3,002 | 3,002 | 3,002 | 3,002 | 3,002 | 3,002 | 3,032 | 3,062 | 3,093 | 3,124 |
| Subtotal - Credit Card Expenses | 919,564 | 1,144,210 | 1,450,480 | 1,807,630 | 2,171,404 | 2,541,751 | 2,567,169 | 2,592,841 | 2,618,769 | 2,644,957 |
| Other Expenses | - | - | - | - | - | - | - | - | - | - |
| *By Reportable Segment:* | | | | | | | | | | |
| Consumer Financial Services | 8,566,995 | 10,008,793 | 11,505,750 | 13,071,227 | 14,659,865 | 16,295,649 | 16,458,605 | 16,623,191 | 16,789,423 | 16,957,317 |
| Consumer Sustainability Services | 739,577 | 846,813 | 987,230 | 1,148,679 | 1,313,773 | 1,482,564 | 1,497,390 | 1,512,364 | 1,527,487 | 1,542,762 |
| Enterprise Sustainability Services | 62,169,627 | 71,902,825 | 82,688,249 | 95,091,486 | 109,355,209 | 125,758,491 | 138,334,340 | 152,167,774 | 167,384,551 | 184,123,006 |
| **Cost of Revenue** | $ 71,476,199 | $ 82,758,431 | $ 95,181,229 | $ 109,311,393 | $ 125,328,847 | $ 143,536,704 | $ 156,290,335 | $ 170,303,329 | $ 185,701,462 | $ 202,623,086 |
| *By Reportable Segment:* | | | | | | | | | | |
| Consumer Financial Services | 6,771,113 | 8,477,959 | 10,333,221 | 12,143,333 | 14,081,912 | 15,753,317 | 15,910,850 | 16,069,959 | 16,230,658 | 16,392,965 |
| Consumer Sustainability Services | 1,050,085 | 1,164,534 | 1,309,178 | 1,473,455 | 1,642,003 | 1,814,880 | 1,833,028 | 1,851,359 | 1,869,872 | 1,888,571 |
| Enterprise Sustainability Services | 101,509,407 | 117,288,972 | 134,882,317 | 155,114,665 | 178,381,865 | 205,139,144 | 225,653,059 | 248,218,365 | 273,040,201 | 300,344,221 |
| **Gross Profit** | $ 109,330,605 | $ 126,931,464 | $ 146,524,717 | $ 168,731,453 | $ 194,105,779 | $ 222,707,341 | $ 243,396,938 | $ 266,139,682 | $ 291,140,732 | $ 318,625,757 |
| *% margin* | *60%* | *61%* | *61%* | *61%* | *61%* | *61%* | *61%* | *61%* | *61%* | *61%* |
| Compensation & Benefits | 10,693,602 | 11,014,410 | 11,344,842 | 11,685,187 | 12,035,743 | 12,396,815 | 12,644,751 | 12,897,646 | 13,155,599 | 13,418,711 |
| Enterprise Sales | 12,485,657 | 16,420,456 | 18,719,320 | 21,340,025 | 24,327,628 | 27,733,496 | 30,506,846 | 33,557,530 | 36,913,283 | 40,604,612 |
| Employee Stock Based Compensation | 349,738 | 361,309 | 368,010 | 379,582 | 391,153 | 402,725 | 410,780 | 418,995 | 427,375 | 435,922 |
| Professional Services | 2,258,601 | 2,371,531 | 2,490,107 | 2,614,613 | 2,745,343 | 2,882,610 | 2,940,263 | 2,999,068 | 3,059,049 | 3,120,230 |
| Software | 5,936,831 | 6,300,213 | 6,685,836 | 7,095,063 | 7,529,338 | 7,990,193 | 8,149,997 | 8,312,997 | 8,479,257 | 8,648,842 |
| Hosting | 286,435 | 286,435 | 286,435 | 286,435 | 286,435 | 286,435 | 292,163 | 298,006 | 303,967 | 310,046 |
| Nottingham Fund | 574,291 | 643,328 | 719,497 | 800,903 | 882,347 | 963,344 | 982,611 | 1,002,263 | 1,022,309 | 1,042,755 |
| Chargebacks/Credits/Refunds/Fraud/Bad Debt | 2,228,361 | 2,712,370 | 3,162,478 | 3,596,280 | 4,042,630 | 4,481,341 | 4,570,968 | 4,662,387 | 4,755,635 | 4,850,748 |
| Legal | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 612,000 | 624,240 | 636,725 | 649,459 |
| Rent & Utilities | 128,086 | 128,086 | 128,086 | 128,086 | 128,086 | 128,086 | 130,647 | 133,260 | 135,926 | 138,644 |
| Other G&A | 1,018,917 | 1,060,224 | 1,175,886 | 1,225,167 | 1,277,445 | 1,332,907 | 1,359,565 | 1,386,757 | 1,414,492 | 1,442,781 |
| **Total G&A** | 36,560,518 | 41,898,361 | 45,680,497 | 49,751,339 | 54,246,148 | 59,197,952 | 62,600,591 | 66,293,151 | 70,303,616 | 74,662,751 |
| *check zero:* | | | | | | | | | | |
| **EBITDAM (unadjusted)** | 72,770,088 | 85,033,104 | 100,844,220 | 118,980,114 | 139,859,631 | 163,509,389 | 180,796,346 | 199,846,531 | 220,837,116 | 243,963,006 |
| Acquisition | 3,676,000 | 4,540,800 | 4,540,800 | 4,540,800 | 4,540,800 | 4,540,800 | 4,540,800 | 4,540,800 | 4,540,800 | 4,540,800 |
| Promotions | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 |
| Brand Marketing & Sponsorship | 17,354,500 | 14,751,325 | 14,751,325 | 14,751,325 | 14,751,325 | 14,751,325 | 14,751,325 | 14,751,325 | 14,751,325 | 14,751,325 |
| **Total Marketing** | 21,230,500 | 19,492,125 | 19,492,125 | 19,492,125 | 19,492,125 | 19,492,125 | 19,492,125 | 19,492,125 | 19,492,125 | 19,492,125 |
| EBITDA (unadjusted) | 51,539,588 | 65,540,979 | 81,352,095 | 99,487,989 | 120,367,506 | 144,017,264 | 161,304,221 | 180,354,406 | 201,344,991 | 224,470,881 |
| Depreciation & Amortization | $ 4,294,589 | $ 4,439,269 | $ 4,584,420 | $ 4,690,282 | $ 4,847,479 | $ 5,058,482 | $ 4,584,420 | $ 4,690,282 | $ 4,847,479 | $ 5,058,482 |
| Tax | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 |
| Other Expenses (Interest Expense) | - | - | - | - | - | - | - | - | - | - |
| Interest Expense | 1,354,715 | 1,347,662 | 1,047,219 | 62,562 | 56,248 | 49,194 | 1,047,219 | 62,562 | 56,248 | 49,194 |
| Amortization of OID and Financing Costs | - | - | - | - | - | - | - | - | - | - |
| Other (Income), incl. realized (gains)/losses | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) |
| **Total Other and non-cash** | $ 5,523,510 | $ 5,661,137 | $ 5,505,845 | $ 4,627,050 | $ 4,777,933 | $ 4,981,882 | $ 5,505,845 | $ 4,627,050 | $ 4,777,933 | $ 4,981,882 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Income** | $ 46,016,078 | $ 59,879,842 | $ 75,846,250 | $ 94,860,939 | $ 115,589,573 | $ 139,035,381 | $ 155,798,376 | $ 175,727,356 | $ 196,567,058 | $ 219,488,999 |
| | | | | | | | | | | |
| Interest expense (incl. Financing Cost amort.) | 1,354,715 | 1,347,662 | 1,047,219 | 62,562 | 56,248 | 49,194 | 1,047,219 | 62,562 | 56,248 | 49,194 |
| Provision for (benefit from) income taxes | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 | 51,206 |
| Depreciation and amortization | $ 4,294,589 | $ 4,439,269 | $ 4,584,420 | $ 4,690,282 | $ 4,847,479 | $ 5,058,482 | $ 4,584,420 | $ 4,690,282 | $ 4,847,479 | $ 5,058,482 |
| EBITDA (non-GAAP) - S-4 definition | $ 51,716,588 | $ 63,667,979 | $ 79,179,095 | $ 97,314,989 | $ 118,194,506 | $ 141,844,264 | $ 159,131,221 | $ 178,181,406 | $ 199,171,991 | $ 222,297,881 |
| Share-based compensation | 1,567,913 | 1,621,584 | 1,656,335 | 1,711,153 | 1,766,641 | 1,822,839 | 1,656,335 | 1,711,153 | 1,766,641 | 1,822,839 |
| Other (income) expense | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) | (177,000) |
| **Adjusted EBITDA (non-GAAP)** | $ 53,107,501 | $ 65,112,563 | $ 80,658,430 | $ 98,849,143 | $ 119,784,147 | $ 143,490,103 | $ 160,610,556 | $ 179,715,560 | $ 200,761,631 | $ 223,943,721 |

* Financial results are unaudited, and subject to further review and adjustments. Some transactions have been backdated to correspond to periods in which those transactions occurred.
* EBITDA is equivalent to GAAP Operating Income (Loss)
* EBITDAM in a non-GAAP metric

**Page 122**



**Catona Climate Year End Review:**

**Section 4: Historic Operating Results**

Catona has successfully executed on an evolution from an unprofitable consumer fintech business (formerly known as Aspiration) to a prosperous producer and enterprise provider of high quality carbon removal credits.

**Catona Climate - Income Statement**
*(Currency in U.S. Dollars, thousands)*

FYE 12/31,

| Income Statement | Mar-19 | Jun-19 | Sep-19 | Dec-19 | Mar-20 | Jun-20 | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enterprise Sustainability Services | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 638 | $ 6,215 | $ 13,151 | $ 14,320 | $ 22,953 | $ 38,832 | $ 62,840 | $ 115,382 | $ 127,314 |
| Interchange - Depository | 375 | 865 | 1,155 | 1,163 | 1,101 | 1,229 | 1,370 | 1,350 | 1,591 | 2,138 | 1,895 | 1,827 | 1,882 | 1,932 | 1,869 | 1,985 |
| Interest Income | 435 | 1,041 | 1,289 | 1,083 | 880 | 177 | 857 | 1,152 | 1,133 | 1,099 | 1,097 | 1,113 | 204 | 436 | 1,886 | 2,075 |
| Consumer Subscription | 345 | 511 | 525 | 538 | 552 | 630 | 749 | 942 | 1,434 | 1,847 | 1,925 | 1,890 | 1,916 | 1,787 | 1,559 | 1,577 |
| Consumer Sustainability | - | - | - | - | 17 | 370 | 545 | 1,279 | 1,800 | 3,394 | 4,012 | 5,322 | 1,478 | 875 | 930 | 922 |
| Product Partnerships | - | - | - | 80 | 126 | 420 | 140 | 113 | 139 | 809 | 4,021 | 5,353 | 5,345 | 5,365 | 102 | 104 |
| Credit Card | - | - | - | - | - | - | - | - | - | - | 5 | 82 | 199 | 228 | 261 | 257 |
| Other Revenue | 2 | 1 | 0 | 10 | 75 | 1 | 0 | 0 | 51 | 0 | 0 | 0 | | | | |
| **Revenue** | **$ 1,157** | **$ 2,418** | **$ 2,970** | **$ 2,874** | **$ 2,752** | **$ 2,827** | **$ 3,661** | **$ 5,474** | **$ 12,363** | **$ 22,439** | **$ 27,274** | **$ 38,539** | **$ 49,855** | **$ 73,462** | **$ 121,989** | **$ 134,233** |
| Enterprise Carbon Credits | | | | | | | | | | | | | | | $ 12,944 | $ 21,364 |
| Enterprise Tree-Planting and Other Expense | | | | | | | | | | | | | | | 13,674 | 15,889 |
| Enterprise Sustainability Services | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 100 | $ 622 | $ 1,546 | $ 1,904 | $ 3,110 | $ 5,555 | $ 25,229 | $ 26,618 | $ 37,253 |
| Service Fees | 648 | 1,517 | 1,234 | 1,217 | 1,500 | 1,390 | 1,488 | 1,777 | 1,996 | 2,447 | 2,657 | 2,517 | 2,750 | 3,038 | 2,673 | 2,878 |
| Interchange expense | 109 | 515 | 379 | 250 | 289 | 147 | 129 | 141 | 114 | 141 | 156 | 54 | 70 | 46 | (88) | (94) |
| Customer sustainability services expense | - | - | - | - | 4 | 183 | 189 | 210 | 402 | 684 | 729 | 525 | 413 | 316 | 333 | 347 |
| ATM Network | 284 | 442 | 703 | 550 | 445 | 75 | 72 | 71 | 72 | 90 | 94 | 82 | 83 | 133 | 121 | 125 |
| Interest Expense | 261 | 473 | 572 | 384 | 291 | 26 | 29 | 33 | 36 | 48 | 46 | 251 | 301 | 393 | 403 | 403 |
| Subscription expense | 31 | 48 | 53 | 54 | 54 | 71 | 69 | 93 | 137 | 217 | 157 | 269 | 266 | 222 | 155 | 161 |
| Product Partnership Expense | - | - | - | - | - | - | - | 55 | 13 | 21 | 4 | 6 | 6 | 8 | 7 | 7 |
| Credit Card Expenses | - | - | - | - | - | - | - | - | - | - | - | 3 | 55 | 5 | 46 | 48 | 48 |
| Other Expenses | 2 | 31 | - | - | - | - | 1 | 60 | | | | | | | | |
| **Cost of Revenue** | **$ 1,334** | **$ 3,027** | **$ 2,940** | **$ 2,455** | **$ 2,583** | **$ 1,892** | **$ 1,977** | **$ 2,540** | **$ 3,391** | **$ 5,195** | **$ 5,750** | **$ 6,869** | **$ 9,450** | **$ 29,432** | **$ 30,271** | **$ 41,128** |
| **Gross Profit** | **$ (177)** | **$ (608)** | **$ 30** | **$ 419** | **$ 169** | **$ 935** | **$ 1,684** | **$ 2,934** | **$ 8,972** | **$ 17,244** | **$ 21,524** | **$ 31,670** | **$ 40,405** | **$ 44,031** | **$ 91,718** | **$ 93,105** |
| *% Margin* | *(15.3)%* | *(25.2)%* | *1.0%* | *14.6%* | *6.1%* | *33.1%* | *46.0%* | *53.6%* | *72.6%* | *76.8%* | *78.9%* | *82.2%* | *81.0%* | *59.9%* | *75.2%* | *69.4%* |
| Employee Stock-Based Compensation | - | - | - | - | - | - | - | - | - | - | - | - | 499 | 444 | 495 | $ 382 |
| Compensation & Benefits | - | - | - | - | - | - | - | - | - | - | - | - | 9,416 | 10,388 | 14,400 | $ 15,637 |
| Professional Services | - | - | - | - | - | - | - | - | - | - | - | - | 132,738 | 6,802 | 19,443 | 19,283 |
| Software | - | - | - | - | - | - | - | - | - | - | - | - | 3,485 | 3,759 | 3,355 | 3,413 |
| Hosting | - | - | - | - | - | - | - | - | - | - | - | - | 281 | 278 | 228 | 230 |
| Nottingham Fund | - | - | - | - | - | - | - | - | - | - | - | - | 121 | 122 | 104 | 105 |
| Bad Debt/Chargebacks/Fraud/Disputes | - | - | - | - | - | - | - | - | - | - | - | - | 3,336 | 1,448 | 10,992 | 10,465 |
| Legal | - | - | - | - | - | - | - | - | - | - | - | - | 1,186 | 1,357 | 1,964 | 2,600 |
| Rent & Utilities | - | - | - | - | - | - | - | - | - | - | - | - | 188 | 184 | 42 | 42 |
| Other G&A | - | - | - | - | - | - | - | - | - | - | - | - | 1,407 | 1,492 | 1,266 | 1,207 |
| **Total G&A** | **$ 9,505** | **$ 13,301** | **$ 16,658** | **$ 10,470** | **$ 8,478** | **$ 7,458** | **$ 14,082** | **$ 17,093** | **$ 12,333** | **$ 54,823** | **$ 19,999** | **$ 33,323** | **$ 152,656** | **$ 26,275** | **$ 52,288** | **$ 53,364** |
| Acquisition | | | | | | | | | | | | | $ 23,083 | $ 12,901 | $ 6,973 | $ 2,998 |
| Promotions | | | | | | | | | | | | | 1,653 | 1,488 | 183 | 205 |
| Brand Marketing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,935 | 7,460 |
| Sponsorship | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 7,084 | 10,382 |
| Brand & Sponsorship | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 4,972 | $ 6,527 | $ 13,019 | $ 17,842 |
| **Total Marketing** | **$ 16,019** | **$ 18,468** | **$ 2,023** | **$ 440** | **$ 646** | **$ 3,763** | **$ 5,339** | **$ 12,359** | **$ 24,563** | **$ 34,526** | **$ 22,310** | **$ 41,030** | **$ 29,707** | **$ 20,917** | **$ 20,174** | **$ 21,045** |
| **EBITDA (unadjusted)** | **$ (25,702)** | **$ (32,378)** | **$ (18,651)** | **$ (10,491)** | **$ (8,955)** | **$ (10,286)** | **$ (17,737)** | **$ (26,518)** | **$ (27,923)** | **$ (72,106)** | **$ (20,785)** | **$ (42,684)** | **$ (141,958)** | **$ (3,161)** | **$ 19,255** | **$ 18,697** |
| Depreciation & Amortization | $ 404 | $ 472 | $ 534 | $ 587 | $ 635 | $ 678 | $ 722 | $ 768 | $ 842 | $ 941 | $ 1,093 | $ 1,924 | $ 2,409 | $ 2,928 | $ 2,843 | $ 2,843 |
| Income Tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes Other than Income Tax | - | - | - | - | - | - | - | - | - | - | - | - | 96 | 51 | 63 | 63 |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - | - | 895 | 1,375 | 1,429 | 1,429 |
| Other Expense (Income) - Carbon Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (63) |
| Other Expenses (Interest Expense) | 352 | 892 | 929 | 761 | 519 | 65 | 166 | 162 | 978 | 4,128 | 2,139 | 1,432 | 483 | - | - | - |
| Amortization of OID and Financing Costs | - | - | - | - | - | - | - | - | - | - | - | - | 5 | 8 | 9 | - |
| Other Expense (Income), incl. realized (gains)/losses | (442) | (16) | (10) | 281 | (12) | (329) | (489) | (324) | (171) | (386) | 32,110 | 8,833 | (46) | (177) | 2,048 | 2,119 |
| **Total Other and non-cash** | **$ 314** | **$ 1,348** | **$ 1,453** | **$ 1,628** | **$ 1,141** | **$ 413** | **$ 398** | **$ 606** | **$ 1,650** | **$ 4,683** | **$ 35,342** | **$ 12,189** | **$ 3,843** | **$ 4,185** | **$ 6,392** | **$ 6,392** |
| **Net Income** | **$ (26,016)** | **$ (33,727)** | **$ (20,104)** | **$ (12,119)** | **$ (10,097)** | **$ (10,700)** | **$ (18,135)** | **$ (27,124)** | **$ (29,573)** | **$ (76,788)** | **$ (56,127)** | **$ (54,873)** | **$ (145,801)** | **$ (7,347)** | **$ 12,864** | **$ 12,305** |
| Interest expense (incl. Financing Cost amort.) | $ 352 | $ 892 | $ 929 | $ 761 | $ 519 | $ 65 | $ 166 | $ 162 | $ 978 | $ 4,128 | $ 2,139 | $ 1,432 | $ 1,384 | $ 1,383 | $ 1,429 | $ 1,384 |
| Provision for (benefit from) income taxes | - | - | - | - | - | - | - | - | - | - | - | - | 96 | 51 | - | - |
| Depreciation and amortization | 404 | 472 | 534 | 587 | 635 | 678 | 722 | 768 | 842 | 941 | 1,093 | 1,924 | 2,414 | 2,936 | 2,843 | 4,101 |
| **EBITDA (non-GAAP) - S-4 definition** | **$ (25,259)** | **$ (32,362)** | **$ (18,641)** | **$ (10,772)** | **$ (8,943)** | **$ (9,958)** | **$ (17,247)** | **$ (26,194)** | **$ (27,753)** | **$ (71,720)** | **$ (52,895)** | **$ (51,517)** | **$ (141,907)** | **$ (2,976)** | **$ 17,136** | **$ 17,790** |

**Page 125**



CATONA CLIMATE CONFIDENTIAL & PROPRIETARY



# Our Tech-driven Approach to Carbon Project Monitoring

Catona Climate utilizes a variety of cutting-edge technology and data solutions to enable robust remote project monitoring and measurement, alongside our on-site monitoring activities. We've curated a set of geospatial data and remote sensing tools that enable us to track habitat and vegetation changes, climatic trends, carbon biomass estimates, and risk detection across all sites in our carbon portfolio. All tools are selected or developed to improve the efficiency, accuracy and transparency of data collection, analysis and reporting, and are integrated into our cohesive monitoring ecosystem. Ultimately, we want to ensure project integrity and achieve maximum climate, environmental and community impact.

Below is an overview of our (1) strategic technology partnerships related to carbon project monitoring and measurement and (2) internal geographic information system (GIS) capabilities paired with external datasets.

## I. Strategic Technology Partnerships

- → **Rainforest Connection (RFCx)**
    - ◆ Catona utilizes RFCx technology to monitor and measure ecosystem biodiversity impacts of our projects. The tech allows us to monitor 100 species with a focus on threatened, endangered and endemic species.
    - ◆ In collaboration with RFCx, we are deploying the world's first scalable monitoring system for protecting and studying biodiversity in remote ecosystems through bioacoustic monitoring devices, artificial intelligence trained by expert biologists, and a cloud-based platform for automated analysis.
- → **Planet Labs**
    - ◆ Planet Labs is a leading supplier of satellite imagery captured at sub-km resolution.
    - ◆ With access to 3m resolution imagery over current and future project areas, we leverage this data to produce Normalized Difference Vegetation Index (NDVI) maps to track vegetation change and identify nearby hazards such as illegal deforestation and illegal road development.
- → **Chloris Geospatial**
    - ◆ Chloris uses cutting-edge remote sensing and AI to measure biomass changes and carbon stock gains and losses.
    - ◆ With access to historical 30m biomass and carbon stock data for all project sites back to 2000 and yearly 10m biomass and carbon stock data from 2023 onwards, we leverage this data to monitor biomass changes across our projects.
- → **Meta**

1

**Page 127**

◆ Catona Climate and Meta are collaborating on the development of a forest canopy height model. The resulting dataset will enable improved carbon project risk analysis, leakage monitoring, vegetation growth comparisons, and climate impact assessment.

◆ Meta is developing canopy height maps using Maxar imagery and other imagery where available. Catona is validating and calibrating the canopy height dataset by providing ground imagery, ground truth measurements, field observations and project documentation to expand available calibration datasets for Meta and aid in quantitative and qualitative model validation workflows.

## II. Internal GIS Capabilities Paired with External Datasets

We utilize geospatial and scientific analysis throughout the carbon project lifecycle to ensure community and environmental impact. We synthesize an array of data sources together to understand how projects function and work in the landscape. These datasets, in combination with partner data, enable the following:

➔ Thorough evaluation of historical, present and future trends to ensure project additionality and permanence
➔ Creation of origination reports to communicate due diligence practices to stakeholders and aid project developers in creating monitoring, engagement and reporting practices.
➔ Creation of internal and external monitoring reports evaluating quarterly hazards, project activities, and environmental change
➔ Creation of potential leakage and hazard event reports to transparently communicate project variation and risks
➔ Yearly tracking of GHG emissions to identify potential variations in project crediting schedules
➔ Creation of project dashboards to provide key project metrics

*Key Internal Toolsets*

➔ ESRI Software Package
  ◆ ESRI is the premier provider of geospatial software solutions providing mapping, analytics and data presentation tools to enable robust analysis and visualization.
  ◆ ArcGIS Pro is the primary tool used for analysis. We combine data provided directly by our project partners with open-source scientific datasets, data from the ESRI Living Atlas, and proprietary data layers. We also directly integrate satellite imagery to track project evolution.
  ◆ ArcGIS Online is a cloud hosted ecosystem for data storage, data portals and data visualization. This is used to provide access to data analysis portals for the Carbon Team, generate project dashboards to track change, and generate data visualizations.
➔ Python

2

**Page 128**

◆ Workflows for ArcGIS Pro analysis and external data integration are coded in python drawing on the academic background provided by the Catona Climate Lead Geospatial Scientist.
◆ ESRI provides direct integration with python through its ArcPy module.
◆ Using python to automate and process data provides the most seamless way to integrate cutting-edge data provided by the scientific community that is commonly distributed through NetCDF, GeoTIFF, and HDF5 formats.

*External Geospatial Datasets*

Integration of external datasets is primarily categorized into climate, environment, hazard, and community variables. Below we outline some key datasets used for our day-to-day monitoring activities and how they support our workflow. We also utilize a large amount of country and region-specific datasets not included in the tables below.

**Climate**

| Data Variable | Datasets Used | Use within M&E Workflow |
|---|---|---|
| Precipitation | Automatic Weather Station (AWS) Data | Used to analyze historical and current trends at discrete local points |
| | Gridded Model data from NASA GLDAS[1] and CHIRPS[2] | Used to evaluate historical and current precipitation trends across project areas |
| | CMIP6[3] | Used to predict future precipitation patterns over project areas aligned with IPCC scenarios |
| Temperature | Automatic Weather Station (AWS) Data | Used to analyze historical and current trends at discrete local points |
| | ECMWF ERA5 Model[4] | This is a comprehensive reanalysis model used to look at historical temperature |

---

[1] https://www.arcgis.com/home/item.html?id=d9f5a81ae364451ca62ffab775527ab4

[2] https://data.chc.ucsb.edu/products/CHIRPS-2.0/

[3] Eyring, Veronika, Bony, Sandrine, Meehl, Gerald A., Senior, Catherine A., Stevens, Bjorn, Stouffer, Ronald J., Taylor, Karl E., 2016: Overview of the Coupled Model Intercomparison Project Phase 6 (CMIP6) experimental design and organization. Geoscientific Model Development, 9, 1937-1958, doi:10.5194/gmd-9-1937-2016.

[4] Hersbach H, Bell B, Berrisford P, et al. The ERA5 global reanalysis. Q J R Meteorol Soc. 2020; 146: 1999–2049. https://doi.org/10.1002/qj.3803

3

| | | variations |
|---|---|---|
| | CMIP6[3] | Used to predict future temperature trends over project areas aligned with IPCC scenarios |
| Evapotranspiration | GLDAS Evapotranspiration[5] | This is used primarily within our soil organic carbon projects in direct relation to the use of evapotranspiration in the VM0026 methodology |
| Greenhouse Gas Changes | We use a combination of publicly available[6] and proprietary data from Chloris Geospatial (see more information on this partnership below) | Understand historical trends in greenhouse gas fluxes for origination and yearly updates of GHG fluxes over project sites |
| Extreme Meteorological Events | We look at storm datasets and predictions from NOAA[7]  and ENSO predictions[8] | Evaluate historical trends in storm pathways to evaluate risk, monitor currently active storms, understand potential changes caused by ENSO events and how this will impact project activities |

**Environment**

| Data Variable | Datasets Used | Use within M&E Workflow |
|---|---|---|
| Land Classification | Sentinel-2 Land Cover Dataset[9] | Yearly maps of land classification are used to track change within, and close to project sites. This includes urban expansion, deforestation and cropland conversion. |

---

[5] https://www.arcgis.com/home/item.html?id=23605c21c353454892978587d1b3d8bb

[6] Harris et al. (2021). Global maps of 21st century forest carbon fluxes.

[7] https://www.ncdc.noaa.gov/stormevents/

[8] https://www.cpc.ncep.noaa.gov/products/analysis_monitoring/enso_advisory/ensodisc.shtml

[9] Karra, K. C. Kontgis, Z. Statman-Weil, J. C. Mazzariello, M. Mathis and S. P. Brumby, "Global land use / land cover with Sentinel 2 and deep learning," 2021 IEEE International Geoscience and Remote Sensing Symposium IGARSS, Brussels, Belgium, 2021, pp. 4704-4707, doi: 10.1109/IGARSS47720.2021.9553499.

4

**Page 130**

| | ESA Global Land Cover Time Series Dataset[10] | This dataset goes back to 2000 allowing a historical look at land patterns. |
|---|---|---|
| Forest & Vegetation Change | Forest Cover Maps accessed through Global Forest Watch[11] and Chloris Geospatial partnership (see below) | Track historical and current deforestation trends around projects |
| | Vegetation vigor NDVI change maps using planet partnership | Evaluate vegetation change at quarterly cadence |
| | Integrated deforestation alerts[12] | Live locations of deforestation to evaluate risk |
| Biomass changes | Proprietary data from Chloris Geospatial (see below) and NASA GEDI data[13] | Evaluate yearly changes in project biomass to track progress relative to historical baseline |
| Soil Classification and Organic Carbon | USDA SSURGO Data[14] (within the USA), soilgrids.org[15] | Understand soil characteristics to guide implementation of practices where appropriate |
| Biodiversity | Bioacoustic monitoring data from Rainforest Connection partnership, biodiversity surveys conducted by project developers. | Track improvements in biodiversity as a result of project activities |

**Hazards**

| Data Variable | Datasets Used | Use within M&E Workflow |
|---|---|---|
| Fires | Historical Fires[16] | Understand historical risk and causes of fires to inform project practices |

---

[10] ESA. Land Cover CCI Product User Guide Version 2. Tech. Rep. (2017). Available at: maps.elie.ucl.ac.be/CCI/viewer/download/ESACCI-LC-Ph2-PUGv2_2.0.pdf

[11] Hansen, M. C., P. V. Potapov, R. Moore, M. Hancher, S. A. Turubanova, A. Tyukavina, D. Thau, S. V. Stehman, S. J. Goetz, T. R. Loveland, A. Kommareddy, A. Egorov, L. Chini, C. O. Justice, and J. R. G. Townshend. 2013. "High-Resolution Global Maps of 21st-Century Forest Cover Change." Science 342 (15 November): 850–53. Data available on-line from: https://glad.umd.edu/dataset/global-2010-tree-cover-30-m.

[12] "Integrated Deforestation Alerts". UMD/GLAD and WUR, accessed through Global Forest Watch

[13] https://daac.ornl.gov/GEDI/guides/GEDI_L4B_Gridded_Biomass.html

[14] https://www.nrcs.usda.gov/resources/data-and-reports/soil-survey-geographic-database-ssurgo

[15] Batjes, N. H., Ribeiro, E., and van Oostrum, A.: Standardised soil profile data to support global mapping and modelling (WoSIS snapshot 2019), Earth Syst. Sci. Data, 12, 299–320, https://doi.org/10.5194/essd-12-299-2020, 2020.

[16] https://firms.modaps.eosdis.nasa.gov/map/

5

**Page 131**

| | Active Fires from NASA VIIRS and MODIS [16][17] | Live identification of fire hazards over project areas |
|---|---|---|
| | Future Fire Risk (USA)[18] | Used to understand potential future mitigation methods required |
| Drought | Historical and current drought conditions from a variety of sources[19] [20][21][22] | Impact of drought on project progress |
| | Future drought risk from NOAA[23] | Understanding potential variations project practices for potential drought season |
| Flooding and Sea Level Change | Coastal flooding and future predictions[24][25] | Evaluate long term risk in coastal projects and permanence |
| Famine Risk | Evaluation of famine risk[26] | Holistic synthesis of impact of a variety of metrics on famine |
| Crop Risk | Synthesis of data to evaluate specific impacts on crops | Understanding potential variations project practices due to crop risk |

**Community**

| Data Variable | Datasets Used | Use within M&E Workflow |
|---|---|---|
| Key Protected Regions | Protected Areas[27] | Ensure projects are not in protected areas unless specifically outlined in project documents |

---

[17] https://www.maaproject.org/fires-dashboard/

[18] https://hazards.fema.gov/nri/map

[19] https://edo.jrc.ec.europa.eu/gdo/php/index.php?id=2020

[20] https://gdis-noaa.hub.arcgis.com/pages/drought-monitoring

[21] https://www.drought.gov/international

[22] https://www.ncei.noaa.gov/access/monitoring/monthly-report/global-drought/202309

[23] https://gdis-noaa.hub.arcgis.com/pages/drought-forecasting

[24] https://bit.ly/40HOSMo

[25] https://sealevel.nasa.gov/ipcc-ar6-sea-level-projection-tool

[26] https://fews.net/

[27] IUCN and UNEP-WCMC (2022), The World Database on Protected Areas (WDPA) [On-line], Cambridge, UK: UNEP-WCMC. Available at: www.protectedplanet.net. Accessed through Global Forest Watch

6

**Page 132**

|  | Indigenous and Community Lands[28] | Ensure projects do not illegally encroach on community lands or if projects are on these lands that are managed by local communities |
|---|---|---|
|  | Biodiversity Hotspots[29] | Identify key species to guide future biodiversity project activities |
| Demographics | ESRI data[30] [31] | Data to understand socio economic environment of project area and track change during project lifetime |
|  | Local census data | Used in tandem with regional datasets to understand impact of project activities |
|  | Project reporting variables | Data is provided directly by project developers to Catona Climate |

[28] LandMark, 2021. "Indigenous and Community Lands." www.landmarkmap.org. Accessed through Global Forest Watch

[29] https://www.cepf.net/node/1996

[30] https://doc.arcgis.com/en/esri-demographics/latest/reference/michael-bauer.htm

[31] https://doc.arcgis.com/en/esri-demographics/latest/get-started/us-data-fact-sheet.htm

7

**EXHIBIT B**

API
Cash Flow Statement
2Q23

|  |  | 2023-06-30 |
|---|---|---|
| **Cash & Equivalents, Beginning of period** | $ | 147,696,551 |
| **Operating Activities** |  |  |
| Net Income | $ | 43,237,500 |
|  |  |  |
| Add: Depreciation/Amortization |  | 3,942,000 |
| Add: Amortization of debt costs |  |  |
| Add: Amortization of preferred OID |  |  |
|  |  |  |
| Add: Stock Based Compensation |  | 426,000 |
|  |  |  |
| Accounts Receivables |  | 1,002,418 |
| Inventory (Carbon Credits) |  | (2,942,956) |
| Prepaid Assets |  | (8,068,900) |
| Other Current Assets |  | (299,551) |
| Lease Liability |  | (91,742) |
| Accounts Payable |  | 461,502 |
| Accrued Expenses |  | 49,829 |
| **Net cash provided by (used in) operating activities** | $ | 37,716,100 |
|  |  |  |
| **Investing Activities** |  |  |
| Fixed Assets, Gross |  | (4,183,199) |
| Other Assets |  |  |
| Sale of Investment in Securities |  |  |
| **Net cash provided by (used in) investing activities** | $ | (4,183,199) |
|  |  |  |
| **Financing Activities** |  |  |
|  |  |  |
| Receipts from Convertible Note C |  |  |
| Receipts from Equity Series A,B, C and X |  |  |
|  |  |  |
| InterPrivate Trust and PIPE, Net of Fees |  |  |
| Term Loan Given |  |  |
| Principal payment of long-term debt |  |  |
| Loan Derivative |  |  |
| Other |  |  |
| Long-term debt issued |  |  |
| **Net cash provided by (used in) financing activities** |  | - |
| **Net increase (decrease) in cash** |  | 33,532,901 |
|  |  |  |
| **Cash & Equivalents, End of Period** | $ | 181,229,452 |

Aspiration Partners Inc
Balance Sheet
2Q23

| | | 2023-06-30 |
|---|---|---|
| **Assets** | | |
| | | |
| Cash & Equivalents | $ | 181,229,452 |
| Receivables | | 52,710,509 |
| Inventory | | 56,757,332 |
| Prepaid Assets | | 84,000,227 |
| Other Current Assets | | 10,448,048 |
| **Total Current Assets** | | **385,145,569** |
| Fixed Assets, Net | | 59,115,700 |
| Other Assets | | 3,011,873 |
| **Total Assets** | | **447,273,142** |
| | | |
| **Liabilities & Equity** | | |
| | | |
| Accounts Payable | | 45,520,958 |
| Accrued Expenses | | 20,198,519 |
| Lease Liability | | 2,006,747 |
| Term Loan | | 71,138,322 |
| Loan Derivative | | 42,476,000 |
| Convertible Notes | | |
| **Total Liabilities** | | **181,340,546** |
| | | |
| **Total Shareholders Equity** | | **265,932,596** |
| | | |
| **Total Liabilities & Equity** | $ | **447,273,142** |

API
Operating Results
2Q23

|  | 2023-06-30 |
|---|---|
| Enterprise Sustainability Services | $ 153,892,321 |
| Interchange Depository | 2,105,292 |
| Interest Income | 2,538,002 |
| Consumer Subscription | 1,622,031 |
| Consumer Sustainability | 950,582 |
| Product Partnerships | 117,930 |
| Credit Card | 103,511 |
| Other Revenue | - |
| **Revenue** | $ 161,329,669 |
| | |
| Enterprise Carbon Credits | $ 26,487,000 |
| Enterprise Tree Planting and Other Expense | 23,283,000 |
| Enterprise Sustainability Services | $ 49,770,000 |
| | |
| Service Fees | 3,041,128 |
| Interchange expense | (98,004) |
| Customer sustainability services expense | 339,369 |
| ATM Network | 115,073 |
| Interest Expense | 418,144 |
| Subscription expense | 168,895 |
| Product Partnership Expense | 7,564 |
| Credit Card Expenses | 25,000 |
| Other Expenses | - |
| | - |
| **Cost of Revenue** | 53,787,169 |
| | |
| **Gross Profit** | $ 107,542,500 |
| *% Margin* | 66.7% |
| | |
| Employee Stock-Based Compensation | $ 426,000 |
| Compensation & Benefits | 11,735,968 |
| Professional Services | 6,483,192 |
| Software | 3,754,083 |
| Hosting | 246,132 |
| Nottingham Fund | 106,710 |
| Bad Debt/Chargebacks/Fraud/Disputes | 5,145,502 |
| Legal | 3,147,494 |
| Rent & Utilities | 46,000 |
| Other G&A | 4,271,000 |
| | |
| **Total G&A** | $ 35,362,081 |

| | |
|---|---:|
| Acquisition | 2,813,919 |
| Promotions | 109,381 |
| | |
| Brand Marketing | 8,271,000 |
| Sponsorship | 11,583,114 |
| Brand & Sponsorship | 19,854,114 |
| | |
| **Total Marketing** | 22,777,414 |

| | |
|---|---:|
| **EBITDA (unadjusted)** | $ 49,403,005 |
| | |
| Depreciation & Amortization | 3,942,000 |
| Income Tax | - |
| Taxes Other than Income Tax | 86,000 |
| Interest Expense | 1,357,544 |
| Other Expense (Income) · Carbon Sales | (190,544) |
| Other Expenses (Interest Expense) | - |
| Amortization of OID and Financing Costs | - |
| Other Expense (Income), incl. realized (gains)/losses | 970,505 |
| **Total Other and non-cash** | 6,165,505 |

| | |
|---|---:|
| **Net Income** | $ 43,237,500 |
| | |
| Interest expense (incl. Financing Cost amort.) | 1,357,000 |
| Provision for (benefit from) income taxes | - |
| Depreciation and amortization | 3,942,000 |
| **EBITDA (non-GAAP) - S-4 definition** | $ 48,536,500 |
| | |
| Share-based compensation | $ 426,000 |
| Severance expenses | 3,677,422 |
| Other (income) expense | 688,297 |
| **Adjusted EBITDA (non-GAAP)** | $ 53,328,219 |